**The relief described hereinbelow is SO ORDERED.**

**Signed August 09, 2019.**



_____
**Ronald B. King**
**Chief United States Bankruptcy Judge**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| A'GACI, L.L.C.,[1] | ) | Case No.: 19-51919 |
| | ) | |
| _Debtor._ | ) | |
| | ) | |

**INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364 AND 507
(I) APPROVING POSTPETITION FINANCING, (II) AUTHORIZING
USE OF CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING
SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING
ADEQUATE PROTECTION, (V) MODIFYING AUTOMATIC STAY, (VI) GRANTING
RELATED RELIEF, AND (VII) SCHEDULING A FINAL HEARING**

THIS MATTER having come before the Court upon the motion (the "**DIP Motion**") by A'GACI, L.L.C., a Texas limited liability company (the "**Borrower**"), as a debtor

---

[1] The last four digits of the Debtor's federal tax identification number are 9604.

and debtor in possession (the "**Debtor**") in the above-captioned chapter 11 case (the "**Case**"), pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d), and 507 of Title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), seeking entry of an interim order (this "**Interim Order**") *inter alia*:

(i)     authorizing the Debtor to obtain, as Borrower, secured, superpriority postpetition financing (the "**DIP Facility**"), consisting of a senior secured super-priority revolving credit facility, pursuant to the terms and conditions of that certain Debtor-In-Possession Credit Agreement (as amended, supplemented, restated, or otherwise modified from time to time, the "**DIP Credit Agreement**") by among the Debtor, the Lenders party thereto (the "**DIP Lenders**" and each a "**DIP Lender**"), and Second Avenue Capital Partners, LLC, as Administrative Agent and Collateral Agent (the "**DIP Agent**") for the DIP Lenders, substantially in the form of **Exhibit A** to this Interim Order;

(ii)    authorizing the Debtor to execute and deliver the DIP Credit Agreement and all other related documents and agreements, including (without limitation) security agreements, deposit account control agreements, pledge agreements, guaranties and promissory notes (collectively, the "**DIP Loan Documents**") and to perform such other acts as may be necessary or desirable in connection with the DIP Loan Documents;[2]

(iii)   granting allowed superpriority administrative expense claim status in the Case and any Successor Cases (as defined herein) to all obligations owing under the DIP Credit Agreement and the other DIP Loan Documents to the DIP Agent (collectively, and including all "Obligations" as described in the DIP Credit Agreement, the "**DIP Obligations**"), subject to the priorities set forth herein;

(iv)    authorizing the Debtor to use, in accordance with the Approved Budget (as defined below), "Cash Collateral," as defined in section 363(a) of the Bankruptcy Code, that the Debtor is holding or may obtain, pursuant to sections 361 and 363 of the Bankruptcy Code and Bankruptcy Rules 4001(b) and 6004;

(v)     granting to the DIP Agent automatically perfected security interests in and liens on all of the DIP Collateral (as defined herein), including, without limitation, all property constituting Cash Collateral (other than cash in

---

[2]     Capitalized terms used but not defined have the meanings given to them in the DIP Loan Documents.

Excluded Accounts (as defined in the DIP Credit Agreement)), which liens shall be subject to the priorities set forth herein;

(vi)     authorizing and directing the Debtor to pay the principal, interest, fees, expenses and other amounts payable under each of the DIP Loan Documents as they become due, including, without limitation, commitment or unused line fees, closing fees, maintenance fees and exit fees, the reasonable fees and disbursements of the DIP Agent's attorneys, advisers, accountants, and other consultants, and all related expenses of the DIP Agent, all to the extent provided by and in accordance with the terms of the respective DIP Loan Documents and this Interim Order;

(vii)    authorizing and directing the Debtor to pay in full the remaining amounts of the Prepetition Obligations (as defined herein) upon entry of the Final Order (as defined herein) and as set forth herein, subject to the rights of parties in interest described in paragraphs 36 and 37 of this Interim Order;

(viii)   providing adequate protection to the Prepetition Secured Creditors (as defined herein) to the extent set forth herein;

(ix)     modifying the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and this Interim Order;

(x)      granting related relief; and

(xi)     scheduling a final hearing (the "**Final Hearing**") to consider the relief requested in the DIP Motion and approving the form of notice with respect to the Final Hearing.

The Court having considered the DIP Motion, the *Declaration of Thomas J. Lynch in Support of Debtor's Motion Seeking Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507 (I) Approving Postpetition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Granting Related Relief, and (VII) Scheduling a Final Hearing*, the *Declaration of Thomas J. Lynch in Support of the Debtor's Chapter 11 Petition and First Day Motions*, including the DIP Motion, the exhibits attached thereto, the DIP Loan Documents, and the evidence submitted or adduced and the arguments of counsel made at the interim hearing held on

the DIP Motion (the "**Interim Hearing**"); and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 4001(b), (c) and (d), 9014; and the Interim Hearing to consider the interim relief requested in the DIP Motion having been held and concluded; and all objections, if any, to the interim relief requested in the DIP Motion having been withdrawn, resolved or overruled by the Court; and it appearing to the Court that, pursuant to Bankruptcy Rule 4001(c)(2), granting the interim relief requested is necessary to avoid immediate and irreparable harm to the Debtor and its estate pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtor, its estate, and its creditors and equity holders, and is essential for the continued operation of the Debtor's businesses; and after due deliberation and consideration, and for good and sufficient cause appearing therefor;

BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING BY THE DEBTOR, INCLUDING THE SUBMISSION OF DECLARATIONS AND THE REPRESENTATIONS OF COUNSEL, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

A. *Petition Date*. On August 7, 2019 (the "**Petition Date**"), the Debtor filed a voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Western District of Texas (the "**Court**") commencing this Case.

B. *Debtor in Possession*. The Debtor is continuing in the management and operation of its businesses and properties as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in this Case.

C. *Jurisdiction and Venue*. The Court has jurisdiction, pursuant to 28 U.S.C. §§ 157(b) and 1334, over these proceedings and over the persons and property affected hereby. Consideration of the DIP Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2).

Venue for the Case and proceedings on the DIP Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

D. *Committee Formation*. As of the date hereof, the Office of the United States Trustee (the "**U.S. Trustee**") has not yet appointed any official committee in the Case pursuant to section 1102 of the Bankruptcy Code (each, a "**Statutory Committee**").

E. *Debtor's Stipulations*. Without prejudice to the rights of parties in interest as set forth in paragraphs 36 and 37 herein, the Debtor (on behalf of and for itself) admits, stipulates, acknowledges and agrees that (collectively, paragraphs E(i) through E(v) below are referred to herein as the "**Debtor's Stipulations**"):

(i) *Prepetition Credit Documents*. As of the Petition Date, the Debtor had outstanding secured debt to Second Avenue Capital Partners, LLC (the "**Prepetition Facility**"), as administrative agent and collateral agent (in such capacity, the "**Prepetition Agent**") the lender parties thereto (collectively, together with the Prepetition Agent, the "**Prepetition Secured Creditors**" and each a "**Prepetition Secured Creditor**"), pursuant to that certain Credit Agreement dated as of August 2, 2018, by and between the Debtor and the Prepetition Agent (as amended, modified and supplemented from time to time, the "**Prepetition Credit Agreement**" and together with all related documents, instruments, guaranties and agreements, the "**Prepetition Credit Documents**").

(ii) *Prepetition Obligations*. As of the Petition Date, the aggregate outstanding principal amount owed by the Debtor under the Prepetition Credit Documents was not less than $6,099,123.62 million (collectively, together with any interest, fees (including, without limitation, any early termination and prepayment fees and closing fees owing under the DIP Facility), costs and other charges or amounts paid, incurred or accrued prior to the Petition

Date in accordance with the Prepetition Credit Documents, including all "Obligations" as described in the Prepetition Credit Agreement, and all interest, fees, costs and other charges allowable under section 506(b) of the Bankruptcy Code, the "**<u>Prepetition Obligations</u>**"). As more fully set forth in the Prepetition Credit Documents, prior to the Petition Date, the Debtor granted first-priority security interests in and liens on substantially all of the assets of the Debtor, including, without limitation, accounts, inventory, equipment and general intangibles (collectively, the "**<u>Prepetition Collateral</u>**") to the Prepetition Agent (for the ratable benefit of the Prepetition Secured Creditors) (collectively, the "**<u>Prepetition Liens</u>**") to secure repayment of the Prepetition Obligations. As of the Petition Date, the value of the Prepetition Collateral exceeds the amount of the Prepetition Obligations.

      (iii)    *Validity, Perfection and Priority of Prepetition Liens and Obligations*. The Debtor (for itself and its estate only, and without limiting the rights of other parties in interest under paragraphs 36 and 37 of this Interim Order), and the Prepetition Secured Creditors acknowledge and agree that: (a) as of the Petition Date, the Prepetition Liens on the Prepetition Collateral are valid, binding, enforceable, non-avoidable and properly perfected, (b) as of the Petition Date, the Prepetition Liens have priority over any and all other liens, if any, on the Prepetition Collateral, subject only to certain other liens otherwise permitted by the Prepetition Credit Documents (to the extent any such permitted liens were valid, binding, enforceable, properly perfected, non-avoidable and senior in priority to the Prepetition Liens as of the Petition Date, the "**<u>Prepetition Permitted Liens</u>**") and otherwise had priority over any and all other liens on the Prepetition Collateral;[3] (d) the Prepetition Obligations constitute legal, valid, binding, and

---

[3]    For purposes of this Interim Order, Prepetition Permitted Liens shall include all liens that were valid, senior, enforceable, nonavoidable, and perfected under applicable law as of the Petition Date. Nothing herein shall constitute a finding or ruling by the Court that any such Prepetition Permitted Liens are valid, senior, enforceable, perfected or non-avoidable. Moreover, nothing shall prejudice the rights of any party in interest

non-avoidable obligations of the Debtor; (e) no offsets, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the Prepetition Liens or the Prepetition Obligations exist, and no portion of the Prepetition Liens or the Prepetition Obligations is subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (whether equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (f) the Debtor and its estate have no claims, objections, challenges, causes of actions, and/or choses in action, including without limitation, avoidance claims under Chapter 5 of the Bankruptcy Code, against any of the Prepetition Secured Creditors or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors or employees arising out of, based upon or related to the Prepetition Credit Documents; and (g) without the DIP Facility, the Debtor would not anticipate sufficient liquidity from cash receipts to meet its obligations for the term contemplated under the Consulting Agreement (as defined herein).

(iv) *Cash Collateral*. All of the Debtor's cash, including the cash in its stores and deposit accounts (other than Excluded Accounts), wherever located, whether as original collateral or proceeds of other Prepetition Collateral, constitutes Cash Collateral and is Prepetition Collateral of the Prepetition Secured Creditors.

(v) *Default by the Debtor*. The Debtor is in default under the Prepetition Credit Documents.

F. <u>Continuation of Liens</u>. The Prepetition Liens, and the DIP Liens that prime the Prepetition Liens, are continuing liens, and the Prepetition Collateral and DIP Collateral are and

---

including, but not limited, to the Debtor, the DIP Agent, and any Statutory Committee to challenge the validity, priority, enforceability, seniority, avoidability, perfection or extent of any such Prepetition Permitted Lien and/or security interest. Any right or alleged right of a seller of goods to reclaim such goods under section 546(c) of the Bankruptcy Code is not a Prepetition Permitted Lien and is expressly subject to the Prepetition Liens and the DIP Liens.

will continue to be encumbered by such liens in light of the integrated nature of the DIP Facility, the DIP Loan Documents and the Prepetition Credit Documents.

G. _Findings Regarding Corporate Authority_. The Debtor has all requisite corporate power and authority to execute and deliver the DIP Loan Documents to which it is a party and to perform its obligations thereunder.

H. _Findings Regarding the Postpetition Financing_.

(i) _Request for Postpetition Financing_. The Debtor seeks authority to (a) enter into the DIP Facility on the terms described herein and in the DIP Loan Documents, (b) repay the balance of the Prepetition Obligations upon entry of the Final Order and as otherwise set forth herein, and (c) use Cash Collateral on the terms described herein to administer its Case and fund its operations. At the Final Hearing, the Debtor will seek final approval of the proposed postpetition financing arrangements and the use of Cash Collateral pursuant to a proposed final order (the "**Final Order**"), which shall be in form and substance acceptable to the DIP Agent. Notice of the Final Hearing and Final Order will be provided in accordance with this Interim Order.

(ii) _Need for Postpetition Financing and Use of Cash Collateral_. The Debtor's need to use Cash Collateral and to obtain credit pursuant to the DIP Facility is immediate and critical in order to enable the Debtor to continue operations and to administer and preserve the value of its estate. The ability of the Debtor to finance its operations, maintain business relationships, pay its employees, protect the value of its assets and otherwise finance its operations requires the availability of working capital from the DIP Facility and the use of Cash Collateral, the absence of either of which would immediately and irreparably harm the Debtor, its estate, its creditors and equity holders, and the possibility for a successful administration of

this Case. The Debtor does not have sufficient available sources of working capital and financing to operate its businesses or to maintain its properties in the ordinary course of business without the DIP Facility and authorized use of Cash Collateral.

(iii)   *No Credit Available on More Favorable Terms*.   Given its current financial condition, financing arrangements, and capital structure, the Debtor is unable to obtain financing from sources other than the DIP Agent on terms more favorable than the DIP Facility. The Debtor has been unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtor has also been unable to obtain credit: (a) having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a) and 507(b) of the Bankruptcy Code; (b) secured by a lien on property of the Debtor and its estate that is not otherwise subject to a lien; or (c) secured solely by a junior lien on property of the Debtor and its estate that is subject to a lien. Financing on a postpetition basis is not otherwise available without granting the DIP Agent (1) perfected security interests in and liens on (each as provided herein) all of the Debtor's existing and after-acquired assets with the priorities set forth herein, (2) superpriority claims, and (3) the other protections set forth in this Interim Order.

(iv)   *Use of Proceeds of the DIP Facility*.   As a condition to entry into the DIP Credit Agreement, the extensions of credit under the DIP Facility and the authorization to use Cash Collateral, the DIP Agent requires, and the Debtor has agreed, that proceeds of the DIP Facility shall be used (a) for the repayment in full in cash of the balance of the Prepetition Obligations upon entry of the Final Order (other than contingent indemnification obligations) as provided in a payoff letter to be prepared by the Prepetition Agent (the "**Payoff Letter**"), and, (b) in a manner consistent with the terms and conditions of the DIP Loan Documents and in

accordance with the budget (a copy of which is attached as **Exhibit B** hereto, as the same may be modified from time to time consistent with the terms of the DIP Loan Documents and this Interim Order, the "**Approved Budget**") , and subject to such variances as may be permitted thereby, solely for (i) post-petition operating expenses and other working capital, (ii) certain transaction fees and expenses, (iii) permitted payment of costs of administration of the Case, including professional fees to the extent permitted by the DIP Loan Documents and this Interim Order, (iv) Prepetition Agent Adequate Protection Payments (as defined herein), and (v) as otherwise permitted under the DIP Loan Documents including, without limitation, to pay certain Prepetition Indebtedness (as defined in the DIP Credit Agreement) as approved by the Bankruptcy Court. The repayment of the Prepetition Obligations as set forth herein is necessary, as the Prepetition Agent has not otherwise consented to the use of Cash Collateral or the subordination of its liens to the DIP Liens, and the DIP Agent is not willing to provide the DIP Facility unless the Prepetition Obligations (other than contingent indemnification obligations) are paid in full upon the entry of the Final Order (subject to the terms of the Payoff Letter) and as otherwise set forth herein. Such payments will not prejudice the Debtor or its estate, because payment of such amounts is subject to the rights of parties in interest under paragraphs 36 and 37 herein.

(v) *Application of Proceeds of DIP Collateral.* As a condition to entry into the DIP Loan Documents, the extension of credit under the DIP Facility, and the authorization to use Cash Collateral, the Debtor, the DIP Agent, and the Prepetition Secured Creditors have agreed that the proceeds of DIP Collateral (as defined herein) shall be applied in accordance with paragraph 20 of this Interim Order.

(vi)  *Roll-up of Prepetition Obligations into DIP Obligations.*  At the Final Hearing, the Debtor will seek a ruling that, upon entry of the Final Order, any outstanding Prepetition Obligations shall be converted into DIP Obligations (the "<u>DIP Roll-Up Loans</u>").  The Prepetition Secured Creditors would not otherwise consent to the use of their Cash Collateral or the subordination of their liens to the DIP Liens, and the DIP Agent and the DIP Lenders would not be willing to provide the DIP Facility or extend credit to the Debtor thereunder without the inclusion of the DIP Roll-Up Loans in the DIP Obligations.  Because the DIP Roll-Up Loans are subject to the reservation of rights in paragraphs 36 and 37 below, they will not prejudice the right of any party in interest.

I.  <u>*Adequate Protection*</u>.  The Debtor shall pay to the Prepetition Agent the amounts required under the Payoff Letter upon the entry of the Final Order and as otherwise set forth herein.  The Prepetition Agent and the other Prepetition Secured Creditors shall receive (i) subject to the priorities set forth in paragraphs 13 and 14 below, the Adequate Protection Liens (as defined herein) to secure the Prepetition Obligations (including, without limitation, the "Surviving Obligations" (as defined in the Payoff Letter)) and Adequate Protection Superpriority Claims (as defined herein) with respect to the Prepetition Obligations (including, without limitation, the Surviving Obligations), and (ii) additional adequate protection in the form of (A) payment of the Prepetition Obligations from the proceeds of the DIP Collateral as set forth in paragraph 20 below and (B) payments in the amount of interest (which shall be payable at the default rate under the Prepetition Credit Agreement), fees, costs, expenses (including, without limitations, attorneys' fees, consultants' fees, accountants' fees, auditor fees, appraisers' fees and financial advisors' fees, and related expenses and disbursements), indemnities and other amounts with respect to the Prepetition Obligations when due in accordance with the Prepetition Credit

Documents (collectively, the "Prepetition Agent Adequate Protection Payments"). For the avoidance of doubt, the Adequate Protection Liens and the Adequate Protection Superpriority Claims each shall be junior in all respects to the DIP Liens and the Carve Out, and the Adequate Protection Superpriority Claims are junior in all respects to the DIP Superpriority Claim (as defined herein).

J.     *Sections 506(c) and 552(b)*.   In light of (i) the DIP Agent's and DIP Lenders' agreement to subordinate their liens and superpriority claims, as applicable, to the Carve Out (as defined herein); (ii) the Prepetition Secured Creditors' agreement that their liens shall be subject to the Carve Out and subordinate to the DIP Liens; and (iii) the payment of expenses as set forth in the Approved Budget, in accordance with and subject to the terms and conditions of this Interim Order and the DIP Loan Documents, at the Final Hearing, the Debtor will seek a ruling that, upon entry of the Final Order, (a) each of the Prepetition Secured Creditors is entitled to a waiver of any "equities of the case" exception under section 552(b) of the Bankruptcy Code; and (b) each of the DIP Agent, DIP Lenders, and Prepetition Secured Creditors is entitled to a waiver of the provisions of section 506(c) of the Bankruptcy Code.

K.     *Good Faith of the DIP Agent, DIP Lenders, and Prepetition Secured Creditors*.

(i)     *Willingness to Provide Financing*.   The DIP Agent has indicated a willingness to provide financing to the Debtor subject to:  (a) the entry of this Interim Order and the Final Order; (b) approval of the terms and conditions of the DIP Facility and the DIP Loan Documents and the payoff of the Prepetition Obligations; (c) satisfaction of the closing conditions set forth in the DIP Loan Documents; and (d) entry of findings by the Court that such financing is essential to the Debtor's estate, that the DIP Agent is extending credit to the Debtor pursuant to the DIP Loan Documents in good faith, that the DIP Agent, DIP Lenders, and

Prepetition Secured Creditors have acted in good faith, and that the DIP Agent's, DIP Lenders', and Prepetition Secured Creditors' claims, superpriority claims, security interests, liens, rights, and other protections granted pursuant to this Interim Order and the DIP Loan Documents will have the protections provided in sections 363(m) and 364(e) of the Bankruptcy Code and will not be affected by any subsequent reversal, modification, vacatur, amendment, reargument or reconsideration of this Interim Order or any other order.

(ii)     *Business Judgment and Good Faith Pursuant to Sections 363(m) and 364(e)*.  The extension of credit under the DIP Facility reflects the Debtor's exercise of its prudent business judgment consistent with its fiduciary duties, and is supported by reasonably equivalent value and consideration.  The DIP Facility and the use of Cash Collateral were negotiated in good faith and at arms' length among the Debtor, the DIP Agent, DIP Lenders, and Prepetition Secured Creditors, with the assistance and counsel of their respective advisors, and the DIP Agent, DIP Lenders, and Prepetition Secured Creditors have acted in good faith.  The use of Cash Collateral and credit to be extended under the DIP Loan Documents shall be deemed to have been so allowed, advanced, made, used or extended in good faith, and for valid business purposes and uses, within the meaning of sections 363(m) and 364(e) of the Bankruptcy Code, and the DIP Agent, DIP Lenders, and Prepetition Secured Creditors are therefore entitled to the protection and benefits of sections 363(m) and 364(e) of the Bankruptcy Code and this Interim Order.

L.     *Notice*.  Notice of the Interim Hearing and the emergency relief requested in the DIP Motion has been provided by the Debtor, whether by facsimile, email, overnight courier or hand delivery, to certain parties in interest, including:  (i) the U.S. Trustee for the District of Western District of Texas; (ii) the Internal Revenue Service; (iii) the parties included on the

Debtor's consolidated list of thirty (30) largest unsecured creditors; (iv) counsel to each of the Prepetition Secured Creditors and any other lienholders of record; and (v) those parties who have filed a notice of appearance and request for service of pleadings in the Case pursuant to Bankruptcy Rule 2002. The Debtor has made reasonable efforts to afford the best notice possible under the circumstances and such notice is good and sufficient to permit the interim relief set forth in this Interim Order, and no other or further notice is or shall be required.

M. *Immediate Entry*. Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).

Based upon the foregoing findings and conclusions, the DIP Motion and the record before the Court with respect to the DIP Motion, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1. <u>DIP Financing Approved on an Interim Basis</u>. The DIP Motion is granted as set forth herein on an interim basis, the DIP Financing (as defined herein) is authorized and approved on an interim basis, and the use of Cash Collateral on an interim basis is authorized, in each case subject to the terms and conditions set forth in the DIP Loan Documents and this Interim Order.

2. <u>Objections Overruled</u>. All objections to approval of the DIP Financing on an interim basis, to the extent not withdrawn, waived, settled, or resolved, are hereby overruled.

**<u>DIP Facility Authorization</u>**

3. <u>Authorization of the DIP Financing, DIP Loan Documents and Payoff Letter</u>. The Debtor is expressly and immediately authorized and empowered (i) to execute and deliver the DIP Loan Documents, (ii) to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Interim Order, the DIP Loan Documents and the Approved Budget,

(iii) to deliver all instruments and documents that may be necessary or required for performance by the Debtor under the DIP Facility and the creation and perfection of the DIP Liens described in and provided for by this Interim Order and the DIP Loan Documents, and (iv) subject to the rights of third parties pursuant to paragraphs 36 and 37 below and entry of the Final Order, to execute, deliver, pay and perform all obligations under the Payoff Letter in accordance with the terms set forth therein, including to provide for (x) the releases in favor of the Prepetition Secured Creditors and each of their related parties and (y) repayment in full in cash of the remaining balance of the Prepetition Obligations (other than the Surviving Obligations), subject only to the ability of the Court to unwind the repayment of the Prepetition Obligations in the event there is a successful Challenge (as defined herein) to the validity, enforceability, extent, perfection and priority of the Prepetition Secured Creditors' claims or liens. The Debtor is hereby authorized to pay the principal, interest, fees, expenses and other amounts described in the DIP Loan Documents as such become due and without need to obtain further Court approval, including, without limitation, commitment or unused line fees, closing fees, maintenance fees and exit fees, the reasonable fees and disbursements of the DIP Agent's, the DIP Lenders', and the Prepetition Secured Creditors' attorneys, advisers, accountants, and other consultants and professional persons, all to the extent provided in the DIP Loan Documents, with invoices to be provided in accordance with paragraph 29 below.  All collections and proceeds, whether from ordinary course collections, asset sales, debt issuances, insurance recoveries, condemnations or otherwise, will be deposited and applied as required by this Interim Order and the DIP Loan Documents.  Upon execution and delivery, the DIP Loan Documents shall represent valid and binding obligations of the Debtor, enforceable against the Debtor in accordance with their terms. Upon execution and delivery, the Payoff Letter shall represent a valid and binding obligation of

the Debtor, enforceable against the Debtor and its estate in accordance with its terms, but subject only to the rights of third parties pursuant to paragraphs 36 and 37 below.

4. <u>Authorization to Borrow</u>. Until the earliest to occur of (i) entry of the Final Order or (ii) the Termination Date (as defined in the DIP Credit Agreement), and subject to the terms, conditions, limitations on availability and reserves set forth in the DIP Loan Documents, the DIP Facility, and this Interim Order, and in order to prevent immediate and irreparable harm to the Debtor's estate, the Debtor is hereby authorized to request extensions of revolving credit under the DIP Facility up to an aggregate principal amount of $10,000,000 (comprised of actual funds disbursed) at any one time outstanding (the "**DIP Financing**").

5. <u>DIP Obligations</u>. The DIP Loan Documents and this Interim Order shall constitute and evidence the validity and binding effect of the Debtor's DIP Obligations, which DIP Obligations shall be enforceable against the Debtor, its estate and any successors thereto, including without limitation, any trustee or other estate representative appointed in the Case, or any case under Chapter 7 of the Bankruptcy Code upon the conversion of any the Case (collectively, any "**Successor Cases**"). Upon entry of this Interim Order, the DIP Obligations will include all loans and any other indebtedness, indemnities or obligations, contingent or absolute, which may now or from time to time be owing by the Debtor to the DIP Agent under the DIP Loan Documents or this Interim Order, including, without limitation, all principal, accrued interest, costs, fees, expenses, indemnities and other amounts owed pursuant to the DIP Loan Documents, and shall be obligations of the Debtor in all respects. Without limiting the foregoing, the DIP Obligations shall also include cash management exposure to the extent described in, or secured by, the Prepetition Credit Documents and the DIP Loan Documents, including all Obligations (as defined in the DIP Credit Agreement). The DIP Obligations shall

be due and payable, without notice or demand, and the use of Cash Collateral shall automatically cease on the Termination Date, except as provided in paragraph 22 herein. No obligation, payment, transfer, or grant of collateral security hereunder or under the DIP Loan Documents (including any DIP Obligations or DIP Liens, and including in connection with any adequate protection provided to the Prepetition Secured Creditors hereunder) shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any applicable law (including under sections 502(d), 544, and 547 to 550 of the Bankruptcy Code or under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaim, cross-claim, defense, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

6.     DIP Liens and DIP Collateral.

(a)     Effective immediately upon the entry of this Interim Order, pursuant to sections 361, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Agent (for itself and the ratable benefit of the DIP Lenders) is hereby granted, continuing valid, binding, enforceable, non-avoidable and automatically and properly perfected postpetition security interests in and liens on (collectively, the "**DIP Liens**") any and all presently owned and hereafter acquired assets and real and personal property of the Debtor, including, without limitation, the following (the "**DIP Collateral**"):

(i)     all Accounts[4];

(ii)     all Goods, including Equipment, Inventory and Fixtures;

---

[4]     All defined terms in the description of DIP Collateral shall have the meanings ascribed thereto in the DIP Loan Documents. All terms not specifically defined in the DIP Loan Documents shall have the meanings ascribed to such terms in Article 8 or 9 of the Uniform Commercial Code, as applicable.

(iii)    all Documents, Instruments and Chattel Paper;

(iv)    all Letters of Credit and Letter-of-Credit Rights;

(v)    all Securities Collateral;

(vi)    all Investment Property;

(vii)    all Intellectual Property Assets;

(viii)    all Commercial Tort Claims;

(ix)    all General Intangibles (including, without limitation, all Payment Intangibles);

(x)    all Deposit Accounts (including, without limitation, the Concentration Account);

(xi)    all Supporting Obligations;

(xii)    all money, cash or cash equivalents;

(xiii)    all credit balances, deposits and other property now or hereafter held or received by or in transit to the DIP Agent or at any other depository or other institution from or for the account of the Debtor, whether for safekeeping, pledge, custody, transmission, collection or otherwise;

(xiv)    all proceeds of leases of real property and all owned real property;[5]

(xv)    all Prepetition Collateral;

(xvi)    all claims and causes of action and the proceeds thereof to avoid a transfer of property (or an interest in property) pursuant to Section 549 of the Bankruptcy Code;

(xvii)    effective upon the entry of the Final Order, all other claims and causes of action, and any proceeds thereof, to avoid a transfer of property (or an interest in property) or an

_____
[5]    For the avoidance of doubt, the DIP Liens extend only to the proceeds of leased real property and are not direct liens on the Debtor's leases of real property unless such liens are expressly permitted pursuant to the underlying lease documents.

obligation incurred by the Debtor pursuant to any applicable section of the Bankruptcy Code, including, without limitation, chapter 5 and section 724(a) of the Bankruptcy Code (collectively, the "**Avoidance Actions**");

(xviii) to the extent not otherwise described above, all receivables and all present and future claims, rights, interests, assets and properties recovered by or on behalf of the Debtor;

(xix) all books, records, and information relating to any of the foregoing and/or to the operation of the Debtor's business, and all rights of access to such books, records, and information, and all property in which such books, records and information are stored, recorded and maintained; and

(xx) to the extent not otherwise included or specifically excluded, all other personal property of the Debtor, whether tangible or intangible and all Proceeds and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of each of the foregoing, and any and all proceeds of any insurance, indemnity, warranty or guaranty payable to the Debtor from time to time with respect to any of the foregoing.

(b) The Prepetition Liens shall be deemed continuing liens for the benefit of the Prepetition Secured Creditors, the DIP Agent, and the DIP Lenders to secure the DIP Obligations, and any liens, claims, or interests subordinate to the Prepetition Liens as of the Petition Date shall likewise be deemed subordinate to the DIP Liens.

(c) Effective upon the entry of the Interim Order, (i) all DIP Liens and the Carve Out shall each be and remain at all times senior to the Prepetition Liens, and all existing blocked account agreements, deposit account control agreements, securities account control agreements, credit card acknowledgements, credit card agreements, collateral access agreements,

landlord agreements, warehouse agreements, bailee agreements, carrier agency agreements, customs broker agency agreements, subordination agreements and freight forwarder agreements constituting Prepetition Credit Documents, and all existing Uniform Commercial Code filings and all existing filings with the United States Patent and Trademark Office or the United States Copyright Office with respect to the recordation of an interest in the intellectual property of the Debtos which were filed by the Prepetition Agent, shall perfect the Liens granted under the DIP Facility to the same extent (but subject to the priority under this Interim Order) as the Prepetition Facility and shall remain in full force and effect without any further action by the Debtor, the DIP Agent, the Prepetition Agent or any other person, (ii) any and all references in any such agreements or documents to the "Credit Agreement" shall hereafter be deemed to mean and refer to the DIP Credit Agreement and the Prepetition Credit Agreement, collectively, and (iii) any and all references in any such agreements or documents to the "Loan Documents" shall hereafter be deemed to mean and refer to the DIP Loan Documents and the Prepetition Credit Documents, collectively, in each case as amended, modified, supplemented or restated and in effect from time to time.

7.     <u>DIP Lien Priority</u>.

(a)     *DIP Liens*.  The DIP Liens shall be junior only to the (i) Carve Out, and (ii) the Prepetition Permitted Liens, and shall otherwise be senior in priority and superior to the Prepetition Liens, the Adequate Protection Liens (as defined herein) and Adequate Protection Superpriority Claims (as defined herein) and any other security, mortgage, collateral interest, lien or claim on or to any of the DIP Collateral.

(b)     Other than as set forth herein, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Case or

any Successor Cases. The DIP Liens shall be valid and enforceable against any trustee or other estate representative appointed in the Case or any Successor Cases, upon the conversion of the Case to any case under Chapter 7 of the Bankruptcy Code (or in any other Successor Cases), and/or upon the dismissal of the Case or any Successor Cases. The DIP Liens shall not be subject to challenge under sections 510, 549, or 550 of the Bankruptcy Code. No lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Liens. Notwithstanding any provisions of this Interim Order, or any final orders pertaining to the sale of the Debtor's assets, or any agreements validated by any such orders, any senior liens currently held by the Local Texas Tax Authorities[6] shall neither be primed by, nor subordinated to, any liens granted thereby.

(c)     *Prepetition Liens*. For the avoidance of doubt, the Prepetition Liens shall be junior to the (i) Carve Out; (ii) DIP Liens; (iii) Adequate Protection Liens described in paragraph 13 below; (iv) Adequate Protection Superpriority Claims; and (v) Prepetition Permitted Liens.

8.     DIP Superpriority Claim.

(a)     *DIP Agent Superpriority Claim*. Upon entry of this Interim Order, the DIP Agent (for itself and the ratable benefit of the DIP Lenders) is hereby granted, pursuant to section 364(c)(1) of the Bankruptcy Code, an allowed superpriority administrative expense claim in the Case and any Successor Cases (collectively, the "**DIP Superpriority Claim**") for all DIP Obligations. The DIP Superpriority Claim shall be subordinate only to the DIP Liens, the Carve Out and Prepetition Permitted Liens, and shall otherwise have priority over any and all

---

[6]     "Local Texas Tax Authorities" shall have the meaning given to such term in the Final Order.

administrative expenses of the kinds specified in or ordered pursuant to sections 503(b) and 507(b) of the Bankruptcy Code, as provided under section 364(c)(1) of the Bankruptcy Code.

(b)     *Priority of DIP Superpriority Claim.*  The DIP Superpriority Claim shall be payable from and have recourse to all pre- and post-petition property of the Debtor and all proceeds thereof, subject only to the payment in full in cash of the DIP Obligations, the Carve Out and amounts secured by the Prepetition Permitted Liens.  Upon entry of the Final Order, the DIP Superpriority Claim shall be payable from or have recourse to Avoidance Actions.

9.     <u>No Obligation to Extend Credit</u>.  The DIP Agent and the DIP Lenders shall not have any obligation to make any loan or advance under the DIP Loan Documents unless all of the conditions precedent to the making of such extension of credit under the DIP Loan Documents and this Interim Order have been satisfied in full or waived by the DIP Agent in accordance with the terms of the DIP Credit Agreement.

10.     <u>Use of DIP Facility Proceeds</u>.  From and after the Petition Date, the Debtor shall use advances of credit under the DIP Facility only for the purposes specifically set forth in this Interim Order, the DIP Loan Documents, the Payoff Letter (subject to entry of the Final Order), and the Approved Budget and shall be subject at all times to compliance with the Approved Budget (including, without limitation, to make Prepetition Agent Adequate Protection Payments).

11.     <u>Roll-Up of Prepetition Obligations</u>.  Subject to entry of the Final Order and the consent of the Prepetition Secured Creditors, the DIP Roll-Up Loans shall be included in the DIP Obligations, and all Prepetition Obligations outstanding as of the date of entry of the Final Order, if any, shall be converted and "rolled-up" into DIP Roll-Up Loans, and such Prepetition

Obligations shall constitute DIP Obligations. The authorization of the DIP Roll-Up Loans shall be subject to the reservation of rights set forth in paragraphs 36 and 37 of this Interim Order.

## **Authorization to Use Cash Collateral**

12.     Authorization to Use Cash Collateral.  Subject to the terms and conditions of this Interim Order and the DIP Loan Documents, and in accordance with the Approved Budget, and subject to such variances as may permitted under the DIP Credit Agreement, the Debtor is authorized to use Cash Collateral until the Termination Date; provided, however, that during the Remedies Notice Period (as defined herein) the Debtor may use Cash Collateral in accordance with the terms and provisions of the Approved Budget solely to meet payroll obligations (other than severance), make remittances of trust fund taxes collected by the Debtor during the Remedies Notice Period, and for other expenses approved critical to the preservation of the Debtor and its estate as agreed by the DIP Agent in its sole discretion.  Nothing in this Interim Order shall authorize the disposition of any assets of the Debtor or its estate outside the ordinary course of business (which shall be subject to further Orders of the Court), or the Debtor's use of any Cash Collateral or other proceeds resulting therefrom, except as permitted in this Interim Order, the DIP Loan Documents, and in accordance with the Approved Budget.

13.     Payoff Letter, Adequate Protection Payments and Adequate Protection Liens.

(a)     *Prepetition Agent – Payoff Letter*.  Subject to entry of the Final Order, the Debtor and the Prepetition Agent shall comply with the terms and provisions of the Payoff Letter.  The Debtor's residual interest in any amounts payable or potentially payable to it under the terms of the Payoff Letter shall be subject to the DIP Liens in accordance with the priorities set forth in this Interim Order and the DIP Loan Documents.

(b)     *Prepetition Agent – Adequate Protection Payments*.   The Prepetition Agent and the other Prepetition Secured Creditors shall receive adequate protection in the form of the Prepetition Agent Adequate Protection Payments.

(c)     *Prepetition Agent – Adequate Protection Liens*.   The Prepetition Agent (for the ratable benefit of the Prepetition Secured Creditors) is hereby granted valid and perfected replacement and additional security interests in, and liens on all of the Debtor's right, title and interest in, to and under all DIP Collateral (the "**Adequate Protection Liens**").   The Adequate Protection Liens granted to the Prepetition Agent shall secure only the Prepetition Obligations (including, without limitation, the Surviving Obligations) to the extent of any diminution in value of the Prepetition Collateral due to, among other things, priming liens, the use of the Prepetition Collateral, borrowings under the DIP Facility, or the Carve Out.   The Adequate Protection Liens are and shall be valid, binding enforceable and fully perfected as of the date hereof and subordinate and subject only to (i) the DIP Liens, (ii) the Permitted Prior Liens, and (iii) the Carve Out.

(d)     *Treatment of Adequate Protection Liens*.   Other than as set forth herein or as further ordered by the Court after notice to the DIP Agent and the Prepetition Agent and a hearing, the Adequate Protection Liens shall not be made subject to or *pari passu* with any lien or with any lien or security interest heretofore or hereinafter granted in the Case or any Successor Cases.   The Adequate Protection Liens shall not be subject to sections 510, 549, or 550 of the Bankruptcy Code.   The Adequate Protection Liens shall be valid and enforceable against any trustee or other estate representative appointed in the Case or any Successor Cases, upon the conversion of the Case to a case under Chapter 7 of the Bankruptcy Code (or in any other Successor Cases), and/or upon the dismissal of the Case or any Successor Cases.

14.     Adequate Protection Superpriority Claims.

(a)     *Superpriority Claim of Prepetition Agent*.  As further adequate protection of the interests of the Prepetition Agent with respect to the Prepetition Obligations (including, without limitation, the Surviving Obligations), the Prepetition Agent (for the ratable benefit of the Prepetition Secured Creditors) is hereby granted an allowed administrative claim against the Debtor's estate under sections 503 and 507(b) of the Bankruptcy Code (the "**Adequate Protection Superpriority Claims**") to the extent that the Adequate Protection Liens do not adequately protect against any diminution in the value of the Prepetition Secured Creditors' interests in the Prepetition Collateral.

(b)     *Priority of Adequate Protection Superpriority Claims*.  The Adequate Protection Superpriority Claims shall be junior to the Carve Out, the DIP Liens, the DIP Superpriority Claim, and the Adequate Protection Liens and shall otherwise have priority over administrative expenses of the kinds specified in or ordered pursuant to sections 503(b) and 507(b) of the Bankruptcy Code.  Upon entry of the Final Order, the Adequate Protection Superpriority Claims shall be payable from and have recourse to the Avoidance Actions.

15.     Adequate Protection Reservation.  Nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition Secured Creditors hereunder is insufficient to compensate for any diminution in the value of the Prepetition Secured Creditors' interests in the Prepetition Collateral during the Case or any Successor Cases.  The receipt by the Prepetition Secured Creditors of the adequate protection provided herein shall not be deemed an admission that the interests of the Prepetition Secured Creditors are adequately protected.  Further, this Interim

Order shall not prejudice or limit the rights of the Prepetition Secured Creditors to seek additional relief with respect to the use of Cash Collateral or for additional adequate protection.

**Provisions Common to DIP Financing and Use of Cash Collateral Authorizations**

16. <u>Amendments</u>.  The DIP Loan Documents may from time to time be amended, modified or supplemented by the parties thereto without further Order of this Court and without notice or a hearing if such amendment, modification, or supplement is (A) non-material and (b) in accordance with the DIP Loan Documents.  In the case of a material amendment, modification, or supplement to the DIP Loan Documents that is adverse to the Debtor's estate, the Debtor shall provide notice (which may be provided through electronic mail or facsimile) to counsel to any Statutory Committee (if appointed) and the U.S. Trustee (collectively, the "<u>Notice Parties</u>"), each of whom shall have five (5) days from the date of such notice to object in writing to such amendment, modification or supplement.  If neither of the Notice Parties indicates that they have an objection to the amendment, modification or supplement, the Debtor may proceed to execute the amendment, modification or supplement, which shall become effective immediately upon execution.  If a Notice Party timely objects to such amendment, modification or supplement, and such objection is not consensually resolved by the Debtor, the DIP Agent, and the objecting Notice Party, approval of the Court (which may be sought on an expedited basis) will be necessary to effectuate the amendment, modification or supplement; <u>provided</u>, that such amendment, modification or supplement shall be without prejudice to the right of any party in interest to be heard.  Any material modification, amendment or supplement that becomes effective in accordance with this paragraph 16 shall be filed with the Court by the Debtor no later than three (3) business days after becoming effective (and may be filed with the Court by the DIP Agent if the Debtor fails to do so).

17.     Approved Budget Maintenance.   The use of borrowings under the DIP Facility and the use of Cash Collateral shall be limited in accordance with the Approved Budget, subject to the variances set forth in the DIP Credit Agreement.   The Approved Budget and any modification to, or amendment or update of, the Approved Budget shall be in form and substance acceptable to the DIP Agent and approved by the DIP Agent in its sole discretion.   The Debtor shall comply with and update the Approved Budget from time to time in accordance with the DIP Loan Documents (provided that any update shall be in form and substance acceptable to the DIP Agent and approved by the DIP Agent in its sole discretion), but in any event not less than on a weekly basis (with delivery to the DIP Agent on or before Wednesday of each week (or such day as otherwise agreed to by the DIP Agent) and to the U.S. Trustee and counsel for any Statutory Committee (if appointed) each week after delivery to the DIP Agent), and no such updated, modified, or supplemented budget shall be effective until so approved and once approved shall be deemed the "Approved Budget".   Each budget delivered to the DIP Agent shall be accompanied by such supporting documentation as reasonably requested by the DIP Agent and shall be prepared in good faith based upon assumptions the Debtor believes to be reasonable.

18.     Modification of Automatic Stay.   The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of this Interim Order, including, without limitation, to:  (a) permit the Debtor to grant the DIP Liens, the Adequate Protection Liens, the DIP Superpriority Claim, and the Adequate Protection Superpriority Claims; (b) permit the Debtor to perform such acts as the DIP Agent and the Prepetition Agent each may reasonably request to assure the perfection and priority of the liens granted herein; (c) permit the Debtor to incur all liabilities and obligations to the DIP

Agent, DIP Lenders, and Prepetition Secured Creditors under the DIP Loan Documents, the DIP Facility, and this Interim Order, as applicable; and (d) authorize the Debtor to pay, and the DIP Agent and Prepetition Secured Creditors to retain and apply, payments made in accordance with the terms of this Interim Order.

19.   Perfection of DIP Liens and Adequate Protection Liens.

(a)   *Automatic Perfection of Liens.*  This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of all liens granted herein, including the DIP Liens and the Adequate Protection Liens, without the necessity of filing or recording any financing statement, mortgage, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement, collateral access agreement, customs broker agreement or freight forwarding agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens and the Adequate Protection Liens, or to entitle the DIP Agent or the Prepetition Secured Creditors to the priorities granted herein.  Notwithstanding the foregoing, the DIP Agent and the Prepetition Agent each is authorized to file, as the DIP Agent and Prepetition Agent each in its sole discretion deems necessary, such financing statements, mortgages, notices of liens and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence any of the DIP Liens and the Adequate Protection Liens, and all such financing statements, mortgages, notices and other documents shall be deemed to have been filed or recorded as of the Petition Date; provided, however, that no such filing or recordation shall be necessary or required in order to create, perfect or enforce the DIP Liens or the Adequate Protection Liens.  The Debtor is authorized to execute and deliver promptly upon demand to the

DIP Agent or the Prepetition Agent, as applicable, all such financing statements, mortgages, control agreements, notices and other documents as the DIP Agent or the Prepetition Agent may reasonably request. The DIP Agent and the Prepetition Agent, each in its sole discretion, may file a photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien or similar instrument.

20. _Application of Proceeds of DIP Collateral_. As a condition to the entry into the DIP Loan Documents, the extension of credit under the DIP Facility and the authorization to use Cash Collateral, the Debtor has agreed that the proceeds of the DIP Collateral, and other payments received by the DIP Agent, including whether sold in the ordinary course, liquidated pursuant to any agreement with an Approved Liquidator (as defined in the DIP Credit Agreement), or otherwise, shall be applied as provided in the DIP Credit Agreement, or, to the extent the DIP Credit Agreement does not direct the application of such amounts, as follows: _first_, to payment of the Prepetition Obligations in accordance with the terms of the Prepetition Credit Documents until the Prepetition Obligations have been paid in full in cash, _second_, to payment of the costs and expenses of the DIP Agent and DIP Lenders, including Credit Party Expenses (as defined in the DIP Credit Agreement) payable and reimbursable by the Debtor under the DIP Credit Agreement and the other DIP Loan Documents; _third_, to payment of fees and interest with respect to the DIP Obligations, _fourth_, to payment of all other DIP Obligations in accordance with the DIP Loan Documents until all DIP Obligations have been paid in full in cash, and _fifth_, to the Debtor's operating account, or for the account of and paid to whomever may be lawfully entitled thereto. As between the DIP Lenders, nothing provided herein shall be deemed to modify the allocation of the proceeds of DIP Collateral set forth in the DIP Loan

Documents. The allocation procedure set forth above is without prejudice to the Court ordering at the Final Hearing that the DIP Agent reallocate the funds received in an order different that set forth in this paragraph

21.     Proceeds of Subsequent Financing. If the Debtor, any trustee, any examiner with enlarged powers, any responsible officer or any other estate representative subsequently appointed in this Case or any Successor Cases shall obtain credit or incur debt pursuant to sections 364(b), 364(c) or 364(d) of the Bankruptcy Code in violation of the DIP Loan Documents at any time prior to the repayment in full of all DIP Obligations and Prepetition Obligations and the termination of the DIP Agent's and the DIP Lenders' obligations to extend credit under the DIP Facility, including subsequent to the confirmation of any plan of reorganization or liquidation with respect to the Debtor and its estate, then all the cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Agent to be applied as set forth in paragraph 20 herein.

22.     Maintenance of DIP Collateral. Until the payment in full in cash of all DIP Obligations and Prepetition Obligations and the termination of the DIP Agent's and the DIP Lenders' obligations to extend credit under the DIP Facility, as provided therein, the Debtor shall: (a) insure the DIP Collateral as required under the DIP Facility; and (b) maintain the cash management system approved by the Cash Management Order.

23.     Disposition of DIP Collateral; Rights of DIP Agent, DIP Lenders, and Prepetition Secured Creditors. Unless (i) the DIP Agent and the Prepetition Agent have provided their prior written consent, (ii) all DIP Obligations and all Prepetition Obligations have been indefeasibly paid in full, in cash, or (iii) otherwise authorized by the Court after notice to the DIP Agent and the Prepetition Agent:

(a)     The Debtor shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral outside the ordinary course of business except as permitted by the DIP Loan Documents.  Nothing provided herein shall limit the right of the DIP Agent or the DIP Lenders to object to any proposed disposition of the DIP Collateral;

(b)     Without the prior written consent of the DIP Agent and the Prepetition Agent, there shall not be entered in the Case or any Successor Cases any order (including any order confirming any plan of reorganization or liquidation) that authorizes any of the following: (i) the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other Lien on all or any portion of the DIP Collateral or Prepetition Collateral and/or that is entitled to administrative priority status, in each case that is superior to or *pari passu* with the DIP Liens, the DIP Superpriority Claim, the Prepetition Liens, the Adequate Protection Liens, and/or the Adequate Protection Superpriority Claim except as expressly set forth in this Interim Order or the DIP Loan Documents; (ii) the use of Cash Collateral for any purpose other than as permitted in the DIP Loan Documents and this Interim Order; (iii) the return of goods pursuant to section 546(h) of the Bankruptcy Code (or other return of goods on account of any prepetition indebtedness or consignment arrangement) to any creditor of the Debtor or any creditor's taking any setoff or recoupment against any of its prepetition indebtedness based upon any such return of goods pursuant to section 553 of the Bankruptcy Code or otherwise; or (iv) any modification of the DIP Agent's or DIP Lenders' rights under this Interim Order or the DIP Loan Documents; and

(c)     The Debtor (and/or its professional advisors in the case of clauses (ii) through (iv) below) shall (i) maintain books, records, and accounts to the extent and as required by the DIP Loan Documents (and subject to the applicable grace periods set forth therein); (ii)

cooperate with, consult with, and provide to the DIP Agent all such information and documents that the Debtor is obligated (including upon reasonable request by the DIP Agent) to provide under the DIP Loan Documents or the provisions of this Interim Order; (iii) upon reasonable advance notice, permit the DIP Agent, the DIP Lenders and their advisors to visit and inspect any of the Debtor's respective properties, to examine and make abstracts or copies from any of its books and records, to tour the Debtor's business premises and other properties, and to discuss, and provide advice with respect to, its affairs, finances, properties, business operations, and accounts with its officers, employees, independent public accountants, and other professional advisors (other than legal counsel) as and to the extent required by the DIP Loan Documents and/or the Prepetition Documents; (iv) permit the DIP Agent, the DIP Lenders and their advisors to consult with the Debtor's management and advisors on matters concerning the Debtor's businesses, financial condition, operations, and assets in accordance with the DIP Loan Documents; and (v) upon reasonable advance notice, permit the DIP Agent to conduct, at their discretion and at the Debtor's cost and expense, field audits, collateral examinations, liquidation valuations, and inventory appraisals at reasonable times in respect of any or all of the DIP Collateral in accordance with, and to the extent set forth in, the DIP Loan Documents.

24.    <u>Credit Bidding</u>.  Subject to entry of the Final Order, in connection with any sale process authorized by the Court, the DIP Agent, the DIP Lenders, and the Prepetition Secured Creditors may credit bid some or all of their claims for their respective priority collateral (each a "<u>Credit Bid</u>") pursuant to section 363(k) and/or section 1129 of the Bankruptcy Code.  Each of the DIP Agent, the DIP Lenders, and the Prepetition Secured Creditors shall be considered a "Qualified Bidder" with respect to its rights to acquire all or any of the assets by Credit Bid.

25.     <u>Termination Date</u>.  On the Termination Date, at the option of the DIP Agent: (a) all applicable DIP Obligations shall be immediately due and payable, all commitments to extend credit under the DIP Facility will terminate, other than as required in paragraph 33 with respect to the Carve Out, all treasury and cash management, hedging obligations and bank product obligations constituting Obligations (as defined in the DIP Credit Agreement) shall be cash collateralized in a manner and amount acceptable to the DIP Agent, and none of such cash collateral shall be subject to or subordinate to the Carve Out; (b) all authority to use Cash Collateral shall cease, *provided, however*, that during the Remedies Notice Period (as defined herein), the Debtor may use Cash Collateral to pay payroll obligations (other than severance), make remittances of trust fund taxes collected by the Debtor during the Remedies Notice Period, and for other expenses approved critical to the preservation of the Debtor and its estate as agreed by the DIP Agent in its sole discretion.; and (c) otherwise exercise rights and remedies under the DIP Loan Documents in accordance with this Interim Order (including paragraph 27).

26.     <u>Events of Default</u>.  The occurrence of an "Event of Default" under the DIP Credit Agreement (unless the DIP Agent, in its sole discretion, elects to waive such Event of Default) shall constitute an event of default under this Interim Order (each, an "**Event of Default**").

27.     <u>Rights and Remedies Upon Event of Default</u>.

(a)     *DIP Facility Termination.*  Immediately upon the occurrence and during the continuance of an Event of Default, notwithstanding the provisions of section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from the Court, but subject to the terms of this Interim Order, the DIP Loan Documents and the Remedies Notice Period, the DIP Agent may, in its sole discretion, (a) declare (any such declaration shall be referred to herein as a "**Termination Declaration**") any or all of the following: (i) all DIP

Obligations owing under the DIP Loan Documents to be immediately due and payable, (ii) the termination, reduction or restriction of any further commitment to extend credit to the Debtor to the extent any such commitment remains under the DIP Facility, (iii) termination of the DIP Facility and the DIP Loan Documents as to any future liability or obligation of the DIP Agent and the DIP Lenders, but without affecting any of the DIP Liens or the DIP Obligations, and (iv) that the application of the Carve Out has occurred through the delivery of the Carve Out Trigger Notice (as defined herein) to the Debtor and its counsel, the U.S. Trustee, and lead counsel to any Statutory Committee (if appointed); or (b) send a reservation of rights notice to the Debtor, which notice may advise the Debtor that any further advances under the DIP Facility will be made in the sole discretion of the DIP Agent.  With respect to the DIP Collateral, following the Termination Declaration but subject to the Remedies Notice Period, the DIP Agent, the DIP Lenders and the Prepetition Agent may exercise all rights and remedies available to them under the DIP Loan Documents or the Prepetition Credit Documents, as applicable, or applicable law against the DIP Collateral.  Without limiting the foregoing, the DIP Agent, the DIP Lenders and the Prepetition Agent may, subject to the Remedies Notice Period, (i) upon written notice to the landlord of any leased premises that an Event of Default or the Termination Date has occurred and is continuing, and subject to the applicable notice provisions, if any, in this Interim Order and any separate applicable agreement by and between such landlord, enter onto the premises of the Debtor for the purpose of exercising any remedy with respect to DIP Collateral located thereon and shall be entitled to all of the Debtor's rights and privileges as lessee under such lease without interference from the landlords thereunder;[7] and/or (ii) exercise any rights and remedies

---

[7] Notwithstanding anything in this paragraph to the contrary, subject to (and without waiver of) the rights of the DIP Agent and/or the DIP Lenders under applicable nonbankruptcy law, the DIP Agent and/or the DIP Lenders can only enter upon a leased premises after an Event of Default and expiration of the Remedies Notice Period in accordance with (i) a separate agreement with the landlord at the applicable leased

provided to DIP Agent, the DIP Lenders or the Prepetition Agent under the DIP Loan Documents or the Prepetition Credit Documents, as applicable, or at law or equity, including all remedies provided under the Bankruptcy Code and pursuant to this Interim Order and the Final Order.

(b)     *Notice of Termination*.  Any Termination Declaration shall be given by facsimile (or other electronic means, including electronic mail) to counsel to the Debtor, counsel to any Statutory Committee (if appointed), and the U.S. Trustee (the earliest date any such Termination Declaration is made shall be referred to herein as the "**Termination Declaration Date**").  Any automatic stay otherwise applicable to the DIP Agent, the DIP Lenders and the Prepetition Agent is hereby modified so that five (5) business days after the Termination Declaration Date (the "**Remedies Notice Period**"), the DIP Agent, the DIP Lenders and the Prepetition Agent shall be entitled to exercise all rights and remedies against the DIP Collateral in accordance with the DIP Loan Documents or the Prepetition Credit Documents, as applicable, and this Interim Order and shall be permitted to satisfy the DIP Superpriority Claim and the DIP Liens and the Adequate Protection Liens and Adequate Protection Superpriority Claims of the Prepetition Agent, subject in each case to the Carve Out.  During the Remedies Notice Period, the Debtor shall be entitled to seek an emergency hearing with the Court for the sole purpose of contesting whether an Event of Default has occurred and/or is continuing; provided, that in the event the Debtor seeks such an emergency hearing and the Court is unable to schedule such a hearing during the five (5) business day period described above, the Remedies Notice Period shall be tolled until the date on which the Court enters an order with respect to whether an Event of Default has occurred and/or is continuing.  Unless the Court determines otherwise, the

---

premises, or (ii) upon entry of an order of this Court obtained by motion of the DIP Agent and/or the applicable DIP Lenders on such notice to the landlord as shall be required by this Court.

automatic stay shall automatically be terminated at the end of the Remedies Notice Period without further notice or order and the DIP Agent, the DIP Lenders and the Prepetition Agent shall be permitted to exercise all remedies set forth herein, in the DIP Credit Agreement, the DIP Loan Documents, the Prepetition Credit Documents and as otherwise available at law against the DIP Collateral, without further order of or application or motion to the Court, and without restriction or restraint by any stay under sections 362 or 105 of the Bankruptcy Code, or otherwise, against the enforcement of the liens and security interest in the DIP Collateral or any other rights and remedies granted to (x) the DIP Agent with respect thereto pursuant to the DIP Credit Agreement, the other DIP Loan Documents, or this Interim Order and (y) the Prepetition Agent with respect thereto pursuant to the Prepetition Credit Agreement, the other Prepetition Credit Documents, or this Interim Order.

28.     <u>Good Faith Under Sections 363 and 364 of the Bankruptcy Code; No Modification or Stay of this Interim Order</u>.  Each of the DIP Agent, the DIP Lenders, and the Prepetition Secured Creditors have acted in good faith in connection with this Interim Order and their reliance on this Interim Order is in good faith.  Based on the findings set forth in this Interim Order and the record made during the Interim Hearing, and in accordance with sections 363(m) and 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Interim Order are hereafter modified, amended or vacated by a subsequent order of the Court, or any other court, the DIP Agent, the DIP Lenders, and the Prepetition Secured Creditors shall be and hereby are entitled to the protections provided in sections 363(m) and 364(e) of the Bankruptcy Code.  Any such modification, amendment or vacatur shall not affect the validity and enforceability of any advances previously made, or lien, claim or priority authorized or created hereby, provided that the Interim Order was not stayed by court order after due notice

had been given to the DIP Agent at the time the advances were made or the liens, claims or priorities were authorized and/or created. Any liens or claims granted to the DIP Agent, the DIP Lenders, and the Prepetition Secured Creditors hereunder arising prior to the effective date of any such modification, amendment or vacatur of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges and benefits granted herein, provided that the Interim Order was not stayed by court order after due notice had been given to the DIP Agent and each of the DIP Lenders and Prepetition Secured Creditors at the time the advances were made or the liens, claims or priorities were authorized and/or created.

29. <u>DIP and Other Expenses</u>. The Debtor is authorized and directed to pay all reasonable and documented out-of-pocket expenses of (x) the DIP Agent and the DIP Lenders in connection with the DIP Facility (including, without limitation, expenses incurred prior to the Petition Date), as provided in the DIP Loan Documents, and (y) the Prepetition Agent (including, without limitation, expenses incurred prior to the Petition Date) as provided in the Prepetition Credit Documents including, without limitation, reasonable legal, accounting, collateral examination, monitoring and appraisal fees, financial advisory fees, fees and expenses of other consultants, and indemnification and reimbursement of fees and expenses, upon the Debtor's receipt of summary copies of invoices for the payment thereof. Payment of all such fees and expenses shall not be subject to allowance by the Court and professionals for the DIP Agent, the DIP Lenders and the Prepetition Agent shall not be required to comply with the U.S. Trustee fee guidelines. Notwithstanding the foregoing, at the same time such summary copies of invoices (which shall not be required to contain time entries, but shall include a general, brief description of the nature of the matters for which services were performed, and which may be redacted or

modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney client privilege or of any benefits of the attorney work product doctrine) are delivered to the Debtor, the professionals for the DIP Agent, the DIP Lenders and the Prepetition Agent shall deliver a copy of their respective invoice summaries to counsel for any Statutory Committee (if appointed) and the U.S. Trustee, redacted as necessary with respect to any privileged or confidential information contained therein. Any objections raised by the Debtor, the U.S. Trustee or any Statutory Committee (if appointed) with respect to such invoice summaries within ten (10) days of the receipt thereof will be resolved by the Court or agreed among the parties. In the event of any objection that cannot otherwise be resolved consensually, the provisions of section 107 of the Bankruptcy Code and Rule 9018 of the Federal Rules of Bankruptcy Procedure shall apply. Pending such resolution, the undisputed portion of any such invoice summary will be paid promptly by the Debtor. Notwithstanding the foregoing, the Debtor is authorized and directed to pay on the Closing Date (as defined in the DIP Credit Agreement) all fees, costs and expenses of the DIP Agent, the DIP Lenders and the Prepetition Agent incurred on or prior to such date without the need for any professional engaged by the DIP Agent, the DIP Lenders or the Prepetition Agent to first deliver a copy of its invoice summary as provided for herein.

   30.  <u>Indemnification</u>.

   (a)  The Debtor shall indemnify and hold harmless the DIP Agent and the DIP Lenders and each of their shareholders, members, directors, agents, officers, subsidiaries and affiliates, successors and assigns, attorneys and professional advisors, in their respective capacities as such, from and against any and all damages, losses, settlement payments,

obligations, liabilities, claims, actions or causes of action, whether groundless or otherwise, and reasonable costs and expenses incurred, suffered, sustained or required to be paid by an indemnified party of every nature and character arising out of or related to the DIP Loan Documents, or the DIP Facility or the transactions contemplated thereby and by this Interim Order, whether such indemnified party is party thereto, as provided in and pursuant to the terms of the DIP Loan Documents and as further described therein and herein, or in connection with this Case, any plan, or any action or inaction by the Debtor, in each case except to the extent resulting from such indemnified party's gross negligence or willful misconduct as finally determined by a final non-appealable order of a court of competent jurisdiction. The indemnity includes indemnification for the DIP Agent's exercise of discretionary rights granted under the DIP Facility. In all such litigation, or the preparation therefor, the DIP Agent and/or the DIP Lenders, as applicable, shall be entitled to select their own counsel and, in addition to the foregoing indemnity, the Debtor agrees to promptly advance and pay the reasonable fees and expenses of such counsel.

(b) Subject to entry of the Final Order, upon the earlier of (i) entry of the Final Order and the repayment in full in cash of the Prepetition Obligations, (ii) payment in full in cash of the DIP Obligations and all bank product obligations having been cash collateralized in a manner and amount acceptable to the DIP Agent or (iii) conclusion of the Remedies Notice Period, the Debtor shall deposit $500,000 into an indemnity account (the "Prepetition Loan Indemnity Account") subject to first priority liens of the DIP Agent, for the benefit of the DIP Lenders, and the Prepetition Agent, for the benefit of the Prepetition Secured Creditors. The Prepetition Loan Indemnity Account shall be released and the funds applied in accordance with paragraph 20 of this Interim Order upon the indefeasible payment in full, in cash of the DIP

Obligations and the Prepetition Obligations and all bank product obligations having been cash collateralized in a manner and amount acceptable to the DIP Agent and the Prepetition Agent (as applicable), and the receipt by the DIP Agent, the Prepetition Agent, and each of the DIP Lenders and Prepetition Secured Creditors of releases from the Debtor and its estate, with respect to any claims arising out of or related to the DIP Loan Documents or the Prepetition Credit Documents, acceptable to the DIP Agent, the Prepetition Agent, and each of the DIP Lenders and the Prepetition Secured Creditors, each in their sole discretion

31. <u>Proofs of Claim</u>. Any order entered by the Court in relation to the establishment of a bar date for any claims (including without limitation administrative claims) in the Case or any Successor Cases shall not apply to the DIP Agent, DIP Lenders or the Prepetition Secured Creditors. Neither DIP Agent nor the Prepetition Agent will be required to file proofs of claim or requests for approval of administrative expenses in the Case or any Successor Cases, and the provisions of this Interim Order relating to the amount of the DIP Obligations, the DIP Superpriority Claim, the Prepetition Obligations and the Adequate Protection Superpriority Claim shall constitute timely filed proofs of claim and/or administrative expense requests.

32. <u>Rights of Access and Information</u>. Without limiting the rights of access and information afforded the DIP Agent and the DIP Lenders under the DIP Loan Documents, or the Prepetition Secured Creditors under the Prepetition Credit Documents, the Debtor shall be, and hereby is, required to afford representatives, agents and/or employees of the DIP Agent, DIP Lenders, and Prepetition Secured Creditors reasonable access to the Debtor's premises and its books and records in accordance with the DIP Loan Documents and Prepetition Credit Documents, and shall reasonably cooperate, consult with, and provide to such persons all such information as may be reasonably requested. In addition, the Debtor authorizes its independent

certified public accountants, financial advisors, investment bankers and consultants to cooperate, consult with, and provide to the DIP Agent, DIP Lenders, and Prepetition Secured Creditors all such information as may be reasonably requested with respect to the business, results of operations and financial condition of the Debtor.

33.　Carve Out.

(a)　*Carve Out*.　As used in this Interim Order, the "**Carve Out**" means, collectively, the following expenses: (a) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a) and Section 3717 of title 31 of the United States Code, (b) Allowed Professional Fees of professionals retained by the Debtor and any Statutory Committee (if appointed) (collectively, the "**Case Professionals**") incurred prior to the delivery of a Carve Out Trigger Notice (net of any retainers maintained by such Case Professionals), limited to the weekly budgeted amounts in respect of each applicable Case Professional set forth in the Approved Budget as of any applicable date of determination, which amounts shall be funded into the Professional Fee Escrow Account weekly pursuant to the Approved Budget and in accordance with the DIP Credit Agreement, and (c) $25,000 for Allowed Professional Fees of Case Professionals incurred following the delivery of a Carve Out Trigger Notice, which amount under clause (c) (the "**Final Carve Out Contribution**") shall be funded into the Professional Fee Escrow Account by the Agent promptly upon the delivery of a Carve Out Trigger Notice.　The Professional Fee Escrow Account shall be used to make disbursements to Case Professionals in the amounts and at the times authorized by the Bankruptcy Court and for no other purpose.　No portion of the Carve Out, nor any Cash Collateral or proceeds of the DIP Collateral or Prepetition Collateral may be used in violation of this Interim Order or any Final Order.　Any amounts on deposit in the

Professional Fee Escrow Account after the payment in full of all Allowed Professional Fees of Case Professionals pursuant to final fee applications and orders in the Case shall be returned to the DIP Agent, which amounts shall be applied to the Obligations in the order and manner required by the DIP Loan Documents. For purposes of the foregoing, "**Carve Out Trigger Notice**" shall mean a written notice delivered by the DIP Agent to the lead counsel for the Debtor, the U.S. Trustee, and any Statutory Committee (if appointed), which notice may be delivered at any time by the DIP Agent (1) in connection with the repayment in full, in cash of the DIP Obligations and the Prepetition Obligations and all letters of credit related thereto having been cancelled, backed, or cash collateralized in accordance with the terms thereof, and all bank product obligations having been cash collateralized in a manner and amount acceptable to the DIP Agent and the Prepetition Agent (as applicable) or (2) at the option of the DIP Agent, in its sole discretion, following the occurrence and continuance of any Event of Default and, in any case, shall specify that it is a "Carve Out Trigger Notice" and may, at the option of the DIP Agent and the Prepetition Agent, each in their sole discretion, expressly state that no additional Committed Revolving Loans (as defined in the DIP Credit Agreement) may be requested to fund the Carve Out.

(b)     *No Direct Obligation to Pay Professional Fees or Committee Expenses*. The DIP Agent, the DIP Lenders, and the Prepetition Secured Creditors shall not be responsible for the funding, direct payment or reimbursement of any fees or disbursements of any Case Professionals or any expenses of the members of a Statutory Committee (if appointed) incurred in connection with the Case or any Successor Cases, except as necessary to fund the Carve Out or the Professional Fee Escrow Account. Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Agent, the DIP Lenders, or the Prepetition Secured Creditors in

any way to pay compensation to or to reimburse expenses of any Case Professional (including any expenses of the members of a Statutory Committee (if appointed)), to guarantee that the Debtor has sufficient funds to pay such compensation or reimbursement, or as consent to the allowance of any particular professional fees or expense of any Case Professional.  Nothing in this Interim Order or otherwise shall be construed to increase the Carve Out if actual (i) Allowed Professional Fees of any Case Professional or (ii) Committee Expenses are higher in fact than the estimated fees and disbursements reflected in the Approved Budget.

(c)     *Payment of Carve Out*.  Upon the occurrence of the Termination Date, the DIP Obligations, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens and the Adequate Protection Superpriority Claims shall be subject to the payment of the unfunded amount of the Carve Out into the Professional Fee Escrow Account.  The funding of the Carve Out shall be added to and made a part of the DIP Obligations and secured by the DIP Collateral and otherwise entitled to the protections granted under this Interim Order, the DIP Loan Documents, the Bankruptcy Code and applicable law.

34.     <u>Limitations on the DIP Facility, the DIP Collateral, the Cash Collateral and the Case Professionals Carve Out</u>.  Unless otherwise ordered by the Court after notice to the DIP Agent and a hearing, or consented to by the DIP Agent, the DIP Facility, the DIP Collateral, the Cash Collateral and the Carve Out may not be used:  (a) in connection with or to finance in any way any action, suit, arbitration, proceeding, application, motion or other litigation of any type (i) adverse to or against the interests of the Prepetition Secured Creditors, the DIP Agent or the DIP Lenders or their rights and remedies under the DIP Loan Documents, the Prepetition Credit Documents, or this Interim Order or the Final Order, including, without limitation, for the payment of any services rendered by the professionals retained by the Debtor in connection with

the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment determination, declaration or similar relief, (ii) invalidating, setting aside, avoiding or subordinating, in whole or in part, the DIP Obligations or the Prepetition Obligations, (iii) for monetary, injunctive or other affirmative relief against the DIP Agent, the DIP Lenders, the Prepetition Secured Creditors, or their respective collateral, (iv) preventing, hindering or otherwise delaying the exercise by the DIP Agent, the DIP Lenders, or the Prepetition Secured Creditors of any rights and remedies under this Interim Order or the Final Order, the DIP Loan Documents, the Prepetition Credit Documents, or applicable law, or the enforcement or realization (whether by foreclosure, credit bid, further order of the Court or otherwise) by the DIP Agent upon any of the DIP Collateral, by the Prepetition Agent with respect to its Adequate Protection Liens, or (iv) to pursue litigation against any Prepetition Secured Creditor; (b) to make any distribution under a plan of reorganization in any Chapter 11 Case; (c) to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body; (d) to pay any fees or similar amounts to any person who has proposed or may propose to purchase interests in the Debtor; (e) objecting to, contesting, or interfering with, in any way, the DIP Agent's, the DIP Lenders', or the Prepetition Secured Creditors' enforcement or realization upon any of the DIP Collateral or Prepetition Collateral, as applicable, once an Event of Default has occurred, except as provided for in this Interim Order or Final Order, or seeking to prevent the DIP Agent or Prepetition Agent from credit bidding in connection with any proposed plan or reorganization or liquidation or any proposed transaction pursuant to section 363 of the Bankruptcy Code; (f) using or seeking to use Cash Collateral while the DIP Obligations or the Prepetition Obligations remain outstanding in a

manner inconsistent with the Approved Budget or this Interim Order; (g) using or seeking to use any insurance proceeds constituting DIP Collateral without the consent of the DIP Agent; (h) incurring Indebtedness (as defined in the DIP Credit Agreement) outside the ordinary course of business, except as permitted under the DIP Loan Documents; (i) objecting to or challenging in any way the claims, liens, or interests held by or on behalf of the DIP Agent or Prepetition Agent; (j) asserting, commencing or prosecuting any claims or causes of action whatsoever, including, without limitation, any actions under Chapter 5 of the Bankruptcy Code, against the DIP Agent, the DIP Lenders, or the Prepetition Secured Creditors; or (k) prosecuting an objection to, contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the DIP Obligations, the Prepetition Obligations, the DIP Liens, the Prepetition Liens or any other rights or interests of the DIP Agent, the DIP Lenders, or the Prepetition Secured Creditors *provided, however*, that the Carve Out and such collateral proceeds and loans under the DIP Credit Agreement may be used for allowed fees and expenses, in an amount not to exceed $25,000 in the aggregate, incurred solely by a Statutory Committee (if appointed), in investigating (but not prosecuting or challenging) the validity, enforceability, perfection, priority or extent of the Prepetition Liens within sixty (60) calendar days from formation of such Statutory Committee.

35.     Payment of Compensation.  Nothing herein shall be construed as a consent to the allowance of any professional fees or expenses of any Case Professionals or shall affect the right of the DIP Agent or any of the DIP Lenders to object to the allowance and payment of such fees and expenses.

36.     Reservation of Certain Third Party Rights and Bar of Challenges and Claims.

(a)     The stipulations, findings, representations and releases contained in this Interim Order and the DIP Loan Documents with respect to the Prepetition Secured Creditors and the Prepetition Obligations shall be binding upon all parties-in-interest, any trustee appointed in the Case and any Statutory Committee (if appointed) (each, a "**Challenge Party**"), unless and solely to the extent that (i) the Debtor received from a Challenge Party notice of a potential Challenge (defined below) during the Challenge Period (defined below) and (ii) the Court rules in favor of the plaintiff in any such timely and properly filed Challenge.  For purposes of this paragraph 36:  (a) "**Challenge**" means any claim or cause of action against any of the Prepetition Secured Creditors on behalf of the Debtor or the Debtor's creditors and interest holders, or to object to or to challenge the stipulations, findings or Debtor's Stipulations set forth herein, including, but not limited to those in relation to:  (i) the validity, extent, priority, or perfection of the mortgage, security interests, and liens of any Prepetition Secured Creditor; (ii) the validity, allowability, priority, or amount of the Prepetition Obligations (including any fees included therein); (iii) the secured status of the Prepetition Obligations; (iv) any liability of any of the Prepetition Secured Creditors with respect to anything arising from any of the respective Prepetition Credit Documents; or (v) the releases set forth in the DIP Loan Documents; and (b) "**Challenge Period**" means (i) with respect to any party-in-interest other than the Statutory Committee for unsecured creditors (if appointed), the period from the Petition Date until the date that is seventy five (75) calendar days after the entry of this Interim Order and (ii) with respect to the Statutory Committee for unsecured creditors (if appointed), the period from the date such Statutory Committee is formed, if applicable, until the date that is sixty (60) calendar days thereafter.

(b) During the Challenge Period, a Challenge Party shall be entitled to determine whether a basis to assert a Challenge exists. If a Challenge Party identifies a basis to assert a Challenge, it must notify the Debtor, the DIP Agent and the Prepetition Secured Creditors during the Challenge Period of its demand. Nothing herein shall be deemed to grant standing in favor of any Challenge Party absent further order of the Court.

(c) Upon the expiration of the Challenge Period without the filing of a Challenge (the "**Challenge Period Termination Date**"): (A) any and all such Challenges and objections by any party (including, without limitation, any Statutory Committee (if appointed), any Chapter 11 trustee, and/or any examiner or other estate representative appointed in the Case, and any Chapter 7 trustee and/or examiner or other estate representative appointed in any Successor Case), shall be deemed to be forever waived, released and barred, (B) all matters not subject to the Challenge, and all findings, Debtor's Stipulations, waivers, releases, affirmations and other stipulations as to the priority, extent, and validity as to each Prepetition Secured Creditor's claims, liens, and interests shall be of full force and effect and forever binding upon the Debtor, the Debtor's bankruptcy estate and all creditors, interest holders, and other parties in interest in the Case and any Successor Cases; and (C) any and all claims or causes of action against the Debtor or any of the Prepetition Secured Creditors relating in any way to the Debtor or the Prepetition Credit Documents shall be forever waived and released by the Debtor's estate, all creditors, interest holders and other parties in interest in this Case and any Successor Cases.

37. <u>Reservation of Rights</u>: Notwithstanding anything to the contrary contained in this Interim Order, in the event there is a timely and successful Challenge by any party in interest (in accordance with paragraph 36 hereof), the Court may unwind the repayment of the Prepetition Obligations and order the repayment of such amount to the extent that such payment resulted in

the payment of any Prepetition Obligations consisting of an unsecured claim or other amount not allowable under sections 502 and 506 of the Bankruptcy Code. Notwithstanding the foregoing, a successful Challenge shall not in any way affect the validity, enforceability or priority of the DIP Obligations or the DIP Liens unless otherwise ordered by the Court after notice to the DIP Agent and a hearing.

38. <u>No Third Party Rights</u>. Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

39. <u>Section 506(c) Claims</u>. Upon entry of the Final Order, no costs or expenses of administration which have been or may be incurred in the Case at any time shall be charged against the DIP Agent, the DIP Lenders or the DIP Collateral, the Prepetition Secured Creditors or the Prepetition Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise.

40. <u>No Marshaling/Applications of Proceeds</u>. Upon entry of the Final Order, neither the DIP Agent, the DIP Lenders, nor any of the Prepetition Secured Creditors shall be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral.

41. <u>Section 552(b)</u>. The DIP Agent shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code. Subject to the entry of the Final Order, the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Agent, the DIP Lenders, or any of the Prepetition Secured Creditors with respect to proceeds, products, offspring or profits of any of the Prepetition Collateral.

42. _Discharge Waiver_. The Debtor expressly stipulates, and the Court finds and adjudicates that, none of the DIP Obligations, the DIP Superpriority Claim or the DIP Liens shall be discharged by the entry of an order confirming any plan of reorganization, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless the DIP Obligations (including the DIP Roll-Up Loans) have been paid in full in cash on or before the effective date of a confirmed plan of reorganization. The Debtor expressly stipulates, and the Court finds and adjudicates that, none of the Adequate Protection Liens or Adequate Protection Superpriority Claims shall be discharged by the entry of an order confirming any plan of reorganization, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless the Adequate Protection Superpriority Claims and claims secured by the Adequate Protection Liens have been paid in full in cash on or before the effective date of a confirmed plan of reorganization. The Debtor shall not propose or support any plan or sale of all or substantially all of the Debtor's assets or entry of any confirmation order or sale order that is not conditioned upon the payment in full in cash, on the effective date of such plan of all DIP Obligations (including the DIP Roll-Up Loans) and Adequate Protection Superpriority Claims.

43. _No Superior Rights of Reclamation_. Based on the continuation of the Prepetition Liens, the relation back of the DIP Liens, and the integrated nature of the DIP Facility and the Prepetition Credit Documents, in no event shall any alleged right of reclamation or return (whether asserted under section 546(c) of the Bankruptcy Code or otherwise) be deemed to have priority over the DIP Liens.

44. _Rights Preserved_. Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly: (a) the DIP Agent's or the Prepetition Secured Creditors' right to seek any other or

supplemental relief in respect of the Debtor (including the right to seek additional adequate protection, including, without limitation, in the form of reimbursement of fees and expenses of counsel to the Prepetition Secured Creditors); (b) the rights of any of the Prepetition Secured Creditors to seek the payment by the Debtor of post-petition interest or fees pursuant to section 506(b) of the Bankruptcy Code; or (c) any of the rights of the DIP Agent under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of the Case or Successor Cases, conversion of the Case to a case under Chapter 7, or appointment of a Chapter 11 trustee or examiner with expanded powers, or (iii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a Chapter 11 plan or plans. Other than as expressly set forth in this Interim Order, any other rights, claims or privileges (whether legal, equitable or otherwise) of the DIP Agent, the DIP Lenders, and the Prepetition Secured Creditors are preserved.

45. <u>No Waiver by Failure to Seek Relief</u>. The failure of the DIP Agent, the DIP Lenders, or the Prepetition Secured Creditors to seek relief or otherwise exercise rights and remedies under this Interim Order, the DIP Loan Documents, the Prepetition Credit Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the DIP Agent, the DIP Lenders, or the Prepetition Secured Creditors.

46. <u>Binding Effect of Interim Order</u>. Immediately upon entry by the Court (notwithstanding any applicable law or rule to the contrary), the terms and provisions of this Interim Order shall become valid and binding upon and inure to the benefit of the Debtor, the DIP Agent, the DIP Lenders, the Prepetition Secured Creditors, all other creditors of the Debtor,

any Statutory Committee or any other court appointed committee (if appointed), and all other parties in interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in the Case, any Successor Cases, or upon dismissal of the Case or any Successor Case. Notwithstanding anything contained herein with respect to obligations or limitations when a Final Order is entered, the terms of the Final Order shall be what is binding on all parties.

47. <u>No Modification of Interim Order</u>. Until and unless the DIP Obligations and the Prepetition Obligations have been paid in full in cash (such payment being without prejudice to any terms or provisions contained in the DIP Facility or the Prepetition Facility which survive such discharge by their terms), and all commitments to extend credit under the DIP Facility have been terminated, the Debtor irrevocably waives any right to seek any amendment, modification or extension of this Interim Order without the prior written consent of each of the DIP Agent and Prepetition Agent, and no such consent shall be implied by any other action, inaction or acquiescence of the DIP Agent and/or the Prepetition Agent.

48. <u>Interim Order Controls</u>. In the event of any inconsistency between the terms and conditions of the DIP Loan Documents or this Interim Order, the provisions of this Interim Order shall govern and control.

49. <u>Survival</u>. The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered: (a) confirming any plan of reorganization in the Case; (b) converting the Case to a case under Chapter 7 of the Bankruptcy Code; (c) dismissing the Case or any Successor Cases; or (d) pursuant to which the Court abstains from hearing the Case or any Successor Cases. The terms and provisions of this Interim Order, including the claims, liens, security interests and other protections granted to the DIP

Agent, DIP Lenders, and Prepetition Secured Creditors pursuant to this Interim Order and/or the DIP Loan Documents, notwithstanding the entry of any such order, shall continue in the Case, in any Successor Cases, or following dismissal of the Case or any Successor Cases, and shall maintain their priority as provided by this Interim Order until all DIP Obligations and Prepetition Obligations have been paid in full in cash and all commitments to extend credit under the DIP Facility are terminated. The terms and provisions concerning the indemnification of the DIP Agent and the Prepetition Secured Creditors shall continue in the Case and in any Successor Cases, following dismissal of the Case or any Successor Cases, following termination of the DIP Loan Documents and/or the repayment of the DIP Obligations and the Prepetition Obligations.

50. <u>Final Hearing</u>. The Final Hearing to consider entry of the Final Order and final approval of the DIP Facility is scheduled for **August 28, 2019, at 2:00 p.m. (CT)** before the Honorable Ronald B. King, United States Bankruptcy Judge at the United States Bankruptcy Court for the Western District of Texas. On or before August 12, 2019, the Debtor shall serve, by United States mail, first-class postage prepaid, notice of the entry of this Interim Order and of the Final Hearing (the "**<u>Final Hearing Notice</u>**"), together with copies of this Interim Order and the DIP Motion, on: (a) the parties having been given notice of the Interim Hearing; (b) any party which has filed prior to such date a request for notices with this Court; (c) counsel for a Statutory Committee (if appointed); (d) the Securities and Exchange Commission; and (e) the Internal Revenue Service. The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Court no later than on **August 23, 2019, at 4:00 p.m. (CT)**, which objections shall be served so as to be received on or before such date by: (i) counsel to the Debtor, Eric Terry Law, PLLC, 3511 Broadway St., San Antonio, Texas 78209, Attn: Eric B. Terry; (ii) counsel to the DIP Agent and

the Prepetition Revolving Loan Agent, Choate, Hall & Stewart, LLP, Two International Place, Boston, Massachusetts 02110, Attn: John F. Ventola and Jonathan D. Marshall, and Jackson Walker LLP, 112 East Pecan Street, Suite 2400, San Antonio, Texas 78205, Attn: J. Scott Rose; (iii) counsel to any Statutory Committee (if appointed); and (iv) Kevin M. Epstein, Office of the United States Trustee, 615 East Houston Street, Suite 533, San Antonio, Texas 78205. Any party wishing to appear by phone in connection with the Final Hearing should contact the Court's setting clerk at deanna_castleberry@txwb.uscourts.gov to arrange for such telephonic appearance.

51.     Treatment of Proceeds from Sale of Texas Assets.  As adequate protection for the claims of the Local Texas Tax Authorities, the Debtor will fund a segregated account (the "Local Texas Tax Account"), in an amount to be determined in Final Order, from the proceeds of the non-ordinary course sale of any of the Debtor's assets located in the state of Texas that occurs after the Petition Date.  The liens asserted by the Local Texas Tax Authorities (and all other liens junior to those of the Local Texas Tax Authorities) shall attach to the Local Texas Tax Account to the same extent and with the same priority as the liens the Local Texas Tax Authorities assert against such assets of the Debtor.  The Local Texas Tax Account shall be maintained solely for the purpose of providing adequate protection for the Local Texas Tax Authorities prior to the distribution of any proceeds to any other creditor and shall constitute neither the allowance of the claims of the Local Texas Tax Authorities, nor a floor or cap on the amounts the Local Texas Tax Authorities may be entitled to receive.  All parties' rights to object to the priority, validity, amount and extent of the claims and liens asserted by the Local Texas Tax Authorities are fully preserved.  Funds in the Local Texas Tax Account may be distributed upon agreement between the Local Texas Tax Authorities and the Debtor, with the consent of the DIP Agent, or by

subsequent order of the Court, duly noticed to the Local Texas Tax Authorities and the DIP Agent.

52. <u>Consulting Agreement</u>. Subject to paragraphs 36 and 37, the liens and security interests granted pursuant to the Consulting Agreement dated as of July 26, 2019 by and between the Debtor and a contractual joint venture comprised of Hilco Merchant Resources, LLC and SB360 Capital Partners, LLC (the "<u>Consulting Agreement</u>") are valid, enforceable, perfected, non-avoidable, and have the priority set forth in the Consulting Agreement. Nothing in this Interim Order or the DIP Loan Documents shall prime the liens and security interests granted on the "Additional Agent Goods" (as defined in the Consulting Agreement) pursuant to the Consulting Agreement. Notwithstanding anything to the contrary herein, the DIP Agent (subject to the order authorizing the assumption of the Consulting Agreement) and the DIP Lenders shall have no obligation (other than to make proceeds available in accordance with the terms of the DIP Loan Documents) to fund any payments to be made under the Consulting Agreement.

53. <u>Effect of this Interim Order</u>. This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect immediately, notwithstanding anything to the contrary proscribed by applicable law.

54. <u>Retention of Jurisdiction</u>. The Court has and will retain jurisdiction to enforce this Interim Order according to its terms.

### ###

# EXHIBIT A

**DIP Credit Agreement**

DEBTOR-IN-POSSESSION CREDIT AGREEMENT

Dated as of August [\_\_], 2019

among

A'GACI, L.L.C.,

as the Borrower,

The Guarantors Named Herein,

SECOND AVENUE CAPITAL PARTNERS, LLC,

as Administrative Agent and Collateral Agent

and

The Other Lenders Party Hereto

ARTICLE I DEFINITIONS AND ACCOUNTING TERMS ................................................................. 1
    1.01    Defined Terms ........................................................................................... 1
    1.02    Other Interpretive Provisions ................................................................. 34
    1.03    Accounting Terms Generally .................................................................. 35
    1.04    Rounding ................................................................................................. 35
    1.05    Times of Day .......................................................................................... 35

ARTICLE II THE COMMITMENTS AND BORROWINGS ......................................................... 35
    2.01    Committed Revolving Loans; Reserves .................................................. 35
    2.02    Borrowings of Committed Revolving Loans .......................................... 36
    2.03    Reserved ................................................................................................. 37
    2.04    Reserved ................................................................................................. 37
    2.05    Prepayments; Pre-Petition Obligations .................................................. 37
    2.06    Termination or Reduction of Aggregate Revolving Commitments ........ 38
    2.07    Repayment of Committed Revolving Loans ........................................... 39
    2.08    Interest .................................................................................................... 39
    2.09    Fees ........................................................................................................ 39
    2.10    Computation of Interest and Fees; Application of Payments ................. 40
    2.11    Evidence of Debt .................................................................................... 40
    2.12    Payments Generally; Agent's Clawback ................................................ 40
    2.13    Sharing of Payments by Lenders ........................................................... 42
    2.14    Settlement Amongst Lenders ................................................................. 42
    2.15    Release ................................................................................................... 43
    2.16    Defaulting Lenders ................................................................................ 43
    2.17    Waiver of Priming Rights ...................................................................... 44

ARTICLE III TAXES, YIELD PROTECTION AND ILLEGALITY ........................................... 44
    3.01    Taxes ...................................................................................................... 44
    3.02    Illegality ................................................................................................. 46
    3.03    Inability to Determine Rates .................................................................. 46
    3.04    Increased Costs; Reserves on Committed Revolving Loans .................. 46
    3.05    Reserved ................................................................................................. 48
    3.06    Mitigation Obligations; Replacement of Lenders .................................. 48
    3.07    Survival .................................................................................................. 48

ARTICLE IV CONDITIONS PRECEDENT TO REVOLVING CREDIT BORROWINGS .................. 48
    4.01    Conditions of Initial Revolving Credit Borrowing ................................ 48
    4.02    Conditions to all Revolving Credit Borrowings ..................................... 51

ARTICLE V REPRESENTATIONS AND WARRANTIES ......................................................... 52
    5.01    Existence, Qualification and Power ....................................................... 52
    5.02    Authorization; No Contravention .......................................................... 53
    5.03    Governmental Authorization; Other Consents ...................................... 53
    5.04    Binding Effect ........................................................................................ 53
    5.05    Financial Statements; No Material Adverse Effect ................................ 53
    5.06    Litigation ................................................................................................ 54
    5.07    No Default .............................................................................................. 54
    5.08    Ownership of Property; Liens ................................................................ 54

| | | |
|---|---|---|
| 5.09 | Environmental Compliance | 55 |
| 5.10 | Insurance | 55 |
| 5.11 | Taxes | 55 |
| 5.12 | ERISA Compliance | 56 |
| 5.13 | Subsidiaries; Equity Interests | 56 |
| 5.14 | Margin Regulations; Investment Company Act | 57 |
| 5.15 | Disclosure | 57 |
| 5.16 | Compliance with Laws | 57 |
| 5.17 | Intellectual Property; Licenses, Etc | 57 |
| 5.18 | Labor Matters | 57 |
| 5.19 | Security Documents | 58 |
| 5.20 | Bankruptcy Matters | 58 |
| 5.21 | Deposit Accounts; Credit Card Arrangements | 59 |
| 5.22 | Brokers | 59 |
| 5.23 | Customer and Trade Relations | 60 |
| 5.24 | Material Contracts | 60 |
| 5.25 | Casualty | 60 |
| 5.26 | Reserved | 60 |
| 5.27 | Approved Budget | 60 |
| 5.28 | Personally Identifiable Information | 60 |
| 5.29 | OFAC; Sanctions; Anti-Corruption Laws; Anti-Money Laundering Laws | 60 |
| **ARTICLE VI AFFIRMATIVE COVENANTS** | | 61 |
| 6.01 | Financial Statements | 61 |
| 6.02 | Certificates; Other Information | 61 |
| 6.03 | Notices | 62 |
| 6.04 | Payment of Obligations | 63 |
| 6.05 | Preservation of Existence, Etc | 64 |
| 6.06 | Maintenance of Properties | 64 |
| 6.07 | Maintenance of Insurance | 64 |
| 6.08 | Compliance with Laws | 65 |
| 6.09 | Books and Records; Accountants | 66 |
| 6.10 | Inspection Rights | 66 |
| 6.11 | Use of Proceeds | 67 |
| 6.12 | Additional Loan Parties | 67 |
| 6.13 | Cash Management | 67 |
| 6.14 | Information Regarding the Collateral | 69 |
| 6.15 | Commercial Finance Examinations | 70 |
| 6.16 | Environmental Laws | 70 |
| 6.17 | Further Assurances | 70 |
| 6.18 | Compliance with Terms of Leaseholds | 71 |
| 6.19 | Material Contracts | 71 |
| 6.20 | Reserved | 71 |
| 6.21 | Reserved | 71 |
| 6.22 | Employee Benefit Plans | 72 |
| 6.23 | Inventory Tracking and Security | 72 |
| 6.24 | Personally Identifiable Information | 73 |
| 6.25 | Financial Advisor | 73 |
| 6.26 | OFAC; Sanctions; Anti-Corruption Laws; Anti-Coney Laundering Laws | 73 |
| 6.27 | Retention of Consultant; Communication with Accountants and Other Financial Advisors | 73 |

6.28    Performance within Budget ........................................................................... 74
6.29    Bankruptcy Related Affirmative Covenants .............................................. 74
6.30    Lease Extension ........................................................................................... 75
6.31    Financing Orders ......................................................................................... 75

ARTICLE VII NEGATIVE COVENANTS ................................................................... 75

7.01    Liens ............................................................................................................ 75
7.02    Investments ................................................................................................. 75
7.03    Indebtedness; Disqualified Stock ............................................................... 75
7.04    Fundamental Changes .................................................................................. 76
7.05    Dispositions ................................................................................................. 76
7.06    Restricted Payments .................................................................................... 76
7.07    Prepayments of Indebtedness ...................................................................... 76
7.08    Change in Nature of Business ..................................................................... 76
7.09    Transactions with Affiliates ........................................................................ 77
7.10    Burdensome Agreements ............................................................................. 77
7.11    Use of Proceeds .......................................................................................... 77
7.12    Amendment of Material Documents ........................................................... 77
7.13    Fiscal Year .................................................................................................. 77
7.14    Deposit Accounts; Credit Card Processors ................................................ 78
7.15    Reclamation Claims .................................................................................... 78
7.16    Designation of Senior Debt ........................................................................ 78
7.17    New Store Locations ................................................................................... 78
7.18    Bankruptcy Related Negative Covenants ................................................... 78
7.19    Subsidiaries ................................................................................................. 79

ARTICLE VIII EVENTS OF DEFAULT AND REMEDIES .......................................... 79

8.01    Events of Default ........................................................................................ 79
8.02    Remedies Upon Event of Default ............................................................... 83
8.03    Application of Funds ................................................................................... 84

ARTICLE IX THE AGENT ............................................................................................ 85

9.01    Appointment and Authority ........................................................................ 85
9.02    Rights as a Lender ....................................................................................... 85
9.03    Exculpatory Provisions ............................................................................... 85
9.04    Reliance by Agent ....................................................................................... 86
9.05    Delegation of Duties ................................................................................... 86
9.06    Resignation of Agent .................................................................................. 86
9.07    Non-Reliance on Agent and Other Lenders ............................................... 87
9.08    No Other Duties, Etc ................................................................................... 87
9.09    Agent May File Proofs of Claim ................................................................ 87
9.10    Collateral and Guaranty Matters ................................................................ 88
9.11    Notice of Transfer ....................................................................................... 88
9.12    Reports and Financial Statements .............................................................. 89
9.13    Agency for Perfection ................................................................................. 89
9.14    Indemnification of Agent ............................................................................ 89
9.15    Relation among Lenders .............................................................................. 90

ARTICLE X MISCELLANEOUS ................................................................................... 90

10.01    Amendments, Etc ........................................................................................ 90
10.02    Notices; Effectiveness; Electronic Communications ................................. 91

10.03   No Waiver; Cumulative Remedies ........................................................................ 92
10.04   Expenses; Indemnity; Damage Waiver ............................................................... 93
10.05   Payments Set Aside ............................................................................................ 94
10.06   Successors and Assigns ...................................................................................... 94
10.07   Treatment of Certain Information; Confidentiality ............................................. 98
10.08   Right of Setoff ................................................................................................... 98
10.09   Interest Rate Limitation ..................................................................................... 99
10.10   Counterparts; Integration; Effectiveness ............................................................ 99
10.11   Survival .............................................................................................................. 99
10.12   Severability ...................................................................................................... 100
10.13   Replacement of Lenders ................................................................................... 100
10.14   Governing Law; Jurisdiction; Etc .................................................................... 101
10.15   Waiver of Jury Trial ......................................................................................... 102
10.16   No Advisory or Fiduciary Responsibility; Disclosure Regarding Affiliates ......... 102
10.17   USA PATRIOT Act Notice ............................................................................. 103
10.18   Foreign Asset Control Regulations ................................................................... 103
10.19   Time of the Essence ......................................................................................... 103
10.20   Reserved .......................................................................................................... 103
10.21   Press Releases; Non-Disclosure ....................................................................... 104
10.22   Additional Waivers ........................................................................................... 104
10.23   No Strict Construction ...................................................................................... 106
10.24   Attachments ..................................................................................................... 106

**SCHEDULES**

| | |
|---|---|
| 2.01 | Revolving Commitments and Applicable Percentages |
| 5.01 | Loan Parties Organizational Information |
| 5.08(b)(1) | Owned Real Estate |
| 5.08(b)(2) | Leased Real Estate |
| 5.09 | Environmental Matters |
| 5.10 | Insurance |
| 5.13 | Subsidiaries; Equity Interests in the Borrower |
| 5.17 | Intellectual Property Matters |
| 5.18 | Collective Bargaining Agreements |
| 5.20 | Initial Approved Budget |
| 5.21(a) | DDAs |
| 5.21(b) | Credit Card Arrangements |
| 5.24 | Material Contracts |
| 6.02 | Financial and Collateral Reporting |
| 7.01 | Existing Liens |
| 7.03 | Existing Indebtedness |
| 7.09 | Affiliate Transactions |
| 10.02 | Agent's Office; Certain Addresses for Notices |

**EXHIBITS**

*Form of*

| | |
|---|---|
| A | Committed Loan Notice |
| B | Note |
| C | [Reserved] |
| D | [Reserved] |
| E | Assignment and Assumption |
| F | Borrowing Base Certificate |
| G | Credit Card Notification |
| H | DDA Notification |
| I | Cash Management Order |
| J | Interim Financing Order |

DEBTOR-IN-POSSESSION CREDIT AGREEMENT

This **DEBTOR-IN-POSSESSION CREDIT AGREEMENT** ("<u>Agreement</u>") is entered into as of August [__], 2019, among A'GACI, L.L.C., a Texas limited liability company, as a debtor and a debtor-in-possession (the "<u>Borrower</u>"), the Guarantors from time to time party hereto, each Lender from time to time party hereto, and Second Avenue Capital Partners, LLC, as Administrative Agent and Collateral Agent.

On August [__], 2019 (the "Petition Date", the Borrower commenced a case under Chapter 11 of the Bankruptcy Code, 11 U.S.C. 101 et seq. (the "<u>Bankruptcy Code</u>"), case number [_____] (the "<u>Chapter 11 Case</u>") by filing a voluntary petition for relief under Chapter 11 with the United States Bankruptcy Court for the Western District of Texas (the "<u>Bankruptcy Court</u>"), and the Borrower continues to operate its businesses and manage its properties as a debtor and a debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

The Borrower has requested, and the Agent and the Lenders have agreed, upon the terms and conditions set forth in this Agreement, to make available to the Borrower a senior secured revolving credit facility in an aggregate principal amount not to exceed $10,000,000 in order to (a) repay the Pre-Petition Obligations as provided herein, (b) fund the Chapter 11 Case (including, without limitation, (x) payment of transaction expenses and fees, expenses and costs incurred in connection herewith and (y) payment of adequate protection payments approved in the Financing Orders) in accordance with the Approved Budget and as provided herein (subject to the Permitted Variance), (c) make certain other payments on the Closing Date as more fully provided in this Agreement, and (d) provide working capital for the Borrower during the pendency of the Chapter 11 Case in accordance with the Approved Budget and as provided herein (subject to the Permitted Variance).

The Borrower and the other Loan Parties desire to secure the Obligations under the Loan Documents by granting to the Agent, on behalf of itself and the other Credit Parties, a security interest in and Liens upon substantially all of their assets, whether now existing or hereafter acquired, in each instance as more fully set forth in the Loan Documents and the Interim Financing Order (or the Final Financing Order when applicable).

All Obligations of the Loan Parties to the Agent and the Lenders hereunder and under the other Loan Documents shall be full recourse to each of the Loan Parties, secured by the Agent's security interest and liens on all or substantially all of the assets of the Loan Parties included in the Collateral and entitled to super-priority administrative claim status under the Bankruptcy Code as provided herein and in the Financing Orders.

In consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

## <u>ARTICLE I</u>
## DEFINITIONS AND ACCOUNTING TERMS

**1.01    Defined Terms**.  As used in this Agreement, the following terms shall have the meanings set forth below:

"ACH" means automated clearing house transfers.

"Accommodation Payment" as defined in Section <u>10.22(d)</u>.

"Account" means "accounts" as defined in the UCC, and also means a right to payment of a monetary obligation, whether or not earned by performance, (a) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of, (b) for services rendered or to be rendered, (c) for a policy of insurance issued or to be issued, (d) for a secondary obligation incurred or to be incurred, (e) for energy provided or to be provided, (f) for the use or hire of a vessel under a charter or other contract, (g) arising out of the use of a credit or charge card or information contained on or for use with the card, or (h) as winnings in a lottery or other game of chance operated or sponsored by a state, governmental unit of a state, or person licensed or authorized to operate the game by a state or governmental unit of a state. The term "Account" includes health-care-insurance receivables.

"Acquisition" means, with respect to any Person (a) an investment in, or a purchase of, a Controlling interest in the Equity Interests of any other Person, (b) a purchase or other acquisition of all or substantially all of the assets or properties of, another Person or of any business unit of another Person, (c) any merger or consolidation of such Person with any other Person or other transaction or series of transactions resulting in the acquisition of all or substantially all of the assets, or a Controlling interest in the Equity Interests, of any Person, or (d) any acquisition of any Store locations of any Person, in each case in any transaction or group of transactions which are part of a common plan.

"Act" shall have the meaning specified in Section 10.17.

"Administration Fee" has the meaning specified in Section 2.09(c).

"Administrative Agent" means Second Avenue in its capacity as administrative agent under any of the Loan Documents, or any successor thereto in such capacities.

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by the Agent.

"Advisor Motion" has the meaning specified in Section 6.29(c).

"Affiliate" means, with respect to any Person, (i) another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified, (ii) any director, officer, managing member, partner, trustee, or beneficiary of that Person, (iii) any other Person directly or indirectly holding ten percent (10%) or more of any class of the Equity Interests of that Person, and (iv) any other Person ten percent (10%) or more of any class of whose Equity Interests is held directly or indirectly by that Person.

"Agent" means Second Avenue in its capacity as Administrative Agent and Collateral Agent under any of the Loan Documents, or any successor thereto in such capacities.

"Agent's Office" means the Agent's address and, as appropriate, account as set forth on Schedule 10.02, or such other address or account as the Agent may from time to time notify the Borrower and the Lenders.

"Aggregate Revolving Commitments" means the Revolving Commitments of all of the Lenders. As of the Closing Date, the Aggregate Revolving Commitments are $10,000,000.

"Agreement" means this Credit Agreement.

"Allocable Amount" has the meaning specified in Section 10.22(d).

"Anti-Corruption Laws" means the FCPA, the U.K. Bribery Act of 2010, as amended, and all other applicable laws and regulations or ordinances concerning or relating to bribery, money laundering or corruption in any jurisdiction in which any Loan Party or any of its Subsidiaries or Affiliates is located or is doing business.

"Anti-Money Laundering Laws" means the applicable laws or regulations in any jurisdiction in which any Loan Party or any of its Subsidiaries or Affiliates is located or is doing business that relates to money laundering, any predicate crime to money laundering, or any financial record keeping and reporting requirements related thereto.

"Applicable Lenders" means the Required Lenders, all affected Lenders, or all Lenders, as the context may require.

"Applicable Margin" means ten and one-half percent (10.50%) per annum.

"Applicable Percentage" means, with respect to any Lender at any time, the percentage of the sum of the Aggregate Revolving Commitments represented by the sum of such Lender's Revolving Commitment at such time. If the commitment of each Lender to make Committed Revolving Loans has been terminated pursuant to Section 2.06 or Section 8.02 or if the Aggregate Revolving Commitments have expired, then the Applicable Percentage of each Lender shall be determined based on the Applicable Percentage of such Lender most recently in effect, giving effect to any subsequent assignments. The initial Applicable Percentage of each Lender is set forth opposite the name of such Lender on Schedule 2.01 or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable.

"Appraised Value" means, with respect to Eligible Inventory, the appraised orderly liquidation value, net of costs and expenses to be incurred in connection with any such liquidation, which value is expressed as a percentage of Cost of Eligible Inventory as set forth in the inventory stock ledger of the Borrower, which value shall be determined from time to time by the most recent appraisal undertaken by an independent appraiser engaged by the Agent.

"Approved Budget" means the budget prepared by the Borrower and furnished to the Agent on the Closing Date, as the same may or shall, as applicable, be updated, modified and/or supplemented thereafter from time to time as provided in Section 6.01(a), which the Borrower shall use its best efforts to prepare on a book basis (not incorporating any check "float") and shall include a weekly cash budget, including information on a cumulative basis by category (except with respect to professional fees and expenses, which shall be on a line item basis) as to, among other things (w) projected credit card collections, inventory proceeds, furniture, fixtures and equipment proceeds, insurance claim proceeds, and ordinary course receipts (x) projected disbursements (including, without limitation, ordinary course operating expenses, bankruptcy-related expenses (including professional fees and expenses), payroll, rent, tax, credit card fees, insurance and fees and expenses of the Agent and the Lenders (including counsel therefor) and any other fees and expenses relating to the Loan Documents), (y) projected inventory levels and inventory receipts, and (z) a calculation of the Borrowing Base, Total Revolver Outstandings, Pre-Petition Obligations and Availability, which budget and any update thereof shall be acceptable to the Agent in its Permitted Discretion.

"Approved Budget Variance Report" means a weekly report in form and substance acceptable to the Agent in its Permitted Discretion provided by the Borrower to the agent in accordance with Section 6.01(b): (i) showing on a cumulative and weekly basis by category (or line item, as applicable) actual receipts for both inventory and credit card collections and furniture, fixtures and equipment proceeds, actual disbursement amounts, cash on hand, calculation of the Borrowing Base, Total Revolver

Outstandings, Pre-Petition Obligations and Availability as of Saturday of each week on a cumulative and weekly basis, noting therein all variances, on a cumulative or line item basis, as applicable, from amounts set forth for such period in the Approved Budget, and shall include explanations for all material variances, and (ii) certified by a Responsible Officer of the Borrower.

"Approved Fund" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender, (c) an entity or an Affiliate of an entity that administers or manages a Lender, or (d) the same investment advisor or an advisor under common control with such Lender, Affiliate or advisor, as applicable.

"Approved Liquidator" means a professional liquidator, broker or other advisor acceptable to the Agent in its Permitted Discretion.

"Assignee Group" means two or more Eligible Assignees that are Affiliates of one another or two or more Approved Funds managed by the same investment advisor.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee, and accepted by the Agent, in substantially the form of Exhibit E or any other form approved by the Agent.

"Attributable Indebtedness" means, on any date, (a) in respect of any Capital Lease Obligation of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP, and (b) in respect of any Synthetic Lease Obligation, the capitalized amount of the remaining lease or similar payments under the relevant lease or other applicable agreement or instrument that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP if such lease, agreement or instrument were accounted for as a capital lease.

"Availability" means, as of any date of determination thereof by the Agent, the result, if a positive number, of:

      (a)     the Maximum Revolving Loan Amount

      minus

      (b)     the Total Revolver Outstandings.

In calculating Availability at any time and for any purpose under this Agreement, the Borrower shall certify to the Agent that all accounts payable (including, without limitation, all rents) and Taxes are being paid on a timely basis.

"Availability Block" means an amount equal to $0; provided, however, that after the occurrence and during the continuance of an Event of Default, the Availability Block shall mean the greater of (a) $0 and (b) such other amount established from time to time by the Agent.

"Availability Period" means the period from and including the Closing Date to the earliest of (a) the Maturity Date, (b) the date of termination of the Aggregate Revolving Commitments pursuant to Section 2.06, and (c) the date of termination of the commitment of each Lender to make Committed Revolving Loans pursuant to Section 8.02.

"Availability Reserves" means, without duplication of any other Reserves or items to the extent such items are otherwise addressed or excluded through eligibility criteria, such reserves as the Agent

from time to time determines in its Permitted Discretion as being appropriate (a) to reflect the impediments to the Agent's ability to realize upon the Collateral, (b) to reflect claims and liabilities that the Agent determines will need to be satisfied in connection with the realization upon the Collateral, including, without limitation, amounts entitled to priority under Section 503(b) of the Bankruptcy Code, as reasonable determined by the Agent, (c) to reflect criteria, events, conditions, contingencies or risks which adversely affect any component of the Borrowing Base, or the assets, business, financial performance or financial condition of any Loan Party, or (d) to reflect that a Default or an Event of Default then exists. Without limiting the generality of the foregoing, Availability Reserves may include, in the Agent's Permitted Discretion, (but are not limited to) reserves based on: (i) rent; (ii) customs duties, and other costs to release Inventory which is being imported into the United States; (iii) outstanding Taxes and other governmental charges, including, without limitation, ad valorem, real estate, personal property, sales, claims of the PBGC and other Taxes which may have priority over the interests of the Agent in the Collateral; (iv) salaries, wages and benefits due to employees of the Borrower; (v) Customer Credit Liabilities; (vi) Customer Deposits; (vii) reserves for reasonably anticipated changes in the Appraised Value of Eligible Inventory between appraisals; (viii) warehousemen's or bailee's charges and other Permitted Encumbrances which may have priority over the interests of the Agent in the Collateral; (ix) amounts due to vendors on account of consigned goods; and (x) the Carve-Out Reserve. For the avoidance of doubt, the Pre-Petition Reserve shall not be included in "Availability Reserves".

"Bankruptcy Code" has the meaning specified in the recitals hereto.

"Bankruptcy Court" has the meaning specified in the recitals hereto.

"Blocked Account" has the meaning specified in Section 6.13(a)(ii).

"Blocked Account Agreement" means with respect to an account established by a Loan Party, an agreement, in form and substance satisfactory to the Agent, establishing control (as defined in the UCC) of such account by the Agent and whereby the bank maintaining such account agrees, to comply only with the instructions originated by the Agent without the further consent of any Loan Party.

"Blocked Account Bank" means each bank with whom deposit accounts are maintained in which any funds of any of the Loan Parties, from one or more DDAs are concentrated and with whom a Blocked Account Agreement has been, or is required to be, executed in accordance with the terms hereof; provided, that a bank shall not qualify as a Blocked Account Bank if the only DDAs of the Loan Parties held by such bank are Excluded Accounts.

"Borrower Materials" means any Borrowing Base information, reports, financial statements and other materials delivered by the Borrower hereunder, as well as other Reports and information provided by the Agent to the Lenders.

"Borrower" has the meaning specified in the introductory paragraph hereto.

"Borrowing Base" means, at any time of calculation, an amount equal to:

> (a) the face amount of Eligible Credit Card Receivables multiplied by the Credit Card Advance Rate;

> plus

> (b) the Cost of Eligible Inventory, net of Inventory Reserves, multiplied by the Appraised Value of Eligible Inventory, multiplied by the Inventory Advance Rate;

minus

(c)     the Availability Block;

minus

(d)     the then amount of all Availability Reserves.

"Borrowing Base Certificate" means a certificate substantially in the form of Exhibit F hereto (with such changes therein as may be required by the Agent to reflect the components of and reserves against the Borrowing Base as provided for hereunder from time to time), executed and certified as accurate and complete by a Responsible Officer of the Borrower which shall include appropriate exhibits, schedules, supporting documentation, and additional reports as reasonably requested by the Agent.

"Business" means the sale of consumer fashion goods, including apparel, shoes and accessories to end-users.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state where the Agent's Office is located.

"Capital Expenditures" means, with respect to any Person for any period, (a) all expenditures made (whether made in the form of cash or other property) or costs incurred for the acquisition or improvement of fixed or capital assets of such Person (excluding normal replacements and maintenance which are properly charged to current operations), in each case that are (or should be) set forth as capital expenditures in a Consolidated statement of cash flows of such Person for such period, in each case prepared in accordance with GAAP, and (b) Capital Lease Obligations incurred by a Person during such period.

"Capital Lease Obligations" means, with respect to any Person for any period, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as liabilities on a balance sheet of such Person under GAAP and the amount of which obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"Carve-Out" means, collectively, the sum of (a) allowed administrative expenses pursuant to 28 U.S.C. § 1930(a)(6) for fees payable to the Office of the United States Trustee, as determined by agreement of the U.S. Trustee or by final order of the Bankruptcy Court and 28 U.S.C. § 156(c) for fees required to be paid to the Clerk of the Bankruptcy Court; (b) all Reported Fee Accruals, allowed at any time by the Bankruptcy Court and incurred by the Case Professionals through the date of service by the Agent of a Carve-Out Trigger Notice, up to and as limited by the respective weekly or aggregate Approved Budget amounts for each Case Professional or category of Case Professional through, but not including, the date of service of said Carve-Out Trigger Notice, less the amount of prepetition retainers received by such Case Professionals and not previously applied to fees and expenses, which amounts shall be funded by the Lenders under this Agreement into a segregated escrow account (the "Professional Fee Escrow Account") on a weekly basis in an amount, with respect to each Case Professional, not to exceed the amount attributable to such Case Professional in the Approved Budget; and (c) all accrued and unpaid fees, disbursements, costs and expenses incurred by the Case Professionals from and after the date of service of a Carve-Out Trigger Notice, to the extent allowed at any time, in an aggregate amount not to exceed the "Carve-Out Cap less the amount of prepetition retainers received by such Case Professionals and not applied to the fees, disbursements, costs and expenses set forth in clause (b) above. The Carve-

Out Cap shall be reduced on a dollar-for-dollar basis by any payments of fees or expenses of the Case Professionals made after delivery of the Carve-Out Trigger Notice in respect of fees and expenses incurred after delivery of the Carve-Out Trigger Notice. For the avoidance of doubt, the Agent and Lenders reserve the right to object to the fees and expenses of any Cash Professional with the Bankruptcy Court; to the extent any such objection is brought by Agent or Lenders, any amounts in dispute in excess of the amounts reflected in the Approved Budget will remain in the Professional Fee Escrow Account until such objection has been resolved.

"Carve-Out Cap" means $25,000.

"Carve-Out Reserve" means a Reserve in the amount of the Carve-Out.

"Carve-Out Trigger Notice" means a written notice by the Agent to lead counsel for the Borrower, any Statutory Committee and the U.S. Trustee following the occurrence of an Event of Default, expressly stating that no additional Committed Revolving Loans may be requested to fund the Carve-Out.

"Case Professionals" means Borrower's and any Statutory Committee's professionals, retained by either of them by final order of the Bankruptcy Court (which order has not been reversed, vacated or stayed unless such stay is no longer effective) under Sections 327 or 1103(a) of the Bankruptcy Code.

"Cash Management Order" means the order of the Bankruptcy Court entered in the Chapter 11 Case, together with all extensions, modifications and amendments that are in form and substance acceptable to the Agent in its Permitted Discretion, which, among other matters, authorizes the Borrower to use its cash management system, substantially in the form of Exhibit I or another form satisfactory to the Agent in its Permitted Discretion.

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq.

"CERCLIS" means the Comprehensive Environmental Response, Compensation, and Liability Information System maintained by the United States Environmental Protection Agency.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority, or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided, however, for the purposes of this Agreement: (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Change of Control" means an event or series of events by which:

(a) during any period of twelve (12) consecutive months, a majority of the members of the board of directors or other equivalent governing body of the Borrower cease to be composed of individuals (i) who were members of that board or equivalent governing body on the first day of such period, (ii) whose election or nomination to that board or equivalent governing body was approved by individuals referred to in clause (i) above constituting at the time of such election or nomination at least a

majority of that board or equivalent governing body, or (iii) whose election or nomination to that board or other equivalent governing body was approved by individuals referred to in clauses (i) and (ii) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body; or

> (b)     any Person or two or more Persons acting in concert shall have acquired by contract or otherwise, or shall have entered into a contract or arrangement that, upon consummation thereof, will result in its or their acquisition of the power to exercise, directly or indirectly, a controlling influence over the management or policies of the Borrower, or control over the Equity Interests of the Borrower entitled to vote for members of the board of directors or equivalent governing body of the Borrower on a fully-diluted basis (and taking into account all such securities that such Person or Persons have the right to acquire pursuant to any option right) representing twenty percent (20%) or more of the combined voting power of such securities; or

> (c)     any "change in control" or "sale" or "disposition" or similar event as defined in any Organization Document of any Loan Party or in any Material Contract, or any document governing Material Indebtedness of any Loan Party;

> (d)     the Borrower fails at any time to own, directly or indirectly, one-hundred percent (100%) of the Equity Interests of each other Loan Party free and clear of all Liens (other than the Liens in favor of the Agent), except where such failure is as a result of a transaction permitted by the Loan Documents; or

> (e)     any Key Person shall for any reason either cease to hold such office or be actively engaged in the day-to-day management of the Borrower, unless a successor with similar industry experience, reputation and expertise is appointed within forty-five (45) days of such cessation and such successor is approved by the Agent in its Permitted Discretion.

"Chapter 11 Case" has the meaning specified in the recitals to this Agreement.

"Closing Date" means the first date all the conditions precedent in Section 4.01 are satisfied or waived in accordance with Section 10.01.

"Code" means the Internal Revenue Code of 1986, and the regulations promulgated thereunder, as amended and in effect.

"Collateral" means any and all "Collateral" as defined in any applicable Security Document and all other property that is or is intended under the terms of the Security Documents to be subject to Liens in favor of the Agent.

"Collateral Access Agreement" means an agreement reasonably satisfactory in form and substance to the Agent executed by (a) a bailee or other Person in possession of Collateral, or (b) any landlord of Real Estate leased by any Loan Party, pursuant to which such Person (i) acknowledges the Agent's Lien on the Collateral, (ii) releases or subordinates such Person's Liens on the Collateral held by such Person or located on such Real Estate, (iii) provides the Agent with access to the Collateral held by such bailee or other Person or located in or on such Real Estate, (iv) as to any landlord, provides the Agent with a reasonable time to sell and dispose of the Collateral from such Real Estate, and (v) makes such other agreements with the Agent as the Agent may reasonably require.

"Collateral Agent" means Second Avenue in its capacity as collateral agent under any of the Loan Documents, or any successor thereto in such capacities.

"Committed Loan Notice" means a notice of a Revolving Credit Borrowing, pursuant to Section 2.02, which, if in writing, shall be substantially in the form of Exhibit A.

"Committed Revolving Loan" has the meaning specified in Section 2.01(b).

"Concentration Account" has the meaning specified in Section 6.13(c).

"Confirmation and Ratification Agreement" means the Confirmation and Ratification of Ancillary Loan Documents dated as of the Closing Date among the Loan Parties and the Agent, as the same now exists or may hereafter be amended, modified, supplemented, renewed, restated or replaced.

"Consent" means actual consent given by a Lender from whom such consent is sought; or the passage of seven (7) Business Days from receipt of written notice to a Lender from the Agent of a proposed course of action to be followed by the Agent without such Lender giving the Agent written notice of that Lender's objection to such course of action.

"Consolidated" means, when used to modify a financial term, test, statement, or report of a Person, the application or preparation of such term, test, statement or report (as applicable) based upon the consolidation, in accordance with GAAP, of the financial condition or operating results of such Person and its Subsidiaries.

"Consultant" means a joint venture between Hilco Merchant Resources, LLC and SB360 Capital Partners, LLC, and any such replacement that is acceptable to the Agent in its Permitted Discretion.

"Consulting Agreement" means that certain Consulting Agreement dated as of July 26, 2019, entered into between the Borrower, on the one hand, and Hilco Merchant Resources, LLC and SB360 Capital Partners, LLC (which is an Affiliate of Second Avenue), relating to a Permitted Sale (structured as a "fee bid" and as further described in clause (ii)(x) of such definition), as in effect on the Closing Date, and as may be amended with the consent of the Agent.

"Consulting Motion" has the meaning specified in Section 4.01(o).

"Contractual Obligation" means, as to any Person, any provision of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Cost" means the lower of cost or market value of Inventory, based upon the Borrower's accounting practices, known to the Agent, which practices are in effect on the Closing Date as such calculated cost is determined from invoices received by the Borrower, the Borrower's purchase journals or the Borrower's stock ledger. "Cost" does not include inventory capitalization costs or other non-purchase price charges (such as freight) used in the Borrower's calculation of cost of goods sold.

"Credit Card Advance Rate" means (i) for the first five weeks of the Permitted Sale, ninety-five percent (95%) and (ii) at all times from and after the sixth week of the Permitted Sale, zero percent (0%).

"Credit Card Issuer" means any person (other than the Borrower or other Loan Party) who issues or whose members issue credit cards, including, without limitation, MasterCard or VISA bank credit or debit cards or other bank credit or debit cards issued through MasterCard International, Inc., Visa, U.S.A.,

Inc. or Visa International and American Express, Discover, Diners Club, Carte Blanche and other non-bank credit or debit cards, including, without limitation, credit or debit cards issued by or through American Express Travel Related Services Company, Inc., and Novus Services, Inc. and other issuers approved by the Agent.

"Credit Card Processor" means any servicing or processing agent or any factor or financial intermediary who facilitates, services, processes or manages the credit authorization, billing transfer and/or payment procedures with respect to the Borrower's sales transactions involving credit card or debit card purchases by customers using credit cards or debit cards issued by any Credit Card Issuer.

"Credit Card Notifications" has the meaning specified in Section 6.13(a)(i).

"Credit Card Receivables" means each "payment intangible" (as defined in the UCC) together with all income, payments and proceeds thereof, owed by a Credit Card Issuer or Credit Card Processor to a Loan Party resulting from charges by a customer of a Loan Party on credit or debit cards issued by such issuer in connection with the sale of goods by a Loan Party, or services performed by a Loan Party, in each case in the ordinary course of its business.

"Credit Party" or "Credit Parties" means (a) individually, (i) each Lender and its Affiliates, (ii) the Agent, (iii) each beneficiary of each indemnification obligation undertaken by any Loan Party under any Loan Document, (iv) any other Person to whom Obligations under this Agreement and other Loan Documents are owing, and (v) the successors and assigns of each of the foregoing, and (b) collectively, all of the foregoing.

"Credit Party Expenses" means, without limitation, (a) all reasonable expenses incurred by the Agent and its Affiliates in connection with this Agreement and the other Loan Documents, including without limitation (i) the reasonable fees, charges and disbursements of (A) counsel for the Agent, (B) outside consultants, advisors and other service providers to or for the Agent (including without limitation Tower Hill and its affiliates and any other professionals, consultants, appraisers, analysts, accountants and lawyers hired by the Agent), (C) appraisers, (D) commercial finance examiners, (E) insurance analysts or consultants, and (F) all such expenses incurred during any workout, restructuring or negotiations in respect of the Obligations, (ii) in connection with (A) the syndication or financing of the credit facility provided for herein, including any fees or expenses incurred in connection with obtaining a rating for such credit facility, (B) the preparation, negotiation, management, execution and delivery of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (C) the administration of this Agreement and the other Loan Documents, and (D) the enforcement or protection of the rights of the Credit Parties in connection with this Agreement and the other Loan Documents or efforts to monitor, preserve, protect, collect, or enforce rights with respect to the Collateral; (b) all customary fees and charges (as adjusted from time to time) of the Agent with respect to access to online Committed Revolving Loan information, the disbursement of funds (or the receipt of funds) to or for the account of the Loan Parties (whether by wire transfer or otherwise), together with any costs and expenses incurred in connection therewith; (c) all costs related to the hedging of any exposure to foreign currency fluctuations or the conversion of foreign currency to Dollars; and (d) upon the occurrence and during the continuance of an Event of Default or upon any increase in the amount of Aggregate Revolving Commitments after the Closing Date, all reasonable expenses incurred by the Credit Parties who are not the Agent or any Affiliate, provided that such Credit Parties shall be entitled to reimbursement for no more than one counsel representing all such Credit Parties (absent a conflict of interest in which case the Credit Parties may engage and be reimbursed for additional counsel).

"Customer Credit Liabilities" means at any time, the aggregate remaining value at such time of (a) outstanding gift certificates and gift cards of the Borrower entitling the holder thereof to use all or a portion of the certificate or gift card to pay all or a portion of the purchase price for any Inventory, (b) outstanding merchandise credits of the Borrower, and (c) liabilities in connection with frequent shopping programs of the Borrower.

"Customer Deposits" means at any time, the aggregate amount at such time of (a) deposits made by customers with respect to the purchase of goods or the performance of services, and (b) layaway obligations of the Borrower.

"Customs Broker/Carrier Agreement" means an agreement in form and substance satisfactory to the Agent among the Borrower, a customs broker, freight forwarder, consolidator or carrier, and the Agent, in which the customs broker, freight forwarder, consolidator or carrier acknowledges that it has control over and holds the documents evidencing ownership of the subject Inventory for the benefit of the Agent and agrees, upon notice from the Agent, to hold and dispose of the subject Inventory solely as directed by the Agent, and makes such other acknowledgments and agreements with the Agent as the Agent may reasonably require.

"DDA" means each checking, savings or other demand deposit account maintained by any of the Loan Parties. All funds in each DDA shall be conclusively presumed to be Collateral and proceeds of Collateral and the Agent and the Lenders shall have no duty to inquire as to the source of the amounts on deposit in any DDA.

"DDA Notification" has the meaning specified in Section 6.13(a)(iii).

"Debtor Relief Laws" means the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Default" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"Default Rate" means an interest rate equal to the interest rate (including any Applicable Margin) otherwise applicable to such portion of the Obligations plus two percent (2.00%) per annum.

"Defaulting Lender" means, subject to Section 2.16(b), any Lender that (a) has failed to (i) fund all or any portion of its Committed Revolving Loans within two (2) Business Days of the date such Committed Revolving Loans were required to be funded hereunder, or (ii) pay to the Agent or any other Lender any other amount required to be paid by it hereunder within two (2) Business Days of the date when due, (b) has notified the Borrower or the Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect, (c) has failed, within three (3) Business Days after written request by the Agent or the Borrower, to confirm in writing to the Agent and the Borrower that it will comply with its prospective funding obligations hereunder (provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Agent and the Borrower), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity; provided that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of

any Equity Interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender. Any determination by the Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above, and of the effective date of such status, shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to Section 2.16(b)) as of the date established therefor by the Agent in a written notice of such determination, which shall be delivered by the Agent to the Borrower and each other Lender promptly following such determination.

"Disposition" or "Dispose" means the sale, transfer, license, lease, return of any Collateral to any vendor to offset an account payable or other disposition (whether in one transaction or in a series of transactions, and including any sale and leaseback transaction and any sale, transfer, license or other disposition) of any property (including, without limitation, any Equity Interests) by any Person (or the granting of any option or other right to do any of the foregoing), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"Disqualified Stock" means any Equity Interest that, by its terms (or by the terms of any security into which it is convertible, or for which it is exchangeable, in each case at the option of the holder thereof), or upon the happening of any event, matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or redeemable at the option of the holder thereof, in whole or in part, on or prior to the date that is ninety-one (91) days after the date on which the Committed Revolving Loans mature; provided, however, that (i) only the portion of such Equity Interests which so matures or is mandatorily redeemable, is so convertible or exchangeable or is so redeemable at the option of the holder thereof prior to such date shall be deemed to be Disqualified Stock, and (ii) with respect to any Equity Interests issued to any employee or to any plan for the benefit of employees of the Loan Parties or by any such plan to such employees, such Equity Interest shall not constitute Disqualified Stock solely because it may be required to be repurchased by the Loan Parties in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, resignation, death or disability and if any class of Equity Interest of such Person that by its terms authorizes such Person to satisfy its obligations thereunder by delivery of an Equity Interest that is not Disqualified Stock, such Equity Interests shall not be deemed to be Disqualified Stock. Notwithstanding the preceding sentence, any Equity Interest that would constitute Disqualified Stock solely because the holders thereof have the right to require a Loan Party to repurchase such Equity Interest upon the occurrence of a change of control or an asset sale shall not constitute Disqualified Stock. The amount of Disqualified Stock deemed to be outstanding at any time for purposes of this Agreement will be the maximum amount that the Loan Parties may become obligated to pay upon maturity of, or pursuant to any mandatory redemption provisions of, such Disqualified Stock or portion thereof, plus accrued dividends.

"Dollars" and "$" mean lawful money of the United States.

"Eligible Assignee" means (a) a Credit Party or any of its Affiliates; (b) a bank, insurance company, or other Person engaged in the business of making commercial loans, which Person, together with its Affiliates, has a combined capital and surplus in excess of $250,000,000; (c) an Approved Fund; (d) any Person to whom a Credit Party assigns its rights and obligations under this Agreement as part of an assignment and transfer of such Credit Party's rights in and to a material portion of such Credit Party's portfolio of asset based credit facilities, and (e) any other Person approved by the Agent.

"Eligible Credit Card Receivables" means at the time of any determination thereof, each Credit Card Receivable that satisfies the following criteria at the time of creation and continues to meet the same at the time of such determination: such Credit Card Receivable (i) has been earned by performance and represents the bona fide amounts due to a Borrower from a Credit Card Issuer or Credit Card Processor, and in each case originated in the ordinary course of business of such Borrower, and (ii) in each case is acceptable to the Agent in its Permitted Discretion, and is not ineligible for inclusion in the calculation of the Borrowing Base pursuant to any of clauses (a) through (j) below. Without limiting the foregoing, to qualify as an Eligible Credit Card Receivable, such Credit Card Receivable shall indicate no Person other than a Borrower as payee or remittance party. In determining the amount to be so included, the face amount of a Credit Card Receivable shall be reduced by, without duplication, to the extent not reflected in such face amount, (i) the amount of all accrued and actual discounts, claims, credits or credits pending, promotional program allowances, price adjustments, finance charges or other allowances (including any amount that a Borrower may be obligated to rebate to a customer, a Credit Card Issuer or Credit Card Processor pursuant to the terms of any agreement or understanding (written or oral)) and (ii) the aggregate amount of all cash received in respect of such Credit Card Receivable but not yet applied by the Loan Parties to reduce the amount of such Credit Card Receivable. Except as otherwise agreed by the Agent, any Credit Card Receivable included within any of the following categories shall not constitute an Eligible Credit Card Receivable:

(a)     any Credit Card Receivable which does not constitute a "payment intangible" (as defined in the UCC);

(b)     Credit Card Receivables that have been outstanding for more than five (5) Business Days from the date of sale;

(c)     Credit Card Receivables (i) that are not subject to a perfected first priority security interest in favor of the Agent, or (ii) with respect to which a Borrower does not have good, valid and marketable title thereto, free and clear of any Lien (other than Liens granted to the Agent pursuant to the Security Documents);

(d)     Credit Card Receivables which are disputed, are with recourse, or with respect to which a claim, counterclaim, offset or chargeback has been asserted (to the extent of such claim, counterclaim, offset or chargeback);

(e)     Credit Card Receivables as to which the Credit Card Issuer or Credit Card Processor has the right under certain circumstances to require a Loan Party to repurchase the Credit Card Receivables from such Credit Card Issuer or Credit Card Processor;

(f)     Credit Card Receivables due from any Credit Card Issuer or Credit Card Processor which is the subject of any bankruptcy or insolvency proceedings;

(g)     Credit Card Receivables which are not a valid, legally enforceable obligation of the applicable Credit Card Issuer or Credit Card Processor with respect thereto;

(h)     Credit Card Receivables which do not conform to all representations, warranties or other provisions in the Loan Documents relating to Credit Card Receivables;

(i)     Credit Card Receivables which are evidenced by "chattel paper" or an "instrument" of any kind unless such "chattel paper" or "instrument" is in the possession of the Agent, and to the extent necessary or appropriate, endorsed to the Agent; or

(j)     Credit Card Receivables which the Agent determines in its Permitted Discretion to be uncertain of collection or which do not meet such other reasonable eligibility criteria for Credit Card Receivables as the Agent may determine in its Permitted Discretion.

"Eligible Inventory" means, as of the date of determination thereof, items of Inventory (but not In-Transit Inventory) of the Borrower that are finished goods, merchantable and readily saleable to the public in the ordinary course of the Borrower's business and deemed by the Agent in its Permitted Discretion to be eligible for inclusion in the calculation of the Borrowing Base, in each case that, except as otherwise agreed by the Agent, (A) complies with each of the representations and warranties respecting Inventory made by the Borrower in the Loan Documents, and (B) is not excluded as ineligible by virtue of one or more of the criteria set forth below.  Except as otherwise agreed by the Agent, in its Permitted Discretion, the following items of Inventory shall not be included in Eligible Inventory:

(a)     Inventory that is not solely owned by the Borrower or the Borrower does not have good and valid title thereto;

(b)     Inventory that is leased by or is on consignment to the Borrower, or was furnished to the Borrower on a contract for service;

(c)     Inventory that is not located in the United States of America (including territories or possessions of the United States);

(d)     Inventory that is not located at a location that is owned or leased by the Borrower, except to the extent that the Borrower has furnished the Agent with (i) any UCC financing statements or other documents that the Agent may determine to be necessary to perfect its security interest in such Inventory at such location, and (ii) a Collateral Access Agreement executed by the Person owning any such location on terms acceptable to the Agent in its Permitted Discretion;

(e)     Inventory that is located: (i) in a distribution center leased by the Borrower unless the applicable lessor has delivered to the Agent a Collateral Access Agreement, or (ii) at any leased location in a Landlord Lien State unless the applicable lessor has delivered to the Agent a Collateral Access Agreement or the Agent has implemented Reserves for such location;

(f)     Inventory that is comprised of goods which (i) are damaged, defective, "seconds," or otherwise unmerchantable, (ii) are to be returned to the vendor, or were rejected by the Borrower, (iii) are obsolete or slow moving, or custom items, work in process, raw materials, or that constitute samples, spare parts, promotional, advertising, marketing, labels, bags and other packaging and shipping materials or supplies used or consumed in the Borrower's business, (iv) are seasonal in nature and which have been packed away for sale in the subsequent season, (v) not in compliance with all standards imposed by any Governmental Authority having regulatory authority over such Inventory, its use or sale, or (vi) are bill and hold goods;

(g)     Inventory that is not subject to a perfected first priority security interest in favor of the Agent;

(h)     Inventory that is not insured in compliance with the provisions of Section 5.10 hereof;

(i)     Inventory that has been sold but not yet delivered or as to which the Borrower has accepted a deposit;

(j) Inventory that is subject to any licensing, patent, royalty, trademark, trade name or copyright agreement with any third party from which the Borrower or any of its Subsidiaries has received notice of a dispute in respect of any such agreement; or

(k) Inventory which is not of the type usually sold in the ordinary course of the Borrower's business, unless and until the Agent has completed or received (A) an appraisal of such Inventory from appraisers satisfactory to the Agent and establishes the Appraised Value and Inventory Reserves (if applicable) therefor, and otherwise agrees that such Inventory shall be deemed Eligible Inventory, and (B) such other due diligence as the Agent may require, all of the results of the foregoing to be satisfactory to the Agent in its Permitted Discretion.

"Environmental Laws" means any and all federal, state, local, and foreign statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, agreements or governmental restrictions relating to pollution and the protection of the environment or the release of any materials into the environment, including those related to hazardous substances or wastes, air emissions and discharges to waste or public systems.

"Environmental Liability" means any liability, obligation, damage, loss, claim, action, suit, judgment, order, fine, penalty, fee, expense, or cost, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of the Borrower, any other Loan Party or any of their respective Subsidiaries directly or indirectly resulting from or based upon (a) the violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal or presence of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equipment" has the meaning specified in the UCC.

"Equity Interests" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with any Loan Party within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 and 4971 of the Code).

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by any Loan Party or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by any Loan Party or any ERISA Affiliate from a Multiemployer Plan or

notification that a Multiemployer Plan is in reorganization; (d) the filing of a notice of intent to terminate, the treatment of a plan amendment as a termination of a Pension Plan or a Multiemployer Plan under Sections 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (e) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; (f) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Borrower or any ERISA Affiliate; or (g) the determination that any Pension Plan is considered to be an "at-risk" plan or that any Multiemployer Plan is considered to be in "endangered" or "critical" status within the meaning of Sections 430, 431 and 432 of the Code or Sections 303, 304 and 305 of ERISA.

"Event of Default" has the meaning specified in Section 8.01. An Event of Default shall be deemed to be continuing unless and until that Event of Default has been duly waived as provided in herein.

"Events and Circumstances" has the meaning specified in the definition of "Material Adverse Effect".

"Excluded Account" means any DDA that is a "zero balance" account or is solely used for payroll, trust or tax withholding in the ordinary course of business.

"Excluded Taxes" means, with respect to the Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of the Loan Parties hereunder, (a) taxes imposed on or measured by its overall net income (however denominated), and franchise taxes imposed on it (in lieu of net income taxes), by the jurisdiction (or any political subdivision thereof) pursuant to the Laws of the jurisdiction under which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable Lending Office is located, (b) any branch profits taxes imposed by the United States or any similar tax imposed by any other jurisdiction in which any Loan Party is located, (c) in the case of a Foreign Lender (other than an assignee pursuant to a request by the Borrower under Section 10.13), any withholding tax that is imposed on amounts payable to such Foreign Lender at the time such Foreign Lender becomes a party hereto (or designates a new Lending Office) or is attributable to such Foreign Lender's failure or inability (other than as a result of a Change in Law) to comply with Section 3.01(e), except to the extent that such Foreign Lender (or its assignor, if any) was entitled, at the time of designation of a new Lending Office (or assignment), to receive additional amounts from the Loan Parties with respect to such withholding tax pursuant to Section 3.01(a), (d) any U.S. federal, state or local backup withholding tax, and (e) any U.S. federal withholding tax imposed under FATCA.

"Executive Order" has the meaning specified in Section 10.18.

"Extraordinary Receipt" means any cash received by or paid to or for the account of any Person not in the ordinary course of business, including tax refunds, pension plan reversions, proceeds of insurance (other than proceeds of business interruption insurance to the extent such proceeds constitute compensation for lost earnings), condemnation awards (and payments in lieu thereof), indemnity payments and any purchase price adjustments related to any Acquisition.

"Facility Fee" has the meaning specified in Section 2.09(b).

"Facility Guaranty" means, collectively, each Guarantee made by a Guarantor in favor of the Agent and the other Credit Parties, in form and substance reasonably satisfactory to the Agent, and (b)

each Validity and Liquidation Support Agreement, in each case, as the same now exists or may hereafter be amended, modified, supplemented, renewed, restated or replaced.

"FATCA" means current Section 1471 through 1474 of the Code or any amended version or successor provision that is substantively similar thereto and, in each case, any regulations promulgated thereunder and any interpretation and other guidance issued in connection therewith.

"FCPA" means the Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder.

"Federal Funds Rate" means, for any day, the rate per annum equal to the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided, that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) charged to money center banks on such day on such transactions as determined by the Agent.

"Final Financing Order" means, the order of the Bankruptcy Court entered in the Chapter 11 Case after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court, which order shall be satisfactory in form and substance to the Agent in its Permitted Discretion and from which no appeal or motion to reconsider has been filed, together with all extensions, modifications and amendments thereto, in form and substance reasonably satisfactory to the Agent, which, among other matters but not by way of limitation, authorizes the Borrower to obtain credit, incur the Obligations, and grant Liens under this Agreement and the other Loan Documents, as the case may be, and provides for the super-priority of the claims of the Agent and Lenders, subject to the Carve-Out and Permitted Prior Liens.

"Final Order Entry Date" means the date on which the Bankruptcy Court enters the Final Financing Order.

"Financing Orders" means the Interim Financing Order and Final Financing Order, as applicable.

"Financial Advisor" as defined in Section 6.25.

"Fiscal Month" means any fiscal month of any Fiscal Year, which month shall generally consist of (a) in the case of the first, third, fourth, sixth, seventh, ninth and tenth Fiscal Months of each Fiscal Year, four calendar weeks, (b) in the case of the second, fifth, eighth and eleventh Fiscal Months of each Fiscal Year, five calendar weeks and (c) in the case of the twelfth Fiscal Month of each Fiscal Year, the period from the first day following the eleventh Fiscal Month of such Fiscal Year through the last day of such Fiscal Year, in accordance with the fiscal accounting calendar of the Loan Parties.

"Fiscal Quarter" means any fiscal quarter of any Fiscal Year, which quarter shall generally end on (a) in the case of the first three Fiscal Quarters of each Fiscal Year, on the date that is 13 weeks after the last day of the preceding Fiscal Quarter and (b) in the case of the last Fiscal Quarter of each Fiscal Year, on the last day of such Fiscal Year, in accordance with the fiscal accounting calendar of the Loan Parties.

"Fiscal Year" means any period of twelve consecutive Fiscal Months ending on the Saturday closest to January 31 of any calendar year.

"Foreign Asset Control Regulations" has the meaning specified in Section 10.18.

"Foreign Lender" means any Lender that is organized under the Laws of a jurisdiction other than that in which the Borrower is resident for tax purposes. For purposes of this definition, the United States, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"Foreign Vendor" means a Person that sells In-Transit Inventory to the Borrower.

"FRB" means the Board of Governors of the Federal Reserve System of the United States.

"Fund" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Guarantee" means, as to any Person, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other obligation of the payment or performance of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness or other obligation of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof. The term "Guarantee" as a verb has a corresponding meaning.

"Guarantor" means each Subsidiary of the Borrower, but, for the avoidance of doubt, not the Limited Recourse Guarantors.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)    all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)    the maximum amount of all direct or contingent obligations of such Person arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

(c)    reserved;

(d)    all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business and, in each case, not past due for more than sixty (60) days after the date on which such trade account payable became due and payable);

(e)    indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f)    all Attributable Indebtedness of such Person;

(g)    all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Equity Interest in such Person or any other Person (including, without limitation, Disqualified Stock, or any warrant, right or option to acquire such Equity Interest, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends); and

(h)    all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person.

"Indemnified Taxes" means Taxes other than Excluded Taxes.

"Indemnitee" has the meaning specified in Section 10.04(b).

"Information" has the meaning specified in Section 10.07.

"Intellectual Property" means all present and future: trade secrets, know-how and other proprietary information; trademarks, trademark applications, internet domain names, service marks, trade dress, trade names, business names, designs, logos, slogans (and all translations, adaptations, derivations

and combinations of the foregoing) indicia and other source and/or business identifiers, and all registrations or applications for registrations which have heretofore been or may hereafter be issued thereon throughout the world; copyrights and copyright applications; (including copyrights for computer programs) and all tangible and intangible property embodying the copyrights, unpatented inventions (whether or not patentable); patents and patent applications; industrial design applications and registered industrial designs; license agreements related to any of the foregoing and income therefrom; books, records, writings, computer tapes or disks, flow diagrams, specification sheets, computer software, source codes, object codes, executable code, data, databases and other physical manifestations, embodiments or incorporations of any of the foregoing; all other intellectual property; and all common law and other rights throughout the world in and to all of the foregoing.

"Interest Payment Date" means the first day after the end of each month and the Maturity Date.

"Internal Control Event" means a material weakness in, or fraud that involves management or other employees who have a significant role in, the Borrower's and/or its Subsidiaries' internal controls over financial reporting, in each case as described in the Securities Laws.

"Interim Financing Order" means, the order of the Bankruptcy Court entered in the Chapter 11 Case after an interim hearing, substantially in the form attached hereto as Exhibit J and/or otherwise in form and substance satisfactory to the Agent in its Permitted Discretion, together with all extension, modifications, and amendments thereto approved by the Agent, which, among other matters but not by way of limitation, authorizes, on an interim basis, the Borrower to execute and perform under the terms of this Agreement and the other Loan Documents.

"In-Transit Inventory" means Inventory of the Borrower which is in the possession of a common carrier and is in transit from a Foreign Vendor of the Borrower from a location outside of the continental United States to a location of the Borrower that is within the continental United States.

"Inventory" has the meaning given that term in the UCC, and shall also include, without limitation, all: (a) goods which (i) are leased by a Person as lessor, (ii) are held by a Person for sale or lease or to be furnished under a contract of service, (iii) are furnished by a Person under a contract of service, or (iv) consist of raw materials, work in process, or materials used or consumed in a business; (b) goods of said description in transit; (c) goods of said description which are returned, repossessed or rejected; and (d) packaging, advertising, and shipping materials related to any of the foregoing.

"Inventory Advance Rate" means (i) for the first week of the Permitted Sale, one hundred percent (100%), (ii) from and after the second week through and including the fifth week of the Permitted Sale, one hundred percent (100%) multiplied by the inverse of the projected prevailing discount for the following week applied to such Eligible Inventory, as determined by the Agent in its Permitted Discretion, and (iii) at all times from and after the sixth week of the Permitted Sale, zero percent (0%).

"Inventory Reserves" means such reserves as may be established from time to time by the Agent in its Permitted Discretion with respect to the determination of the saleability, at retail, of the Eligible Inventory, which reflect such other factors as affect the market value of the Eligible Inventory or which reflect claims and liabilities that the Agent determines will need to be satisfied in connection with the realization upon the Inventory. Without limiting the generality of the foregoing, Inventory Reserves may, in the Agent's Permitted Discretion, include (but are not limited to) reserves based on:

    (a)     obsolescence;

    (b)     seasonality;

(c)     Shrink;

(d)     imbalance;

(e)     change in Inventory character;

(f)     change in Inventory composition;

(g)     change in Inventory mix;

(h)     markdowns (both permanent and point of sale);

(i)     retail markups inconsistent with prior period practice and performance, industry standards, current business plans or advertising calendar and planned advertising events; and

(j)     out-of-date and/or expired Inventory.

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or interest in, another Person, or (c) any Acquisition, or (d) any other investment of money or capital in order to obtain a profitable return.   For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment.

"IRS" means the United States Internal Revenue Service.

"Joinder" means an agreement, in form and substance satisfactory to the Agent pursuant to which, among other things, a Person becomes a party to, and bound by the terms of, this Agreement and/or the other Loan Documents in the same capacity and to the same extent as either the Borrower or a Guarantor, as the Agent may determine.

"JPM Cash Collateral Account" means the Borrower's deposit account number xxxxxx8570 held with JPMorgan Chase Bank, N.A. for the purpose of securing its credit card obligations and the letter of credit issued on its behalf to LCG Stout Drive LLC as collateral security for the Borrower's leased location at Stout Drive Industrial Center, 4958 Stout Drive, Suite A, San Antonio, Texas 78219.

"Key Person" means each of (a) David Won, as Chief Executive Officer and Manager, (b) any person serving as the Borrower's Chief Financial Officer (or similar position) from time to time, (c) any person serving as the Borrower's Controller (or similar position) from time to time, and (d) any person serving as the Borrower's Chief Operating Officer (or similar position) from time to time.

"Landlord Lien State" means such state(s) in which a landlord's claim for rent may have priority over the Lien of the Agent in any of the Collateral.

"Laws" means each international, foreign, federal, state and local statute, treaty, rule, guideline, regulation, ordinance, code and administrative or judicial precedent or authority, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and each applicable administrative order, directed duty, request, license, authorization and permit of, and agreement with, any Governmental Authority, in each case whether or not having the force of law.

"Lease" means any agreement, whether written or oral, no matter how styled or structured, pursuant to which a Loan Party is entitled to the use or occupancy of any space in a structure, land, improvements or premises for any period of time.

"Lease Extension Order" has the meaning assigned to such term in Section 6.30.

"Lender" means, individually, each Person having a Revolving Commitment as set forth on Schedule 2.01 hereto or in the Assignment and Assumption by which such Person becomes a Lender, and collectively, all such persons.

"Lender Group Consultant" has the meaning specified in Section 6.27(c).

"Lender Service Parties" has the meaning specified in Section 10.16(b).

"Lending Office" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Borrower and the Agent.

"LIBO Rate" means, at any date of determination, the greater of (a) one and one half of one percent (1.50%), and (b) the rate per annum which appears in the Wall Street Journal as of such date for a three (3) month period in the London interbank market (or, if such rate does not appear in the Wall Street Journal, then the rate as determined by the Administrative Agent from another recognized source or interbank quotation) (and, if any such rate is below one and one half of one percent (1.50%), the LIBO Rate shall be deemed to be one and one half of one percent (1.50%)), which determination shall be made by Agent and shall be conclusive in the absence of manifest error.

"Lien" means (a) any mortgage, deed of trust, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale, Capital Lease Obligation, Synthetic Lease Obligation, or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any financing lease having substantially the same economic effect as any of the foregoing), and (b) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Limited Recourse Guarantors" means each Person who has signed a Validity and Liquidation Support Agreement.

"Loan Documents" means this Agreement, the Financing Orders, each Note, the Confirmation and Ratification Agreement, all Borrowing Base Certificates, the Blocked Account Agreements, the DDA Notifications, the Credit Card Notifications, the Security Documents, each Facility Guaranty and each other Subordination Agreement, each Validity and Liquidation Support Agreement, the Perfection Certificate and any other instrument or agreement now or hereafter executed and delivered in connection herewith, each as amended and in effect from time to time.

"Loan Parties" means, collectively, the Borrower and each Guarantor (but excluding, for the avoidance of doubt, the Limited Recourse Guarantors).

"Material Adverse Effect" means (a) a material adverse change in, or a material adverse effect upon, the operations, business, properties, liabilities (actual or contingent), condition (financial or otherwise) or prospects of any Loan Party or the Borrower and its Subsidiaries taken as a whole; (b) a material impairment of the ability of any Loan Party to perform its obligations under any Loan Document

to which it is a party; or (c) a material impairment of the rights and remedies of the Agent or any Lender under any Loan Document or a material adverse effect upon the legality, validity, binding effect or enforceability against any Loan Party of any Loan Document to which it is a party. In determining whether any individual event would result in a Material Adverse Effect, notwithstanding that such event in and of itself does not have such effect, a Material Adverse Effect shall be deemed to have occurred if the cumulative effect of such event and all other then-existing events would result in a Material Adverse Effect. Notwithstanding the foregoing, (i) the filing of the Chapter 11 Case, (ii) the events specifically described in the Declaration of Thomas J. Lynch in Support of First Day Motions, dated on or about the date hereof, (iii) the incurrence of any claim or liability that is Pre-Petition, unsecured and junior in priority to the Obligations and (iv) the existence of any prior Default or Event of Default (as defined in the Pre-Petition Credit Agreement) or cross-default under the Pre-Petition Credit Agreement (each of the foregoing clauses (i), (ii), (iii) and (iv), collectively, the "Events and Circumstances"), will, individually and collectively, not be deemed to have a Material Adverse Effect..

"Material Contract" means, with respect to any Person, each contract to which such Person is a party that is material to the business, condition (financial or otherwise), operations, performance, properties or prospects of such Person, including, without limitation, any contract or agreement of the Loan Parties the loss of which could reasonably be expected to result in a Material Adverse Effect.

"Material Indebtedness" means, collectively, (i) the Subordinated Indebtedness, and (ii) any other Indebtedness (other than the Obligations) of the Loan Parties in an aggregate principal amount exceeding $500,000. For purposes of determining the amount of Material Indebtedness at any time, (a) undrawn committed or available amounts shall be included, and (b) all amounts owing to all creditors under any combined or syndicated credit arrangement shall be included.

"Maturity Date" means the earliest of: (a) August [__], 2020; (b) if the Final Financing Order is not entered within twenty-five (25) calendar days after the Petition Date, immediately thereafter, (c) the effective date of a Chapter 11 plan of reorganization, (d) the closing of a sale of all or substantially all of the assets of the Loan Parties pursuant to Section 363 of the Bankruptcy Code and (e) the date upon which all or substantially all of the Loan Parties' working capital assets have been sold or otherwise disposed of, such that the Borrowing Base is equal to or less than twenty percent (20%) of the Revolving Credit Commitments (as in effect on the Closing Date).

"Maximum Rate" has the meaning specified in Section 10.09.

"Maximum Revolving Loan Amount" means, at any time of determination, the lesser of (a) the Aggregate Revolving Commitments, or (b) the Borrowing Base, in each case, minus the Pre-Petition Reserve.

"Multiemployer Plan" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which the Borrower or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five (5) plan years, has made or been obligated to make contributions.

"Net Proceeds" means:

(a)     with respect to any Disposition by any Loan Party or any of its Subsidiaries, or any Extraordinary Receipt received or paid to the account of any Loan Party or any of its Subsidiaries, the excess, if any, of (i) the sum of cash and cash equivalents received in connection with such transaction (including any cash or cash equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received), over (ii) the sum of

(A) the principal amount of any Indebtedness that is secured by the applicable asset by a Lien permitted hereunder which is senior to the Agent's Lien on such asset and that is required to be repaid (or to establish an escrow for the future repayment thereof) in connection with such transaction (other than Indebtedness under the Loan Documents), and (B) the reasonable and customary out-of-pocket expenses incurred by such Loan Party or such Subsidiary in connection with such transaction (including, without limitation, appraisals, and brokerage, legal, title and recording or transfer tax expenses and commissions) paid by any Loan Party to third parties (other than Affiliates)); and

(b)     with respect to the sale or issuance of any Equity Interest by any Loan Party or any of its Subsidiaries, or the incurrence or issuance of any Indebtedness by any Loan Party or any of its Subsidiaries, the excess of (i) the sum of the cash and cash equivalents received in connection with such transaction, over (ii) the underwriting discounts and commissions, and other reasonable and customary out-of-pocket expenses, incurred by such Loan Party or such Subsidiary in connection therewith.

"Non-Defaulting Lender" means, at any time, each Lender that is not a Defaulting Lender at such time.

"Note" means a promissory note made by the Borrower in favor of a Lender evidencing the Committed Revolving Loans made by such Lender, substantially in the form of Exhibit B, as each may be amended, restated, supplemented or modified from time to time.

"NPL" means the National Priorities List under CERCLA.

"Obligations" means all advances to, and debts (including principal, interest, fees, costs, and expenses), liabilities, obligations, covenants, indemnities, and duties of, any Loan Party or Limited Recourse Guarantor arising under any Loan Document or otherwise with respect to any Committed Revolving Loan, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, fees, costs, expenses and indemnities that accrue after the commencement by or against any Loan Party or Limited Recourse Guarantor or any Affiliate thereof of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest, fees, costs, expenses and indemnities are allowed claims in such proceeding.

"OFAC" means The Office of Foreign Assets Control of the United States Department of the Treasury.

"Organization Documents" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity, and (d) in each case, all shareholder or other equity holder agreements, voting trusts and similar arrangements to which such Person is a party or which is applicable to its Equity Interests and all other arrangements relating to the Control or management of such Person.

"Other Taxes" means all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or under any other

Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document.

"Overadvance" means a Committed Revolving Loan to the extent that, immediately after its having been made, Availability is less than or equal to zero.

"Participant" has the meaning specified in Section 10.06(d).

"Participation Register" has the meaning specified in Section 10.06(d).

"PBGC" means the Pension Benefit Guaranty Corporation.

"PCAOB" means the Public Company Accounting Oversight Board.

"Pension Plan" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by the Borrower or any ERISA Affiliate or to which the Borrower or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the immediately preceding five (5) plan years.

"Perfection Certificate" means that certain perfection certificate dated as of the date hereof, executed and delivered by the Loan Parties in favor of the Agent, for the benefit of the Credit Parties, and each other Perfection Certificate (which shall be in form and substance acceptable to the Agent in its Permitted Discretion) executed and delivered by the applicable Borrower or Guarantor in favor of the Agent for the benefit of the Credit Parties contemporaneously with the execution and delivery of a Joinder executed in accordance with Section 6.12, in each case, as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance herewith.

"Permitted Discretion" means a determination made in the exercise of reasonable business judgment from the perspective of a secured, asset-based commercial lender.

"Permitted Disposition" means any of the following:

(a)     Dispositions of inventory and fixtures (i) in accordance with the Consulting Agreement, or (ii) otherwise in accordance with a Permitted Sale as approved by the Bankruptcy Court;

(b)     reserved;

(c)     reserved;

(d)     Pre-Petition licenses for the conduct of licensed departments within the Loan Parties' Stores in the ordinary course of business; provided that, if requested by the Agent, the Agent shall have entered into an intercreditor agreement with the Person operating such licensed department on terms and conditions reasonably satisfactory to the Agent;

(e)     reserved;

(f)     sales, transfers and Dispositions among the Loan Parties or by any Subsidiary to a Loan Party;

(g)     reserved; and

(h)     the deposit of funds in an aggregate amount not to exceed $200,000 into the JPM Cash Collateral Account.

"Permitted Encumbrances" means:

(a)     Liens imposed by law for Taxes that are not yet due or are being contested in compliance with Section 6.04;

(b)     carriers', warehousemen's, mechanics', materialmen's, repairmen's and other like Liens imposed by applicable Law, arising in the ordinary course of business and securing obligations that are not overdue or are being contested in compliance with Section 6.04;

(c)     pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations, other than any Lien imposed by ERISA;

(d)     deposits to secure the performance of bids, trade contracts and leases (other than Indebtedness), statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(e)     Liens in respect of judgments that would not constitute an Event of Default hereunder;

(f)     easements, covenants, conditions, restrictions, building code laws, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property or materially interfere with the ordinary conduct of business of a Loan Party and such other minor title defects or survey matters that are disclosed by current surveys that, in each case, do not materially interfere with the current use of the real property;

(g)     Liens existing on the Closing Date and listed on Schedule 7.01 and any Permitted Refinancings thereof;

(h)     after the Petition Date, Liens on fixed or capital assets acquired by any Loan Party which are permitted under clause (c) of the definition of Permitted Indebtedness so long as (i) such Liens and the Indebtedness secured thereby are incurred prior to or within ninety (90) days after such acquisition, (ii) the Indebtedness secured thereby does not exceed the cost of acquisition of such fixed or capital assets and (iii) such Liens shall not extend to any other property or assets of the Loan Parties;

(i)     Liens in favor of the Agent;

(j)     statutory Liens of landlords and lessors in respect of rent not in default;

(k)     adequate protection liens granted under the Financing Orders;

(l)     Liens arising solely by virtue of any statutory or common law provisions relating to banker's liens, liens in favor of securities intermediaries, rights of setoff or similar rights and remedies as to deposit accounts or securities accounts or other funds maintained with depository institutions or securities intermediaries;

(m)     Liens arising from precautionary UCC filings regarding "true" operating leases or, to the extent permitted under the Loan Documents, the consignment of goods to a Loan Party;

(n)     the Pre-Petition Liens; and

(o)     Liens in favor of customs and revenues authorities imposed by applicable Law arising in the ordinary course of business in connection with the importation of goods and securing obligations that are (A) being contested in good faith by appropriate proceedings, (B) the applicable Loan Party or Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP, and (C) such contest effectively suspends collection of the contested obligation and enforcement of any Lien securing such obligation.

"Permitted Indebtedness" means each of the following as long as no Default or Event of Default exists or would arise from the incurrence thereof:

(a)     Indebtedness outstanding on the Closing Date and listed on Schedule 7.03 and any Permitted Refinancing thereof;

(b)     Indebtedness of any Loan Party to any other Loan Party;

(c)     purchase money Indebtedness of any Loan Party to finance the acquisition of any personal property consisting solely of fixed or capital assets, including Capital Lease Obligations, and any Indebtedness assumed in connection with the acquisition of any such assets or secured by a Lien on any such assets prior to the acquisition thereof, and Permitted Refinancings thereof; provided, however, that the aggregate principal amount of Indebtedness permitted by this clause (c) shall not exceed $200,000 at any time outstanding for such Indebtedness incurred Post-Petition plus any such Indebtedness incurred Pre-Petition; provided further that, if requested by the Agent, the Loan Parties shall use commercially reasonable efforts to cause the holders of such Indebtedness to enter into a Collateral Access Agreement on terms reasonably satisfactory to the Agent;

(d)     Pre-Petition Obligations;

(e)     contingent liabilities under surety bonds or similar instruments incurred in the ordinary course of business in connection with the construction or improvement of Stores; and

(f)     the Obligations.

"Permitted Investments" means each of the following as long as no Default or Event of Default exists or would arise from the making of such Investment:

(a)     Investments by any Loan Party and its Subsidiaries in their respective Subsidiaries outstanding on the Closing Date;

(b)     Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss;

(c)     Guarantees constituting Permitted Indebtedness;

(d)    Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of business; and

(e)    capital contributions made by any Loan Party to another Loan Party.

"Permitted Overadvance" means an Overadvance made by the Agent, in its Permitted Discretion, which:

(a)    is made to maintain, protect or preserve the Collateral and/or the Credit Parties' rights under the Loan Documents or which is otherwise for the benefit of the Credit Parties;

(b)    is made to enhance the likelihood of, or to maximize the amount of, repayment of any Obligation;

(c)    is made to pay any other amount chargeable to any Loan Party hereunder.

provided however, that the foregoing shall not result in any claim or liability against the Agent (regardless of the amount of any Overadvance) for Unintentional Overadvances and such Unintentional Overadvances shall not reduce the amount of Permitted Overadvances allowed hereunder; provided further that in no event shall the Agent make an Overadvance, if after giving effect thereto, the principal amount of the Committed Revolving Loans would exceed the Aggregate Revolving Commitments (as in effect prior to any termination of the Revolving Commitments pursuant to Section 2.06 hereof).

"Permitted Prior Liens" means, collectively, Liens permitted by the Pre-Petition Credit Agreement (to the extent any such permitted Liens are valid, enforceable, properly perfected, non-avoidable and senior in priority to the Liens securing the obligations under the Pre-Petition Credit Agreement as of the Petition Date).

"Permitted Refinancing" means, with respect to any Person, any Indebtedness issued in exchange for, or the net proceeds of which are used to extend, refinance, renew, replace, defease or refund (collectively, to "Refinance"), the Indebtedness being Refinanced (or previous refinancings thereof constituting a Permitted Refinancing); provided, that (a) the principal amount (or accreted value, if applicable) of such Permitted Refinancing does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness so Refinanced (plus unpaid accrued interest and premiums thereon and underwriting discounts, defeasance costs, fees, commissions and expenses), (b) the weighted average life to maturity of such Permitted Refinancing is greater than or equal to the weighted average life to maturity of the Indebtedness being Refinanced, (c) such Permitted Refinancing shall not require any scheduled principal payments due prior to the Maturity Date, (d) if the Indebtedness being Refinanced is subordinated in right of payment to the Obligations under this Agreement, such Permitted Refinancing shall be subordinated in right of payment to such Obligations on terms at least as favorable to the Credit Parties as those contained in the documentation governing the Indebtedness being Refinanced, (e) no Permitted Refinancing shall have direct or indirect obligors who were not also obligors of the Indebtedness being Refinanced, or greater guarantees or security, than the Indebtedness being Refinanced, (f) such Permitted Refinancing shall either be unsecured or secured by liens having the same priority, and subject to any applicable subordination terms, as existing liens securing the Indebtedness being Refinanced, (g) such Permitted Refinancing shall be otherwise on terms not materially less favorable to the Credit Parties than those contained in the documentation governing the Indebtedness being Refinanced, including, without limitation, with respect to financial and other covenants and events of default, (h) the interest rate applicable to any such Permitted Refinancing shall not exceed the then

applicable market interest rate, and (i) at the time thereof, no Default or Event of Default shall have occurred and be continuing.

"Permitted Sale" means (i) the sale on terms and conditions acceptable to each of the Agent and Required Lenders of all or substantially all of the Borrower's business assets as a going concern as approved by the Bankruptcy Court pursuant to the applicable provisions of the Bankruptcy; provided that any going concern sale shall either (x) be for cash consideration to be paid at the closing of such sale in an amount in excess of all outstanding Obligations and Pre-Petition Obligations and shall not be subject to any financing contingencies, or (y) be consented to in writing by each of the Agent and Required Lenders, or (ii) a transaction or transactions on terms and conditions acceptable to each of the Agent and Required Lenders combining the sale of all or substantially all of the Borrower's Equipment and Inventory and the permanent closing of all or a portion of the Borrower's Stores and the sale of all Collateral of the Borrower located therein through the retention by the Borrower of one or more Approved Liquidators (including the transaction contemplated by the Consulting Agreement), as approved by the Bankruptcy Court pursuant to the applicable provisions of the Bankruptcy Code, which transaction shall be (x) in the form of a "fee bid" in form and substance acceptable to the Agent or (y) otherwise consented to in writing by the each of the Agent and Required Lenders. In the case of clauses (i) and (ii) above, all of the proceeds thereof (in an amount up to the outstanding balance of the Pre-Petition Obligations and the Obligations) shall be paid to the Agent for application in accordance with the terms and conditions of this Agreement and the Financing Orders.

"Permitted Variance" has the meaning provided in Section 6.28.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, limited partnership, Governmental Authority or other entity.

"Petition Date" has the meaning specified in the Recitals to this Agreement.

"Plan" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) established by the Borrower or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, any ERISA Affiliate.

"Post-Petition Obligations" means Indebtedness of the Borrower that was incurred or accrued after the commencement of the Chapter 11 Case.

"Pre-Petition" means the period prior to the commencement of the Chapter 11 Case.

"Pre-Petition Agent" means the "Agent" as defined in the Pre-Petition Credit Agreement.

"Pre-Petition Credit Agreement" means that certain Credit Agreement dated as of August 2, 2018, among the Borrower, Guarantors, Second Avenue, as administrative agent and collateral agent, and the lenders from time to time party thereto, as amended or otherwise modified prior to and in effect on the Petition Date.

"Pre-Petition Indebtedness" means Indebtedness of the Borrower that was incurred or accrued prior to the commencement of the Chapter 11 Case.

"Pre-Petition Liens" means Liens in favor of Second Avenue, as administrative agent and/or collateral agent, for its benefit and the benefit of the lenders and other credit parties under the Pre-Petition Credit Agreement.

"Pre-Petition Obligations" means all "Obligations" as such term is defined in the Pre-Petition Credit Agreement.

"Pre-Petition Reserve" means, at any date of determination, an amount equal to the outstanding aggregate amount of the "Total Revolver Outstandings", as such term is defined in the Pre-Petition Credit Agreement, plus all unpaid interest on and unpaid fees related thereto.

"Prepayment Event" means:

(a)     Any Disposition (including pursuant to a sale and leaseback transaction) of any property or asset of a Loan Party;

(b)     Any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of (and payments in lieu thereof), any property or asset of a Loan Party;

(c)     The issuance by a Loan Party of any Equity Interests, other than any such issuance of Equity Interests (i) to a Loan Party, or (ii) as a compensatory issuance to any employee, director, or consultant (including under any option plan);

(d)     The incurrence by a Loan Party of any Indebtedness for borrowed money other than Permitted Indebtedness; or

(e)     The receipt by any Loan Party of any Extraordinary Receipts.

"Professional Fee Escrow Account " has the meaning specified in the definition of "Carve-Out".

"Real Estate" means all Leases and all land, together with the buildings, structures, parking areas, and other improvements thereon, now or hereafter owned by any Loan Party, including all easements, rights-of-way, and similar rights relating thereto and all leases, tenancies, and occupancies thereof.

"Receipts and Collections" has the meaning specified in Section 6.13(c).

"Register" has the meaning specified in Section 10.06(c).

"Registered Public Accounting Firm" has the meaning specified by the Securities Laws and shall be independent of the Borrower and its Subsidiaries as prescribed by the Securities Laws.

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives of such Person and of such Person's Affiliates.

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the thirty (30) day notice period has been waived.

"Reports" has the meaning specified in Section 9.12(b).

"Reported Fee Accruals" means all accrued and unpaid fees, disbursements, costs and expenses incurred by the Case Professionals and allowed by the Bankruptcy Court.

"Required Lenders" means, as of any date of determination, Lenders holding more than fifty percent (50%) of the Aggregate Revolving Commitments or, if the commitment of each Lender to make

Committed Revolving Loans has been terminated pursuant to Section 2.06(a) or Section 8.02, Lenders holding in the aggregate more than fifty percent (50%) of the Total Revolver Outstandings; provided, that the Revolving Commitment of, and the portion of the Total Revolver Outstandings held or deemed held by, any Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders.

"Reserves" means all Inventory Reserves and Availability Reserves.

"Responsible Officer" means the chief executive officer, president, chief financial officer, treasurer or assistant treasurer of a Loan Party or any of the other individuals designated in writing to the Agent by an existing Responsible Officer of a Loan Party as an authorized signatory of any certificate or other document to be delivered hereunder; provided, that, in each case the Agent shall have received satisfactory background checks with respect to each such person. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any capital stock or other Equity Interest of any Person or any of its Subsidiaries, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such capital stock or other Equity Interest, or on account of any return of capital to such Person's stockholders, partners or members (or the equivalent of any thereof), or any option, warrant or other right to acquire any such dividend or other distribution or payment. Without limiting the foregoing, "Restricted Payments" with respect to any Person shall also include all payments made by such Person with any proceeds of a dissolution or liquidation of such Person.

"Revolving Commitment" means, as to each Lender, its obligation to make Committed Revolving Loans to the Borrower pursuant to Section 2.01 in an aggregate principal amount at any one time outstanding not to exceed the amount set forth opposite such Lender's name on Schedule 2.01 or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement.

"Revolving Credit Borrowing" means a borrowing consisting of simultaneous Committed Revolving Loans made by each of the Lenders pursuant to Section 2.01.

"Sanctioned Entity" means (a) a country or territory or a government of a country or territory, (b) an agency of the government of a country or territory, (c) an organization directly or indirectly controlled by a country or territory or its government, or (d) a Person resident in or determined to be resident in a country or territory, in each case of clauses (a) through (d) that is a target of Sanctions, including a target of any country or territory sanctions program administered and enforced by OFAC.

"Sanctioned Person" means, at any time (a) any Person named on the list of Specially Designated Nationals and Blocked Persons maintained by OFAC, OFAC's consolidated Non-SDN list or any other Sanctions-related list maintained by any Governmental Authority, (b) a Person or legal entity that is a target of Sanctions, (c) any Person operating, organized or resident in a Sanctioned Entity, or (d) any Person directly or indirectly owned or controlled (individually or in the aggregate) by or acting on behalf of any such Person or Persons described in clauses (a) through (c) above.

"Sanctions" means individually and collectively, respectively, any and all economic sanctions, trade sanctions, financial sanctions, sectoral sanctions, secondary sanctions, trade embargoes anti-terrorism laws and other sanctions laws, regulations or embargoes, including those imposed, administered

or enforced from time to time by: (a) the United States of America, including those administered by OFAC, the U.S. Department of State, the U.S. Department of Commerce, or through any existing or future executive order, (b) the United Nations Security Council, (c) the European Union or any European Union member state, (d) Her Majesty's Treasury of the United Kingdom, or (d) any other Governmental Authority with jurisdiction over any member of Credit Parties or any Loan Party or any of their respective Subsidiaries or Affiliates.

"Sarbanes-Oxley" means the Sarbanes-Oxley Act of 2002.

"Second Avenue" means Second Avenue Capital Partners, LLC.

"Second Avenue Entity" has the meaning specified in Section 10.06(i).

"SEC" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"Securities Laws" means the Securities Act of 1933, the Securities Exchange Act of 1934, Sarbanes-Oxley, and the applicable accounting and auditing principles, rules, standards and practices promulgated, approved or incorporated by the SEC or the PCAOB.

"Security Agreement" means the Security Agreement dated as of the Closing Date among the Loan Parties and the Agent, as the same now exists or may hereafter be amended, modified, supplemented, renewed, restated or replaced.

"Security Documents" means the Security Agreement, the Blocked Account Agreements, the DDA Notifications, the Credit Card Notifications, and each other security agreement or other instrument or document executed and delivered to the Agent pursuant to this Agreement or any other Loan Document granting a Lien to secure any of the Obligations.

"Settlement Date" has the meaning specified in Section 2.14(a).

"Shrink" means Inventory which has been lost, misplaced, stolen, or is otherwise unaccounted for.

"Statutory Committee" means any official committee of unsecured creditors in the Chapter 11 Case pursuant to Section 1102 of the Bankruptcy Code.

"Store" means any retail store (which may include any real property, fixtures, equipment, inventory and other property related thereto) operated, or to be operated, by any Loan Party.

"Subordinated Indebtedness" means Indebtedness which is expressly subordinated with respect to collateral rights and/or in right of payment to the prior payment in full of the Obligations and which is in form and on terms approved in writing by the Agent.

"Subordination Agreements" means, collectively, any subordination agreement entered into in connection with Subordinated Indebtedness, as amended from time to time.

"Subordination Provisions" has the meaning given to such term in Section 8.01(r).

"Subsidiary" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the Equity Interests having ordinary voting

power for the election of directors or other governing body are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of a Loan Party.

"Synthetic Lease Obligation" means the monetary obligation of a Person under (a) a so-called synthetic, off-balance sheet or tax retention lease, or (b) an agreement for the use or possession of property (including sale and leaseback transactions), in each case, creating obligations that do not appear on the balance sheet of such Person but which, upon the application of any Debtor Relief Laws to such Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment).

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to taxes or penalties applicable thereto.

"Termination Date" means the earliest to occur of (i) the Maturity Date, (ii) the date on which the maturity of the Obligations is accelerated (or deemed accelerated) and the Revolving Commitments are irrevocably terminated (or deemed terminated) in accordance with Article VIII, or (iii) the termination of the Revolving Commitments in accordance with the provisions of Section 2.06(a) hereof.

"Total Revolver Outstandings" means, on any date, the aggregate outstanding principal amount of Committed Revolving Loans after giving effect to any borrowings and prepayments or repayments of Committed Revolving Loans occurring on such date.

"Tower Hill" means Tower Hill Advisory Services, LLC.

"Trading with the Enemy Act" has the meaning specified in Section 10.18.

"UCC" or "Uniform Commercial Code" means the Uniform Commercial Code as in effect from time to time in the State of New York; provided, however, that if a term is defined in Article 9 of the Uniform Commercial Code differently than in another Article thereof, the term shall have the meaning set forth in Article 9 of the Uniform Commercial Code; provided further that, if by reason of mandatory provisions of law, perfection, or the effect of perfection or non-perfection, of a security interest in any Collateral or the availability of any remedy hereunder is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "Uniform Commercial Code" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection or availability of such remedy, as the case may be.

"UFCA" has the meaning specified in Section 10.22(d).

"UFTA" has the meaning specified in Section 10.22(d).

"Unfunded Pension Liability" means the excess of a Pension Plan's benefit liabilities under Section 4001(a)(16) of ERISA, over the current value of that Pension Plan's assets, determined in accordance with the assumptions used for funding the Pension Plan pursuant to Section 412 of the Code for the applicable plan year.

"Unintentional Overadvance" means an Overadvance which, to the Agent's knowledge, did not constitute an Overadvance when made but which has become an Overadvance resulting from changed

circumstances beyond the control of the Credit Parties, including, without limitation, a reduction in the Appraised Value of property or assets included in the Borrowing Base or misrepresentation by the Loan Parties.

"United States" and "U.S." mean the United States of America.

"Usage Amount" has the meaning specified in Section 2.09(b).

"Validity and Liquidation Support Agreement" means the validity and liquidation support guaranty, dated as of the date hereof, executed by David Won, as such validity and liquidation support guaranty now exists or may hereafter be amended, modified, supplemented, renewed, restated or replaced.

"Wage Order" means the order of the Bankruptcy Court entered in the Chapter 11 Case, together with all extensions, modifications and amendments that are in form and substance acceptable to the Agent in its Permitted Discretion, which, among other matters, authorizes and directs the Loan Parties to pay certain Pre-Petition wages, benefits and other amounts owing to employees.

**1.02    Other Interpretive Provisions**.  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Organization Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof" and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(c)    Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(d)    Any reference herein or in any other Loan Document to the satisfaction, repayment, or payment in full of the Obligations shall mean the repayment in Dollars in full in cash or

immediately available funds (or, in the case of any contingent Obligations, providing cash collateralization or other collateral as may be requested by the Agent) of all of the Obligations other than unasserted contingent indemnification Obligations, together with any additional steps or items as may be required in accordance with the Financing Orders.

**1.03    Accounting Terms Generally**.

(a)    Generally.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with GAAP, applied on a consistent basis, as in effect from time to time, except as otherwise specifically prescribed herein.

(b)    Changes in GAAP.  If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Borrower or the Required Lenders shall so request, the Agent, the Lenders and the Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); provided that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein, and (ii) the Borrower shall provide to the Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.

**1.04    Rounding**.  Any financial ratios required to be maintained by the Loan Parties pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

**1.05    Times of Day**.  Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

**ARTICLE II**
**THE COMMITMENTS AND BORROWINGS**

**2.01    Committed Revolving Loans; Reserves**.

(a)    Reserved.

(b)    Subject to the terms and conditions set forth herein, each Lender severally agrees to make loans (each such loan, a "Committed Revolving Loan") to the Borrower from time to time, on any Business Day during the Availability Period on which the Agent's offices are open to conduct business, in an aggregate amount not to exceed at any time outstanding the lesser of (x) the amount of such Lender's Revolving Commitment, or (y) such Lender's Applicable Percentage of the Borrowing Base; subject in each case to the following limitations:

(i)    after giving effect to any Revolving Credit Borrowing, the Total Revolver Outstandings shall not exceed the Maximum Revolving Loan Amount; and

(ii)       after giving effect to any Revolving Credit Borrowing, the aggregate outstanding amount of the Committed Revolving Loans of any Lender shall not exceed the lesser of (A) such Lender's Revolving Commitment, and (B) such Lender's Applicable Percentage of the Borrowing Base.

Within the limits of each Lender's Revolving Commitment, and subject to the other terms and conditions hereof, the Borrower may borrow under this Section 2.01, prepay under Section 2.05, and reborrow Committed Revolving Loans under this Section 2.01.

(c)       The Inventory Reserves and Availability Reserves as of the Closing Date are set forth in the Borrowing Base Certificate delivered pursuant to Section 4.01(c) hereof.

(d)       The Agent shall have the right, at any time and from time to time after the Closing Date in its Permitted Discretion to establish, modify or eliminate Reserves.

(e)       Pursuant to the terms of this Section 2.01, except for funding the Professional Fee Escrow Account as provided in this Agreement, the Credit Parties shall not be responsible for the funding, direct payment or reimbursement of any fees or disbursements of any Case Professionals or any committee expenses incurred in connection with the Chapter 11 Case or any successor Chapter 11 Case. For the avoidance of doubt, until such time as the Pre-Petition Obligations and Obligations have been paid in full in cash, amounts in the Weekly Fee Reports of any Case Professional and committee expenses shall be paid solely from the Professional Fee Escrow Account and any retainer, as applicable.

**2.02**    **Borrowings of Committed Revolving Loans**.

(a)       Reserved.

(b)       Each Revolving Credit Borrowing shall be made upon the Borrower's irrevocable written notice to the Agent. Each such notice must be received by the Agent in writing not later than 12:00 p.m. or such earlier time as Agent may designate from time to time by written notice to the Borrower on the requested date of any Revolving Credit Borrowing. Each notice by the Borrower pursuant to this Section 2.02(b) must be confirmed promptly by delivery to the Agent of a written Committed Loan Notice (or, if the Agent so requests, by electronic submission by the Borrower), appropriately completed and signed by a Responsible Officer of the Borrower. Unless otherwise agreed to by the Agent, each Revolving Credit Borrowing shall be in a principal amount of $50,000. Each Committed Loan Notice shall specify (i) the requested date of the Borrowing (which shall be a Business Day), and (ii) the principal amount of the Committed Revolving Loans to be borrowed.

(c)       Following receipt of a Committed Loan Notice, the Agent shall promptly notify each Lender of the amount of its Applicable Percentage of the applicable Committed Revolving Loans. Each Lender shall make the amount of its Committed Revolving Loan available to the Agent in immediately available funds at the Agent's Office not later than 1:00 p.m. on the Business Day specified in the applicable Committed Loan Notice (or, if agreed by the Agent in writing, not later than 1:00 p.m. on the third (3rd) Business Day following the date of such Committed Loan Notice). Upon satisfaction of the applicable conditions set forth in Section 4.02 (and, if such Committed Revolving Borrowing is the initial Committed Revolving Loan, Section 4.01), the Agent shall use reasonable efforts to make all funds so received available to the Borrower in like funds by no later than 4:00 p.m. on the day of receipt by the Agent by wire transfer of such funds in accordance with instructions provided to (and acceptable to the Agent in its Permitted Discretion) the Agent by the Borrower.

(d)     The Agent, without the request of the Borrower, may advance as a Committed Revolving Loan any interest, fee, service charge (including direct wire fees), Credit Party Expenses, or other payment to which any Credit Party is entitled from the Loan Parties pursuant hereto or any other Loan Document and may charge the same to the Loan Account notwithstanding that an Overadvance may result thereby.  The Agent shall advise the Borrower of any such advance or charge promptly after the making thereof.  Such action on the part of the Agent shall not constitute a waiver of the Agent's rights and the Borrower's obligations under Section 2.05(c).  Any amount which is added to the principal balance of the Loan Account as provided in this Section 2.02(c) shall bear interest at the interest rate then and thereafter applicable to Committed Revolving Loans.

(e)     Each Revolving Credit Borrowing of Committed Revolving Loans shall be made by the Lenders pro rata in accordance with their respective Applicable Percentage.  The failure of any Lender to make any Committed Revolving Loan shall neither relieve any other Lender of its obligation to fund its portion of the Committed Revolving Loans in accordance with the provisions of this Agreement nor increase the obligation of any such other Lender.

(f)     Reserved.

(g)     At any time that Committed Revolving Loans are outstanding, the Agent shall notify the Borrower and the Lenders of any change in the applicable prime rate or the LIBO Rate used in determining the applicable interest rate.

(h)     The Agent and the Lenders shall have no obligation to make any Committed Revolving Loan if an Overadvance would result.  The Agent may, in its Permitted Discretion, make Permitted Overadvances without the consent of the Borrower and the Lenders, and the Borrower and each Lender shall be bound thereby.  A Permitted Overadvance is for the account of the Borrower and shall constitute a Committed Revolving Loan and an Obligation and shall be repaid by the Borrower in accordance with the provisions of Section 2.05(c).  The making of any such Permitted Overadvance on any one occasion shall not obligate the Agent or any Lender to make or permit any Permitted Overadvance on any other occasion or to permit such Permitted Overadvances to remain outstanding. The Agent shall have no liability for, and no Loan Party or Credit Party shall have the right to, or shall, bring any claim of any kind whatsoever against the Agent with respect to Unintentional Overadvances regardless of the amount of any such Overadvance(s).

**2.03    Reserved**.

**2.04    Reserved**.

**2.05    Prepayments; Pre-Petition Obligations**.

(a)     The Borrower may, upon irrevocable notice from the Borrower to the Agent, at any time or from time to time, voluntarily prepay Committed Revolving Loans and permanently reduce the Aggregate Revolving Commitments in whole or in part; provided that (i) such notice must be received by the Agent not later than 11:00 a.m. three (3) Business Days prior to any date of prepayment of Committed Revolving Loans; and (ii) any prepayment of Committed Revolving Loans and concurrent permanent reduction of the Aggregate Revolving Commitments shall be in a principal amount of $500,000 or a whole multiple of $500,000 in excess thereof, or, if less, the entire principal amount thereof then outstanding.  Each such notice shall specify the date and amount of such prepayment.  The Agent will promptly notify each Lender of its receipt of each such notice, and of the amount of such Lender's Applicable Percentage of such prepayment.  If such notice is given by the Borrower, the Borrower shall make such prepayment and the payment amount specified in such notice shall be due and payable on the

date specified therein. Any prepayment of a Committed Revolving Loan and permanent reduction of the Aggregate Revolving Commitments shall be accompanied by all accrued interest on the amount prepaid. Each such prepayment and permanent reduction shall be applied to the Committed Revolving Loans and Revolving Commitments of the Lenders in accordance with their respective Applicable Percentages, in all cases, and in accordance with clause (g) below.

(b)     Reserved.

(c)     If for any reason the Total Revolver Outstandings at any time exceed the Maximum Revolving Loan Amount as then in effect, the Borrower shall immediately prepay the Committed Revolving Loans in an aggregate amount equal to such excess.

(d)     The Borrower shall prepay the Committed Revolving Loans with proceeds and collections received by the Loan Parties to the extent so required under the provisions of Section 6.13 hereof.

(e)     The Borrower shall prepay the Committed Revolving Loans in an amount equal to the Net Proceeds received by a Loan Party on account of a Prepayment Event.

(f)     Reserved.

(g)     Prepayments made pursuant to clauses (a), (c), (d) and (e) above shall be applied, first, to the outstanding Pre-Petition Obligations in accordance with the Pre-Petition Credit Agreement, second, ratably to the outstanding Committed Revolving Loans, and third, the amount remaining, if any, after the prepayment in full of the Pre-Petition Obligations as required above and all Committed Revolving Loans outstanding at such time may be retained by the Borrower for use in the ordinary course of its business.

(h)     No later than one (1) Business Day after the Final Order Entry Date, the Borrower shall pay in full with the proceeds of Committed Revolving Loans hereunder, the total outstanding amount of the Pre-Petition Obligations, together with additional amounts due under Section 2.09 of the Pre-Petition Credit Agreement.

**2.06     Termination or Reduction of Aggregate Revolving Commitments**.

(a)     The Borrower may, upon irrevocable notice from the Borrower to the Agent, terminate the Aggregate Revolving Commitments or from time to time permanently reduce the Aggregate Revolving Commitments; provided that (i) any such notice shall be received by the Agent not later than 11:00 a.m. five (5) Business Days prior to the date of termination or reduction, (ii) any such partial reduction shall be in an aggregate amount of $500,000 or any whole multiple of $500,000 in excess thereof, and (iii) the Borrower shall not terminate or reduce the Aggregate Revolving Commitments if, after giving effect thereto and to any concurrent prepayments hereunder, the Total Revolver Outstandings would exceed the Maximum Revolving Loan Amount.

(b)     The Agent will promptly notify the Lenders of any termination or reduction of the Aggregate Revolving Commitments under this Section 2.06. Upon any reduction of the Aggregate Revolving Commitments, the Revolving Commitment of each Lender shall be reduced by such Lender's Applicable Percentage of such reduction amount. All fees (including, without limitation, commitment fees) and interest in respect of the Aggregate Revolving Commitments accrued until the effective date of any termination of the Aggregate Revolving Commitments shall be paid on the effective date of such termination.

**2.07    Repayment of Committed Revolving Loans**.  The Borrower shall repay to the Lenders on the Termination Date the aggregate principal amount of Committed Revolving Loans outstanding on such date, along with accrued but unpaid interest and all other Obligations outstanding with respect to the Committed Revolving Loans.

**2.08    Interest**.

(a)    Subject to the provisions of Sections 2.08(b), 3.02 and 3.03, each Committed Revolving Loan shall bear interest on the outstanding principal amount thereof at a rate per annum equal to the LIBO Rate plus the Applicable Margin.

(b)    (i)    If any amount payable under any Loan Document is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, such amount shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.

(ii)    If any other Event of Default exists, then the Agent may, and upon the request of the Required Lenders shall, notify the Borrower that all outstanding Obligations shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.

(iii)    Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

(c)    Interest on each Committed Revolving Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein. Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment.

**2.09    Fees**.

(a)    Closing Fee.  On the Closing Date, the Borrower shall pay to the Agent, for the ratable benefit of Lenders holding the Revolving Commitments based on their Applicable Percentages, a closing fee of $200,000, which shall be non-refundable and fully earned on the Closing Date.

(b)    Unused Line Fee.  If the average daily unpaid balance of the sum of Total Revolver Outstandings (the "Usage Amount") for any month does not equal the Aggregate Revolving Commitments, then the Borrower shall pay to the Agent, for the ratable benefit of Lenders holding the Revolving Commitments based on their Applicable Percentages, an unused line fee at a rate equal to three quarters of one percent (0.75%) per annum on the amount by which the Aggregate Revolving Commitments exceeds such Usage Amount (the "Facility Fee").  Such Facility Fee shall be payable to the Agent in arrears on the first day of each month with respect to the previous month.

(c)    Administration Fee.  The Borrower shall pay to the Agent, for the ratable benefit of Lenders holding the Revolving Commitments based on their Applicable Percentages, an administrative fee equal to $6,500 per month, payable in advance (i) on the Closing Date for the month of August, and (ii) on the first Business Day of each month thereafter through the Termination Date (the "Administration Fee").  The Administration Fee shall be deemed earned in full on the date when each such payment is due and payable hereunder and shall not be subject to rebate or proration upon termination of this Agreement for any reason.

**2.10    Computation of Interest and Fees; Application of Payments**.  All computations of fees and interest shall be made on the basis of a 365-day year and actual days elapsed.  Interest shall accrue on each Committed Revolving Loan for the day on which the Committed Revolving Loan is made.  For purposes of the calculation of the Total Revolving Outstandings and interest on the Committed Revolving Loans, all payments made by or on account of the Borrower shall be deemed to have been applied to the Committed Revolving Loans two (2) Business Days after receipt of such payments by the Agent (as such receipt is determined pursuant to Section 2.12).  Each determination by the Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

**2.11    Evidence of Debt**.

(a)    The Committed Revolving Loans made by each Lender shall be evidenced by one or more accounts or records maintained by the Agent (the "Loan Account") in the ordinary course of business.  In addition, each Lender may record in such Lender's internal records, an appropriate notation evidencing the date and amount of each Committed Revolving Loan from such Lender, each payment and prepayment of principal of any such Committed Revolving Loan, and each payment of interest, fees and other amounts due in connection with the Obligations due to such Lender.  The accounts or records maintained by the Agent and each Lender shall be conclusive absent manifest error of the amount of the Committed Revolving Loans made by the Lenders to the Borrower and the interest and payments thereon.  Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations.  In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Agent in respect of such matters, the accounts and records of the Agent shall control in the absence of manifest error.  Upon the request of any Lender made through the Agent, the Borrower shall execute and deliver to such Lender (through the Agent) a Note, which shall evidence such Lender's Committed Revolving Loans, in addition to such accounts or records.  Each Lender may attach schedules to its Note and endorse thereon the date, amount and maturity of its Committed Revolving Loans and payments with respect thereto.  Upon receipt of an affidavit of a Lender as to the loss, theft, destruction or mutilation of such Lender's Note and upon cancellation of such Note, the Borrower will issue, in lieu thereof, a replacement Note in favor of such Lender, in the same principal amount thereof and otherwise of like tenor.

(b)    The Agent shall render monthly statements regarding the Loan Account to the Borrower including principal, interest, fees, and including an itemization of all charges and expenses constituting Credit Party Expenses owing, and such statements, absent manifest error, shall be conclusively presumed to be correct and accurate and constitute an account stated between the Borrower and the Credit Parties unless, within thirty (30) days after receipt thereof by the Borrower, the Borrower shall deliver to the Agent a written objection thereto describing the error or errors contained in any such statements.

**2.12    Payments Generally; Agent's Clawback**.

(a)    General.  All payments to be made by the Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.  Except as otherwise expressly provided herein, all payments by the Borrower hereunder shall be made to the Agent, for the account of the respective Lenders to which such payment is owed, at the Agent's Office in Dollars and in immediately available funds not later than 2:00 p.m. on the date specified herein.  The Agent will promptly distribute to each Lender its Applicable Percentage (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office.  All payments received by the Agent (i) prior to or at 2:00 p.m., shall be deemed received on the same Business Day, and (ii) after 2:00 p.m., shall be deemed received on the next succeeding Business Day;

any applicable interest or fee shall continue to accrue and shall be calculated pursuant to Section 2.10. If any payment to be made by the Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

      (b)     Funding by Lenders and Payments by Borrower; Presumptions by Agent.

      (i)     Unless the Agent shall have received notice from a Lender prior to 12:00 noon on the date of such Revolving Credit Borrowing that such Lender will not make available to the Agent such Lender's share of such Revolving Credit Borrowing, the Agent may assume that such Lender has made such share available on such date in accordance with Section 2.02 and may, in reliance upon such assumption, make available to the Borrower a corresponding amount. In such event, if a Lender has not in fact made its share of the applicable Revolving Credit Borrowing available to the Agent, then the applicable Lender and the Borrower severally agree to pay to the Agent forthwith on demand such corresponding amount in immediately available funds with interest thereon, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Agent, at (A) in the case of a payment to be made by such Lender, the greater of the Federal Funds Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation plus any administrative processing or similar fees customarily charged by the Agent in connection with the foregoing, and (B) in the case of a payment to be made by the Borrower, the interest rate applicable to Committed Revolving Loans. If the Borrower and such Lender shall pay such interest to the Agent for the same or an overlapping period, the Agent shall promptly remit to the Borrower the amount of such interest paid by the Borrower for such period. If such Lender pays its share of the applicable Revolving Credit Borrowing to the Agent, then the amount so paid shall constitute such Lender's Committed Revolving Loan included in such Revolving Credit Borrowing. Any payment by the Borrower shall be without prejudice to any claim the Borrower may have against a Lender that shall have failed to make such payment to the Agent.

      (ii)     Unless the Agent shall have received notice from the Borrower prior to the time at which any payment is due to the Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders, as the case may be, the amount due. In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Agent forthwith on demand the amount so distributed to such Lender, in immediately available funds with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Agent, at the greater of the Federal Funds Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation.

A notice from the Agent to any Lender or the Borrower with respect to any amount owing under this subsection (b) shall be conclusive, absent manifest error.

      (c)     Failure to Satisfy Conditions Precedent. If any Lender makes available to the Agent funds for any Committed Revolving Loan to be made by such Lender as provided in the foregoing provisions of this Article II, and such funds are not made available to the Borrower by the Agent because the conditions to the applicable Revolving Credit Borrowing set forth in Article IV are not satisfied or waived in accordance with the terms hereof (subject to the provisions of the last paragraph of Section 4.02 hereof), the Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

(d)     Obligations of Lenders Several.  The obligations of the Lenders hereunder to make Committed Revolving Loans and to make payments hereunder are several and not joint.  The failure of any Lender to make any Committed Revolving Loan or to make any payment hereunder on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its portion of its Committed Revolving Loan or to make its payment hereunder.

(e)     Funding Source.  Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Committed Revolving Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Committed Revolving Loan in any particular place or manner.

**2.13     Sharing of Payments by Lenders**.  If any Credit Party shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of, interest on, or other amounts with respect to, any of the Obligations resulting in any Lender's receiving payment of a proportion of the aggregate amount of Obligations in respect of Committed Revolving Loans greater than its pro rata share thereof as provided herein (including in contravention of the priorities of payment set forth in Section 8.03), then the Credit Party receiving such greater proportion shall (a) notify the Agent of such fact, and (b) purchase (for cash at face value) participations in the Obligations of the other Lenders or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Credit Parties ratably and in the priorities set forth in Section 8.03, provided that:

(i)     if any such participations or subparticipations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations or subparticipations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(ii)     the provisions of this Section shall not be construed to apply to (x) any payment made by the Loan Parties pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender), or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Committed Revolving Loans to any assignee or participant.

Each Loan Party consents to the foregoing and agrees, to the extent it may effectively do so under applicable Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Loan Party rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Loan Party in the amount of such participation.

**2.14     Settlement Amongst Lenders**.

(a)     The amount of each Lender's Applicable Percentage of outstanding Committed Revolving Loans (shall be computed weekly (or more frequently in the Agent's Permitted Discretion) and shall be adjusted upward or downward based on all Committed Revolving Loans and repayments of Committed Revolving Loans received by the Agent as of 3:00 p.m. on the first Business Day (such date, the "Settlement Date") following the end of the period specified by the Agent.

(b)     The Agent shall deliver to each of the Lenders promptly after a Settlement Date a summary statement of the amount of outstanding Committed Revolving Loans for the period and the amount of repayments received for the period.  As reflected on the summary statement, (i) the Agent shall transfer to each Lender its Applicable Percentage of repayments, and (ii) each Lender shall transfer to the Agent (as provided below) or the Agent shall transfer to each Lender, such amounts as are necessary to

insure that, after giving effect to all such transfers, the amount of Committed Revolving Loans made by each Lender shall be equal to such Lender's Applicable Percentage of all Committed Revolving Loans outstanding as of such Settlement Date. If the summary statement requires transfers to be made to the Agent by the Lenders and is received prior to 12:00 p.m. on a Business Day, such transfers shall be made in immediately available funds no later than 3:00 p.m. that day; and, if received after 12:00 p.m., then no later than 12:00 p.m. on the next Business Day. The obligation of each Lender to transfer such funds is irrevocable, unconditional and without recourse to or warranty by the Agent. If and to the extent any Lender shall not have so made its transfer to the Agent, such Lender agrees to pay to the Agent, forthwith on demand, such amount, together with interest thereon, for each day from such date until the date such amount is paid to the Agent, equal to the greater of the Federal Funds Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation plus any administrative, processing, or similar fees customarily charged by the Agent in connection with the foregoing.

2.15 **Release**. The release language and related provisions set forth in paragraphs E, 3 and 36 of the Interim Financing Order (and such corresponding paragraphs in the Final Financing Order) are hereby incorporated by reference and deemed agreed to by each of the Loan Parties and the Credit Parties.

2.16 **Defaulting Lenders**.

(a) Adjustments. Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable Law:

(i) Waivers and Amendments. Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of "Required Lenders" and Section 10.01.

(ii) Defaulting Lender Waterfall. Any payment of principal, interest, fees or other amounts received by the Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article VIII or otherwise) or received by the Agent from a Defaulting Lender pursuant to Section 10.08 shall be applied at such time or times as may be determined by the Agent as follows: first, to the payment of any amounts owing by such Defaulting Lender to the Agent hereunder; second, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Committed Revolving Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Agent; third, if so determined by the Agent and the Borrower, to be held in a deposit account and released pro rata in order to satisfy such Defaulting Lender's potential future funding obligations with respect to Committed Revolving Loans under this Agreement; fourth, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; fifth, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and sixth, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided that if (x) such payment is a payment of the principal amount of any Committed Revolving Loans in respect of which such Defaulting Lender has not fully funded its appropriate share, and (y) such Committed Revolving Loans were made at a time when the conditions set forth in Section 4.02 were satisfied or waived, such payment shall be applied solely to pay the Committed Revolving Loans of all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Committed Revolving Loans of such

Defaulting Lender until such time as all Committed Revolving Loans are held by the Lenders pro rata in accordance with the Revolving Commitments hereunder. Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(iii)    Certain Fees. No Defaulting Lender shall be entitled to receive any fee payable under Section 2.09 for any period during which that Lender is a Defaulting Lender (and the Borrower shall not be required to pay any such fee that otherwise would have been required to have been paid to that Defaulting Lender).

(b)    Defaulting Lender Cure. If the Borrower and the Agent agree in writing that a Lender is no longer a Defaulting Lender, the Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any cash collateral), that Lender will, to the extent applicable, purchase at par that portion of outstanding Committed Revolving Loans of the other Lenders or take such other actions as the Agent may determine to be necessary to cause the Committed Revolving Loans to be held on a pro rata basis by the Lenders in accordance with their Applicable Percentages, whereupon such Lender will cease to be a Defaulting Lender; provided that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; and provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lenders, having been a Defaulting Lender.

**2.17    Waiver of Priming Rights**. Upon the Closing Date, and on behalf of itself and its estate, and for so long as any Obligations or Pre-Petition Obligations shall be outstanding, each Loan Party hereby irrevocably waives any right, pursuant to Sections 364(c) or 364(d) of the Bankruptcy Code or otherwise, to grant any Lien of equal or greater priority than the Liens securing the Obligations or Pre-Petition Obligations, or to approve a claim of equal or greater priority than the Obligations or Pre-Petition Obligations, other than as set forth in a Financing Order or as expressly permitted under this Agreement.

**ARTICLE III**
**TAXES, YIELD PROTECTION AND ILLEGALITY**

**3.01    Taxes**.

(a)    Payments Free of Taxes. Any and all payments by or on account of any obligation of the Borrower hereunder or under any other Loan Document shall be made free and clear of and without reduction or withholding for any Indemnified Taxes or Other Taxes, provided that if the Borrower shall be required by applicable Law to deduct any Indemnified Taxes (including any Other Taxes) from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section) the Agent or the applicable Lender, as the case may be, receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Borrower shall make such deductions, and (iii) the Borrower shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable Law.

(b)    Payment of Other Taxes by the Borrower. Without limiting the provisions of subsection (a) above, the Borrower shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable Law.

(c)     Indemnification by the Loan Parties.  The Loan Parties shall indemnify the Agent and each Lender, within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) paid by the Agent or such Lender, as the case may be, and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Agent), or by the Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(d)     Evidence of Payments.  As soon as practicable after any payment of Indemnified Taxes or Other Taxes by the Borrower to a Governmental Authority, the Borrower shall deliver to the Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Agent.

(e)     Status of Lenders.  Any Foreign Lender that is entitled to an exemption from or reduction of withholding tax under the Law of the jurisdiction in which the Borrower is resident for tax purposes, or any treaty to which such jurisdiction is a party, with respect to payments hereunder or under any other Loan Document shall deliver to the Borrower (with a copy to the Agent), at the time or times prescribed by applicable Law or reasonably requested by the Borrower or the Agent, such properly completed and executed documentation prescribed by applicable Law as will permit such payments to be made without withholding or at a reduced rate of withholding. Such delivery shall be provided on the Closing Date and on or before such documentation expires or becomes obsolete or after the occurrence of an event requiring a change in the documentation most recently delivered.  In addition, any Lender, if requested by the Borrower or the Agent, shall deliver such other documentation prescribed by applicable Law or reasonably requested by the Borrower or the Agent as will enable the Borrower or the Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.

Without limiting the generality of the foregoing, in the event that the Borrower is resident for tax purposes in the United States, any Foreign Lender shall deliver to the Borrower and the Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the request of the Borrower or the Agent, but only if such Foreign Lender is legally entitled to do so), whichever of the following is applicable:

(i)     duly completed copies of Internal Revenue Service Form W-8BEN claiming eligibility for benefits of an income tax treaty to which the United States is a party,

(ii)     duly completed copies of Internal Revenue Service Form W-8ECI,

(iii)     in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under section 881(c) of the Code, (x) a certificate to the effect that such Foreign Lender is not (A) a "bank" within the meaning of section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of the Borrower within the meaning of section 881(c)(3)(B) of the Code, or (C) a "controlled foreign corporation" described in section 881(c)(3)(C) of the Code and (y) duly completed copies of Internal Revenue Service Form W-8BEN, or

(iv)     any other form prescribed by applicable Law as a basis for claiming exemption from or a reduction in United States federal withholding tax duly completed together

with such supplementary documentation as may be prescribed by applicable Law to permit the Borrower to determine the withholding or deduction required to be made.

(f)     Treatment of Certain Refunds.  If the Agent or any Lender determines, in its Permitted Discretion, that it has received a refund of any Taxes or Other Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to this Section, it shall pay to the Borrower an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section with respect to the Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of the Agent or such Lender, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), provided that the Borrower, upon the request of the Agent or such Lender, agrees to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Agent or such Lender in the event the Agent or such Lender is required to repay such refund to such Governmental Authority.  This subsection shall not be construed to require the Agent or any Lender to make available its tax returns (or any other information relating to its taxes that it deems confidential) to the Borrower or any other Person.

**3.02     Illegality**.  If any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable Lending Office to determine or charge interest rates based upon the LIBO Rate, or any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of, Dollars in the London interbank market, then, on notice thereof by such Lender to the Borrower through the Agent, any obligation of such Lender to determine interest based on the LIBO Rate shall be suspended until such Lender notifies the Agent and the Borrower that the circumstances giving rise to such determination no longer exist.  Immediately upon receipt of such notice, interest on the Committed Revolving Loans shall accrue and be payable at a rate determined by such alternate method as reasonably selected by Agent and consistent with Agent's general practices.

**3.03     Inability to Determine Rates**.  In the event that the Agent or any Lender shall have determined that reasonable means do not exist for ascertaining the LIBO Rate or the LIBO Rate with respect to a proposed Committed Revolving Loan does not adequately and fairly reflect the cost to such Lenders of funding such Committed Revolving Loan, the Agent or such Lender shall give the Borrower prompt written, telephonic or electronic notice of the determination of such effect.  Thereafter, the obligation of the Lenders to make or maintain Committed Revolving Loans at the LIBO Rate shall be suspended until the Agent (upon the instruction of the Required Lenders) revokes such notice and until such time, interest on the Committed Revolving Loans shall accrue and be payable at a rate determined by such alternate method as reasonably selected by Agent and consistent with Agent's general practices.

**3.04     Increased Costs; Reserves on Committed Revolving Loans**.

(a)     Increased Costs Generally.  If any Change in Law shall:

(i)     impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender (except any reserve requirement reflected in the LIBO Rate);

(ii)     subject any Lender to any tax of any kind whatsoever with respect to this Agreement or any Committed Revolving Loan made by it at the LIBO Rate, or change the basis of taxation of payments to such Lender in respect thereof (except for Indemnified Taxes or Other

Taxes covered by Section 3.01 and the imposition of, or any change in the rate of, any Excluded Tax payable by such Lender); or

(iii)    impose on any Lender any other condition, cost or expense affecting this Agreement or any Committed Revolving Loans accruing interest at the LIBO Rate made by such Lender;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Committed Revolving Loan at the LIBO Rate (or of maintaining its obligation to make any such Committed Revolving Loan), or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or any other amount) then, upon request of such Lender, the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

(b)    Capital Requirements.    If any Lender determines that any Change in Law affecting such Lender or any Lending Office of such Lender or such Lender's holding company, if any, regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Revolving Commitments of such Lender or the Committed Revolving Loans made by such Lender, to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)    Certificates for Reimbursement.    A certificate of a Lender setting forth in reasonable detail the basis for and the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in subsection (a) or (b) of this Section and, if reasonably requested and readily available, the calculations reflecting such amounts, and delivered to the Borrower shall be conclusive absent manifest error.    The Borrower shall pay such Lender the amount shown as due on any such certificate within ten (10) days after receipt thereof.

(d)    Delay in Requests.    Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of this Section shall not constitute a waiver of such Lender's right to demand such compensation, provided that the Borrower shall not be required to compensate a Lender pursuant to the foregoing provisions of this Section for any increased costs incurred or reductions suffered more than one hundred eighty (180) days prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the one hundred eighty (180) day period referred to above shall be extended to include the period of retroactive effect thereof).

(e)    Reserves on Committed Revolving Loans.    The Borrower shall pay to each Lender, as long as such Lender shall be required to maintain reserves with respect to liabilities or assets consisting of or including Eurocurrency funds or deposits (currently known as "Eurocurrency liabilities"), additional interest on the unpaid principal amount of each Committed Revolving Loan accruing interest at the LIBO Rate equal to the actual costs of such reserves allocated to such Committed Revolving Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive), which shall be due and payable on each date on which interest is payable on such Committed Revolving Loan, provided the Borrower shall have received at least ten (10) days' prior notice (with a copy to the Agent) of such additional interest from such Lender.    If a Lender fails to give notice ten (10) days prior to

the relevant Interest Payment Date, such additional interest shall be due and payable ten (10) days from receipt of such notice.

**3.05    Reserved**.

**3.06    Mitigation Obligations; Replacement of Lenders**.

(a)    Designation of a Different Lending Office.  If any Lender requests compensation under Section 3.04, or the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, or if any Lender gives a notice pursuant to Section 3.02, then such Lender shall use reasonable efforts to designate a different Lending Office for funding or booking its Committed Revolving Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 3.01 or 3.04, as the case may be, in the future, or eliminate the need for the notice pursuant to Section 3.02, as applicable, and (ii) in each case, would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)    Replacement of Lenders.    If any Lender requests compensation under Section 3.04, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, the Borrower may replace such Lender in accordance with Section 10.13.

**3.07    Survival**.  All of the Borrower's obligations under this Article III shall survive the termination of the Aggregate Revolving Commitments and the repayment of the Committed Revolving Loans and all other Obligations hereunder.

<u>**ARTICLE IV**</u>
**CONDITIONS PRECEDENT TO REVOLVING CREDIT BORROWINGS**

**4.01    Conditions of Initial Revolving Credit Borrowing**.  The obligation of each Lender to make its initial credit extension hereunder is subject to satisfaction of the following conditions precedent:

(a)    The Agent's receipt of the following, each of which shall be originals, telecopies or other electronic image scan transmissions (e.g., "pdf" or "tif" via e-mail) (followed promptly by originals) unless otherwise specified, each properly executed by a Responsible Officer of the signing Loan Party, Limited Recourse Guarantor or Lender, as applicable, each dated as of the Closing Date (or, in the case of certificates of governmental officials, a recent date before the Closing Date) and each in form and substance satisfactory to the Agent:

(i)    executed counterparts of this Agreement sufficient in number for distribution to the Agent, each Lender and the Borrower;

(ii)    a Note executed by the Borrower in favor of each Lender requesting a Note;

(iii)    such certificates of resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party and Limited Recourse Guarantor as the Agent may require evidencing (A) the authority of such party to enter into this

Agreement and the other Loan Documents to which such party is a party or is to become a party, and (B) the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such party is a party or is to become a party;

(iv)     copies of each Loan Party's Organization Documents and such other documents and certifications as the Agent may reasonably require to evidence that each Loan Party is duly organized or formed, and that each Loan Party is validly existing, in good standing and qualified to engage in business in each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification, except to the extent that failure to so qualify in such jurisdiction could not reasonably be expected to have a Material Adverse Effect;

(v)     reserved;

(vi)     a certificate signed by a Responsible Officer of the Borrower certifying (A) that the conditions specified in Sections 4.02(a) and 4.02(b) have been satisfied, (B) that, except with respect to the filing of the Chapter 11 Case and those matters resulting from the Events and Circumstances, there has been no event or circumstance since January 31, 2019 that has had or could be reasonably expected to have, either individually or in the aggregate, a Material Adverse Effect, and (C) either that (1) no consents, licenses or approvals are required in connection with the execution, delivery and performance by each Loan Party and the validity against each Loan Party of the Loan Documents to which it is a party, or (2) subject to the entry by the Bankruptcy Court of the Interim Financing Order (as the same may be amended, supplemented or otherwise modified by the Final Financing Order),that all such consents, licenses and approvals have been obtained and are in full force and effect;

(vii)     reserved;

(viii)     evidence that all insurance required to be maintained pursuant to the Loan Documents in favor of the Agent required under the Loan Documents have been obtained and are in effect;

(ix)     reserved;

(x)     the Security Documents and certificates evidencing any stock being pledged thereunder, together with undated stock powers executed in blank, each duly executed by the applicable Loan Parties;

(xi)     the Validity and Liquidation Support Agreement, duly executed by the applicable parties thereto;

(xii)     reserved;

(xiii)     the Perfection Certificate, duly executed by the Loan Parties;

(xiv)     reserved;

(xv)     all other Loan Documents, each duly executed by the applicable Loan Parties and Limited Recourse Guarantors;

(xvi)     reserved;

(xvii)    results of searches or other evidence reasonably satisfactory to the Agent (in each case dated as of a date reasonably satisfactory to the Agent) indicating the absence of Liens on the assets of the Loan Parties, except for Permitted Encumbrances and Liens for which termination statements and releases, satisfactions and discharges of any mortgages, and releases or subordination agreements satisfactory to the Agent are being tendered concurrently with such extension of credit or other arrangements satisfactory to the Agent for the delivery of such termination statements and releases, satisfactions and discharges have been made;

(xviii)   (A)     all documents and instruments, including Uniform Commercial Code financing statements, required by Law or reasonably requested by the Agent to be filed, registered or recorded to create or perfect the first priority Liens intended to be created under the Loan Documents and all such documents and instruments shall have been so filed, registered or recorded to the satisfaction of the Agent, (B) Credit Card Notifications and Blocked Account Agreements required pursuant to Section 6.13 hereof, and (C) all Collateral Access Agreements as required by the Agent; and

(xix)     such other assurances, certificates, documents, consents or opinions as the Agent or its counsel reasonably may require;

(b)     after giving effect to (i) the first funding of the Committed Revolving Loans, and (ii) any charges to the Loan Account made in connection with the establishment of the credit facility contemplated hereby, Availability shall be not less than $900,000;

(c)     the Agent shall have received a Borrowing Base Certificate dated the Closing Date, relating to the week most recently ended prior to the Closing Date, and executed by a Responsible Officer of the Borrower;

(d)     the Agent shall be reasonably satisfied that any financial statements delivered to it fairly present the business and financial condition of the Loan Parties;

(e)     the Permitted Sale contemplated by the Consulting Agreement shall have commenced;

(f)     the Agent shall have received and be satisfied with the Borrower's Approved Budget and such other information (financial or otherwise) reasonably requested by the Agent;

(g)     the Agent shall be satisfied that each Loan Party maintains and is in compliance with a policy for the treatment, handling, and storage of customer information and personally identifiable information in accordance with applicable Laws, and shall have received a true, accurate, and complete copy of the current version of such policy;

(h)     there shall not be pending any litigation or other proceeding, the result of which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect or prevent or restrain the consummation of the Loan Documents and which is not stayed by the filing of the Chapter 11 Case;

(i)     reserved;

(j)        the consummation of the transactions contemplated hereby shall not violate any applicable Law or any Organization Document;

(k)        all fees and expenses required to be paid to the Agent on or before the Closing Date shall have been paid in full, and all fees and expenses required to be paid to the Lenders on or before the Closing Date shall have been paid in full;

(l)        the Borrower shall have paid all fees, charges and disbursements of counsel to the Agent to the extent invoiced prior to or on the Closing Date, plus such additional amounts of such fees, charges and disbursements as shall constitute the Agent's reasonable estimate of such fees, charges and disbursements incurred or to be incurred by the Agent through the Closing Date (provided that such estimate shall not thereafter preclude a final settling of accounts between the Borrower and the Agent);

(m)        the Agent and the Lenders shall have completed satisfactory background checks of the Loan Parties' owners, shareholders and management and shall have received all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the USA PATRIOT Act;

(n)        (i) the Bankruptcy Court shall have entered the Interim Financing Order, the Cash Management Order and the Wage Order, (ii) none of such orders shall have been stayed, vacated or reversed (in whole or in part), and (iii) the Cash Management Order, the Interim Financing Order and the Wage Order shall not have been amended or modified other than with the consent of the Agent in its Permitted Discretion;

(o)        the Loan Parties shall have filed with the Bankruptcy Court, which shall be in form and substance acceptable to the Agent, a motion under Section 363 of the Bankruptcy Code to approve the assumption of the Consulting Agreement (the "Consulting Motion");

(p)        the Loan Parties shall have retained SierraConstellation Partners, LLC (or another qualified party reasonably acceptable to the Agent) to act as the financial advisor and filed with the Bankruptcy Court, in form and substance acceptable to the Agent, a motion under Section 363 of the Bankruptcy Code to approve such retainer (the "Advisor Motion"); and

(q)        the Agent and, as applicable, each Lender, shall have completed all required due diligence, including, but not limited to, a review of any requested documentation related to the Business of the Borrower, and in person meetings with the Borrower's management team and lead investors.

Without limiting the generality of the provisions of Section 9.04, for purposes of determining compliance with the conditions specified in this Section 4.01, each Lender that has signed this Agreement shall be deemed to have Consented to, approved or accepted or to be satisfied with, each document or other matter required hereunder to be Consented to or approved by or acceptable or satisfactory to a Lender unless the Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

4.02    **Conditions to all Revolving Credit Borrowings**.  The obligation of each Lender to honor any Committed Loan Notice is subject to the following conditions precedent:

(a)        The representations and warranties of each other Loan Party contained in Article V or in any other Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct in all respects on and as of the date of such

Revolving Credit Borrowing, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct as of such earlier date;

(b)     no Default or Event of Default shall exist, or would result from such proposed Revolving Credit Borrowing or from the application of the proceeds thereof;

(c)     the Agent shall have received a Committed Loan Notice and a Borrowing Base Certificate in accordance with the requirements hereof;

(d)     no event or circumstance which could reasonably be expected to result in a Material Adverse Effect shall have occurred or would result from the Revolving Credit Borrowing, except for matters arising from the Events and Circumstances;

(e)     no Overadvance shall result from such Revolving Credit Borrowing;

(f)     neither the Interim Financing Order nor the Final Financing order, as applicable, shall have been (i) stayed, vacated or reversed (in whole or in part), or (iii) amended or modified other than with the consent of the Agent in its Permitted Discretion; and

(g)     each Revolving Credit Borrowing shall be for purposes and in amounts consistent with the Approved Budget (subject to the Permitted Variance).

Each Committed Loan Notice submitted by the Borrower shall be deemed to be a representation and warranty by the Borrower that the conditions specified in Section 4.02 have been satisfied on and as of the date of the applicable Revolving Credit Borrowing.  The conditions set forth in this Section 4.02 are for the sole benefit of the Credit Parties, but until the Required Lenders otherwise direct the Agent to cease making Committed Revolving Loans, the Lenders will fund their Applicable Percentage of all Committed Revolving Loans whenever made, which are requested by the Borrower and, notwithstanding the failure of the Loan Parties to comply with the provisions of this Article IV, agreed to by the Agent; provided, however, the making of any such Committed Revolving Loans shall not be deemed a modification or waiver by any Credit Party of the provisions of this Article IV on any future occasion or a waiver of any rights or the Credit Parties as a result of any such failure to comply.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES

To induce the Credit Parties to enter into this Agreement and to make Committed Revolving Loans hereunder, each Loan Party represents and warrants to the Agent and the other Credit Parties that:

**5.01     Existence, Qualification and Power**.  Each Loan Party and each Subsidiary thereof (a) is a corporation, limited liability company, partnership or limited partnership, duly incorporated, organized or formed, validly existing and, where applicable, in good standing under the Laws of the jurisdiction of its incorporation, organization, or formation, (b) subject to any entry of any required orders of the Bankruptcy Court including, without limitation, the entry of the Interim Financing Order and the Final Financing Order, as applicable, has all requisite power and authority and all requisite governmental licenses, permits, authorizations, consents and approvals to (i) own or lease its assets and carry on its business, and (ii) execute, deliver and perform its obligations under the Loan Documents to which it is a party, and (c) is duly qualified and is licensed and, where applicable, in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (b)(i) or (c), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.  Schedule 5.01

annexed hereto sets forth, as of the Closing Date, each Loan Party's name as it appears in official filings in its state of incorporation or organization, its state of incorporation or organization, organization type, organization number, if any, issued by its state of incorporation or organization, and its federal employer identification number.

**5.02    Authorization; No Contravention**.  Subject to the entry of the Interim Financing order and the Final Financing order, as applicable, the execution, delivery and performance by each Loan Party of each Loan Document to which such Person is or is to be a party has been duly authorized by all necessary corporate or other organizational action, and does not and will not (a) contravene the terms of any of such Person's Organization Documents; (b) conflict with or result in any breach, termination, or contravention of, or constitute a default under, or require any payment to be made under (i) any Material Contract or any Material Indebtedness to which such Person is a party or affecting such Person or the properties of such Person or any of its Subsidiaries or (ii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; (c) result in or require the creation of any Lien upon any asset of any Loan Party (other than Liens in favor of the Agent under the Security Documents); or (d) violate any Law.

**5.03    Governmental Authorization; Other Consents**.  Subject to the entry of the Interim Financing order and the Final Financing order, as applicable, no approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, except for such as have been obtained or made and are in full force and effect.

**5.04    Binding Effect**.  This Agreement has been, and each other Loan Document, when delivered, will have been, duly executed and delivered by each Loan Party and Limited Recourse Guarantor that is party thereto.  Subject to the entry of the Interim Financing order and the Final Financing order, as applicable, this Agreement constitutes, and each other Loan Document when so delivered will constitute, a legal, valid and binding obligation of such Loan Party and Limited Recourse Guarantor, as applicable, enforceable against each Loan Party and Limited Recourse Guarantor that is party thereto in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other Laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

**5.05    Financial Statements; No Material Adverse Effect**.

(a)    All financial statements that have been delivered to the Agent under this Agreement (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; (ii) fairly present the financial condition of the Borrower and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; and (iii) show all Material Indebtedness and other liabilities, direct or contingent, of the Borrower and its Subsidiaries as of the date thereof, including liabilities for taxes, material commitments and Indebtedness, subject, in each case, to the absence of footnotes and to normal year-end audit adjustments.

(b)    Reserved.

(c)    Reserved.

(d)    Reserved.

(e) Reserved.

(f) The initial Approved Budget was prepared in good faith on the basis of the assumptions stated therein, which assumptions were fair in light of the conditions existing at the time of delivery of such forecasts, and represented, at the time of delivery, the Loan Parties' best estimate of their future financial performance.

(g) The Loan Parties and their Subsidiaries have no Indebtedness other than Indebtedness permitted pursuant to Section 7.03. There has not been (and none of the Loan Parties has received any notice of) (i) a material reduction or proposed reduction in the aggregate amount of trade credit available to the Loan Parties for purchases of inventory from their key merchandise vendors, or (ii) a material tightening of the terms of the trade credit or the credit limits made available to the Loan Parties by any of the their key merchandise vendors.

**5.06   Litigation**.   Other than the Events and Circumstances, there are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Loan Parties after due and diligent investigation, threatened or contemplated, at law, in equity, in arbitration or before any Governmental Authority, by or against any Loan Party or any of its Subsidiaries or against any of its properties or revenues that (a) purport to affect or pertain to this Agreement or any other Loan Document, or any of the transactions contemplated hereby, or (b) either individually or in the aggregate, if determined adversely, could reasonably be expected to have a Material Adverse Effect.

**5.07   No Default**.   No Default or Event of Default has occurred and is continuing or would result from the consummation of the transactions contemplated by this Agreement or any other Loan Document.

**5.08   Ownership of Property; Liens**.

(a) Each of the Loan Parties and each Subsidiary thereof has good record and marketable title in fee simple to or valid leasehold interests in, all Real Estate necessary or used in the ordinary conduct of its business. Each of the Loan Parties and each Subsidiary has good and marketable title to, valid leasehold interests in, or valid licenses to use all personal property and assets material to the ordinary conduct of its business.

(b) Schedule 5.08(b)(1) sets forth the address (including street address, county and state) of all Real Estate that is owned by the Loan Parties and each of their Subsidiaries, together with a list of the holders of any mortgage or other Lien thereon as of the Closing Date. Each Loan Party and each of its Subsidiaries has good, marketable and insurable fee simple title to the Real Estate owned by such Loan Party or such Subsidiary, free and clear of all Liens, other than Permitted Encumbrances. Schedule 5.08(b)(2) sets forth the address (including street address, county and state) of all Leases of the Loan Parties, together with a list of the lessor and its contact information with respect to each such Lease as of the Closing Date. Each of such Leases is in full force and effect and the Loan Parties are not in default of the terms thereof.

(c) Schedule 7.01 sets forth a complete and accurate list of all Liens on the property or assets of each Loan Party and each of its Subsidiaries, showing as of the Closing Date the lienholder thereof, the principal amount of the obligations secured thereby and the property or assets of such Loan Party or such Subsidiary subject thereto. The property of each Loan Party and each of its Subsidiaries is subject to no Liens, other than Permitted Encumbrances.

(d) Reserved.

(e)    Schedule 7.03 sets forth a complete and accurate list of all Indebtedness of each Loan Party or any Subsidiary of a Loan Party on the Closing Date, showing as of the Closing Date the amount, obligor or issuer and maturity thereof.

**5.09    Environmental Compliance**.

(a)    Except as specifically disclosed in Schedule 5.09, no Loan Party or any Subsidiary thereof (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to any Environmental Liability, (iii) has received notice of any claim with respect to any Environmental Liability, or (iv) knows of any basis for any Environmental Liability, except, in each case, as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)    Except as otherwise set forth in Schedule 5.09, none of the properties currently or formerly owned or operated by any Loan Party or any Subsidiary thereof is listed or proposed for listing on the NPL or on the CERCLIS or any analogous foreign, state or local list or is adjacent to any such property; there are no and never have been any underground or above-ground storage tanks or any surface impoundments, septic tanks, pits, sumps or lagoons in which Hazardous Materials are being or have been treated, stored or disposed of on any property currently owned or operated by any Loan Party or any Subsidiary thereof or, to the best of the knowledge of the Loan Parties, on any property formerly owned or operated by any Loan Party or Subsidiary thereof; there is no asbestos or asbestos-containing material on any property currently owned or operated by any Loan Party or Subsidiary thereof; and Hazardous Materials have not been released, discharged or disposed of on any property currently or formerly owned or operated by any Loan Party or any Subsidiary thereof.

(c)    Except as otherwise set forth on Schedule 5.09, no Loan Party or any Subsidiary thereof is undertaking, and no Loan Party or any Subsidiary thereof has completed, either individually or together with other potentially responsible parties, any investigation or assessment or remedial or response action relating to any actual or threatened release, discharge or disposal of Hazardous Materials at any site, location or operation, either voluntarily or pursuant to the order of any Governmental Authority or the requirements of any Environmental Law; and all Hazardous Materials generated, used, treated, handled or stored at, or transported to or from, any property currently or formerly owned or operated by any Loan Party or any Subsidiary thereof have been disposed of in a manner not reasonably expected to result in material liability to any Loan Party or any Subsidiary thereof.

**5.10    Insurance**.    The properties of the Loan Parties and their Subsidiaries are insured with financially sound and reputable insurance companies which are not Affiliates of the Loan Parties, in such amounts, with such deductibles and covering such risks (including, without limitation, workmen's compensation, public liability, business interruption and property damage insurance) as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the Loan Parties and their Subsidiaries operate.    Schedule 5.10 sets forth a description of all insurance maintained by or on behalf of the Loan Parties and their Subsidiaries as of the Closing Date. Each insurance policy listed on Schedule 5.10 is in full force and effect and all premiums in respect thereof that are due and payable have been paid.

**5.11    Taxes**.    The Loan Parties and their Subsidiaries have filed all federal, state and other material tax returns and reports required to be filed, and have paid all federal, state and other material taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable, except those which are not required to be paid by the Bankruptcy Court and which are being contested in good faith by appropriate proceedings being diligently conducted, for which adequate reserves have been provided in accordance with GAAP, and

which contest effectively suspends the collection of the contested obligation and the enforcement of any Lien securing such obligation. There is no proposed tax assessment against any Loan Party or any Subsidiary that would, if made, have a Material Adverse Effect. No Loan Party or any Subsidiary thereof is a party to any tax sharing agreement.

**5.12    ERISA Compliance**.

(a)    The Borrower, each of its ERISA Affiliates and each Plan is in compliance in all material respects with the applicable provisions of ERISA, the Code and other federal or state Laws. Each Plan that is intended to qualify under Section 401(a) of the Code has received a favorable determination letter from the IRS or an application for such a letter is currently being processed by the IRS with respect thereto and, to the best knowledge of the Borrower, nothing has occurred which would prevent, or cause the loss of, such qualification. The Loan Parties and each ERISA Affiliate have made all required contributions to each Plan subject to Sections 412 or 430 of the Code and to each Multiemployer Plan, and no application for a funding waiver or an extension of any amortization period pursuant to Sections 412 or 430 of the Code has been made with respect to any Plan. No Lien imposed under the Code or ERISA exists or is likely to arise on account of any Plan or Multiemployer Plan.

(b)    There are no pending or, to the best knowledge of the Borrower, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that could reasonably be expected to have a Material Adverse Effect. There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan that has resulted or could reasonably be expected to result in a Material Adverse Effect.

(c)    (i)    No ERISA Event has occurred or is reasonably expected to occur; (ii) no Pension Plan has any Unfunded Pension Liability; (iii) neither any Loan Party nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability under Title IV of ERISA with respect to any Pension Plan (other than premiums due and not delinquent under Section 4007 of ERISA); (iv) neither any Loan Party nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Sections 4201 or 4243 of ERISA with respect to a Multiemployer Plan; and (v) neither any Loan Party nor any ERISA Affiliate has engaged in a transaction that could be subject to Sections 4069 or 4212(c) of ERISA.

**5.13    Subsidiaries; Equity Interests**. The Loan Parties have no Subsidiaries other than those specifically disclosed in Part (a) of Schedule 5.13, which Schedule sets forth the legal name, jurisdiction of incorporation or formation and authorized Equity Interests of each such Subsidiary. All of the outstanding Equity Interests in such Subsidiaries have been validly issued, are fully paid and non-assessable (if applicable) and are owned by a Loan Party (or a Subsidiary of a Loan Party) in the amounts specified on Part (a) of Schedule 5.13 free and clear of all Liens except for those created under the Security Documents. Except as set forth in Schedule 5.13, there are no outstanding rights to purchase any Equity Interests in any Subsidiary. The Loan Parties have no equity investments in any other corporation or entity other than those specifically disclosed in Part (a) of Schedule 5.13. All of the outstanding Equity Interests in the Loan Parties have been validly issued, and are fully paid and non-assessable (if applicable) and are owned in the amounts specified on Part (b) of Schedule 5.13 free and clear of all Liens except for those created under the Security Documents and those expressly granted pursuant to the Financing Orders. The copies of the Organization Documents of each Loan Party and each amendment thereto provided pursuant to Section 4.01 are true and correct copies of each such document, each of which is valid and in full force and effect.

**5.14    Margin Regulations; Investment Company Act**.

(a)    No Loan Party is engaged or will be engaged, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the FRB), or extending credit for the purpose of purchasing or carrying margin stock.  None of the proceeds of the Revolving Credit Borrowings shall be used directly or indirectly for the purpose of purchasing or carrying any margin stock, for the purpose of reducing or retiring any Indebtedness that was originally incurred to purchase or carry any margin stock or for any other purpose that might cause any of the Revolving Credit Borrowings to be considered a "purpose credit" within the meaning of Regulations T, U, or X issued by the FRB.

(b)    None of the Loan Parties, any Person Controlling any Loan Party, or any Subsidiary is or is required to be registered as an "investment company" under the Investment Company Act of 1940.

**5.15    Disclosure**.  Each Loan Party has disclosed to the Agent and the Lenders all agreements, instruments and corporate or other restrictions to which it or any of its Subsidiaries is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.  No report, financial statement, certificate or other information furnished (whether in writing or orally) by or on behalf of any Loan Party to the Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or under any other Loan Document (in each case, as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided that, with respect to projected financial information, the Loan Parties represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time.

**5.16    Compliance with Laws**.  Except to the extent non-performance thereof is permitted by the Bankruptcy Court, each of the Loan Parties and each Subsidiary is in compliance (a) in all material respects with the requirements of all Laws (including without limitation, the provisions of the Bankruptcy Code) and all orders, writs, injunctions and decrees applicable to it or to its properties, except in such instances in which (i) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted, or (ii) the failure to comply therewith, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect, and (b) with Sections 10.17 and 10.18 hereof.

**5.17    Intellectual Property; Licenses, Etc**.  The Loan Parties and their Subsidiaries own, or possess the right to use, all of the Intellectual Property, licenses, permits and other authorizations that are reasonably necessary for the operation of their respective businesses, without conflict with the rights of any other Person.  To the best knowledge of the Borrower, no slogan or other advertising device, product, process, method, substance, part or other material now employed, or now contemplated to be employed, by any Loan Party or any Subsidiary infringes upon any rights held by any other Person.  Except as specifically disclosed in Schedule 5.17, no claim or litigation regarding any of the foregoing is pending or, to the best knowledge of the Borrower, threatened, which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

**5.18    Labor Matters**.  There are no strikes, lockouts, slowdowns or other material labor disputes against any Loan Party or any Subsidiary thereof pending or, to the knowledge of any Loan Party, threatened. The hours worked by and payments made to employees of the Loan Parties comply with the Fair Labor Standards Act and any other applicable federal, state, local or foreign Law dealing with such matters. No Loan Party or any of its Subsidiaries has incurred any liability or obligation under

the Worker Adjustment and Retraining Act or similar state Law. Subject to approval of the Bankruptcy Court, all payments due from any Loan Party and its Subsidiaries, or for which any claim may be made against any Loan Party or any of its Subsidiaries, on account of wages and employee health and welfare insurance and other benefits, have been paid or properly accrued in accordance with GAAP as a liability on the books of such Loan Party. Except as set forth on Schedule 5.18, no Loan Party or any Subsidiary is a party to or bound by any collective bargaining agreement, management agreement, employment agreement, bonus, restricted stock, stock option, or stock appreciation plan or agreement or any similar plan, agreement or arrangement. There are no representation proceedings pending or, to any Loan Party's knowledge, threatened to be filed with the National Labor Relations Board, and no labor organization or group of employees of any Loan Party or any Subsidiary has made a pending demand for recognition. There are no complaints, unfair labor practice charges, grievances, arbitrations, unfair employment practices, charges or any other claims or complaints against any Loan Party or any Subsidiary pending or, to the knowledge of any Loan Party, threatened to be filed with any Governmental Authority or arbitrator based on, arising out of, in connection with, or otherwise relating to the employment or termination of employment of any employee of any Loan Party or any of its Subsidiaries. The consummation of the transactions contemplated by the Loan Documents will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which any Loan Party or any of its Subsidiaries is bound.

**5.19    Security Documents**.

(a)    Upon entry of the Interim Financing Order, the Security Agreement (together with the applicable Financing Order) creates in favor of the Agent, for the benefit of the Secured Parties referred to therein, a legal, valid, continuing and enforceable security interest in the Collateral (as defined in the Security Agreement), the enforceability of which is subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law. Upon entry of the Interim Financing Order (and the subsequent entry of the Final Financing Order), the Agent will have a perfected Lien on, and security interest in, to and under all right, title and interest of the grantors thereunder in all Collateral that may be perfected by filing, recording or registering a financing statement or analogous document or by obtaining "control" under the UCC (including without limitation the proceeds of such Collateral subject to the limitations relating to such proceeds in the UCC), in each case prior and superior in right to any other Person. Assuming entry of the Interim Financing order, filing of the UCC-1 financing statements and/or obtaining of "control" (as defined in the UCC) of Collateral is not required to create or perfect a legal, valid, continuing and enforceable security interest in the Collateral.

(b)    Subject to the entry of the Interim Financing order and the Final Financing Order, as applicable, the Agent shall have a fully perfected Lien on, and security interest in, all right, title and interest of the applicable Loan Parties in the Intellectual Property (as defined in the Security Agreement) in which a security interest may be perfected by filing, recording or registering a security agreement, financing statement or analogous document in such offices, as applicable, in each case prior and superior in right to any other Person.

**5.20    Bankruptcy Matters.**

(a)    The Chapter 11 Case was commenced on the Petition Date in accordance with applicable Law and notice of (i) the motion seeking approval of the Loan Documents and the Interim Financing Order and the Final Financing Order, (ii) the hearing for the entry of the Interim Financing Order, and (iii) the hearing for the entry of the Final Financing Order has been or will be given. The Borrower shall give, on a timely basis as specified in the Interim Financing Order or the Final Financing

Order, as applicable, all notices required to be given to all parties specified in the Interim Financing Order or Final Financing Order, as applicable.

(b)     After the entry of the Interim Financing Order, and pursuant to and to the extent permitted in the Interim Financing Order and the Final Financing Order, the Obligations will constitute allowed administrative expense claims in the Chapter 11 Case having priority over all administrative expense claims (other than (x) the Carve-Out, and (y) Permitted Prior Liens) and unsecured claims against the Loan Parties now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (after entry of the Final Financing Order), 507(a), 507(b), 546(c), 546(d), 726, 1114 or any other provision of the Bankruptcy Code or otherwise, as provided under Section 364(c)(l) of the Bankruptcy Code, subject to the priorities set forth in the Interim Financing Order or the Final Financing Order, as applicable.

(c)     After the entry of the Interim Financing Order and pursuant to and to the extent provided in the Interim Financing Order and the Final Financing Order, the Obligations will be secured by a valid and perfected first priority Lien on all of the Collateral subject, as to priority only, to (x) the Carve-Out and (y) the Permitted Prior Liens.

(d)     The Interim Financing Order (with respect to the period on and after entry of the Interim Financing Order and prior to the Final Order Entry Date) or the Final Financing Order (with respect to the period on and after the Final Order Entry Date), as the case may be, is in full force and effect and has not been reversed, stayed (whether by statutory stay or otherwise), modified or amended.

(e)     Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and subject to the applicable provisions of the Interim Financing Order or Final Financing Order, as the case may be, upon the maturity (whether by acceleration or otherwise) of any of the Obligations, the Credit Parties shall be entitled to immediate payment of such Obligations and to enforce the remedies provided for hereunder, under the other Loan Documents or under applicable law, subject to the terms and conditions of the applicable Financing Order.

(f)     A true and correct copy of the initial Approved Budget is attached hereto as Schedule 5.20.

**5.21    Deposit Accounts; Credit Card Arrangements**.

(a)     Annexed hereto as Schedule 5.21(a) is a list of all DDAs maintained by the Loan Parties as of the Closing Date, which Schedule includes, with respect to each DDA (i) the name and address of the depository; (ii) the account number(s) maintained with such depository; (iii) a contact person at such depository; and (iv) the identification of each Blocked Account Bank.

(b)     Annexed hereto as Schedule 5.21(b) is a list describing all arrangements as of the Closing Date to which any Loan Party is a party with respect to the processing and/or payment to such Loan Party of the proceeds of any credit card charges and debit card charges for sales made by such Loan Party.

**5.22    Brokers**.  No broker or finder brought about the obtaining, making or closing of the Committed Revolving Loans or transactions contemplated by the Loan Documents, and no Loan Party or Affiliate thereof has any obligation to any Person in respect of any finder's or brokerage fees in connection therewith.  Notwithstanding the foregoing, the Loan Parties shall be solely responsible for payment of any other finder's or brokerage fees.

**5.23     Customer and Trade Relations**.  There exists no actual or, to the knowledge of any Loan Party, threatened, termination or cancellation of, or any material adverse modification or change in the business relationship of any Loan Party with any supplier material to its operations.

**5.24     Material Contracts**.  Schedule 5.24 sets forth all Material Contracts to which any Loan Party is a party or is bound as of the Closing Date.  The Loan Parties have delivered true, correct and complete copies of such Material Contracts to the Agent on or before the Closing Date.  The Loan Parties are not in breach or in default in any material respect of or under any Material Contract and have not received any notice of default under, or of the intention of any other party thereto to terminate, any Material Contract.  Except as set forth on Schedule 5.24 attached hereto, to the knowledge of any Loan Party, none of the other parties to any Material Contract are in default in any material respect of or under any Material Contract.

**5.25     Casualty**.  Neither the businesses nor the properties of any Loan Party or any of its Subsidiaries are affected by any fire, explosion, accident, strike, lockout or other labor dispute, drought, storm, hail, earthquake, embargo, act of God or of the public enemy or other casualty (whether or not covered by insurance) that, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

**5.26     Reserved**.

**5.27     Approved Budget**.  The Loan Parties are operating their business in all material respects in a manner consistent with the Approved Budget most recently delivered and accepted by the Agent in its Permitted Discretion.

**5.28     Personally Identifiable Information**.  The Loan Parties maintain a policy for the treatment, handling and storage of consumer information and personally identifiable information in accordance with applicable Laws and a true, accurate and complete copy of the current version thereof has been provided to the Agent.

**5.29     OFAC; Sanctions; Anti-Corruption Laws; Anti-Money Laundering Laws**.  No Loan Party nor any of its Subsidiaries is in violation of any Sanctions.  No Loan Party nor any of its Subsidiaries nor, to the knowledge of such Loan Party, any director, officer, employee, agent or Affiliate of such Loan Party or such Subsidiary (a) is a Sanctioned Person or a Sanctioned Entity, (b) has any assets located in Sanctioned Entities, or (c) derives revenues from investments in, or transactions with Sanctioned Persons or Sanctioned Entities.  Each of the Loan Parties and its Subsidiaries has implemented and maintains in effect policies and procedures designed to ensure compliance by the Loan Parties and their Subsidiaries and their respective directors, officers, employees, agents and Affiliates with all Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws.  Each of the Loan Parties and its Subsidiaries, and to the knowledge of each such Loan Party, each director, officer, employee, agent and Affiliate of each such Loan Party and each such Subsidiary, is in compliance with all Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws.  No proceeds of any loan made or Letter of Credit issued hereunder will be used to fund any operations in, finance any investments or activities in, or make any payments to, a Sanctioned Person or a Sanctioned Entity, or otherwise used in any manner that would result in a violation of any applicable Sanctions, Anti-Corruption Laws or Anti-Money Laundering Laws by any Person (including any Credit Party or other individual or entity participating in any transaction).

# ARTICLE VI
# AFFIRMATIVE COVENANTS

So long as any Lender shall have any Revolving Credit Commitment hereunder, or any Committed Revolving Loan or other Obligation hereunder shall remain unpaid or unsatisfied (other than contingent indemnification obligations for which a claim has not been asserted), each Loan Party shall, and shall (except in the case of the covenants set forth in Sections 6.01, 6.02, and 6.03) cause each Subsidiary to:

**6.01** **Financial Statements**. Deliver to the Agent, in form and detail satisfactory to the Agent:

(a)     The Approved Budget may be updated, modified or supplemented (with the written consent of the Agent and/or at the reasonable request of the Agent) from time to time, and each such updated, modified or supplemented budget shall be approved by, and in form and substance reasonably satisfactory to, the Agent and no such updated, modified or supplemented budget shall be effective until so approved and once so approved shall be deemed an Approved Budget; provided, that during the second (2nd) week of the initial Approved Budget (and the second (2nd) week of each successive Approved Budget thereafter), the Borrower shall submit a budget for the next successive four (4) week period to the Agent, which budget shall be in form and substance reasonably acceptable to the Agent, and approved by the Agent at least five (5) Business Days prior to the expiration of such Approved Budget.   Each Approved Budget delivered to the Agent shall be accompanied by such supporting documentation as requested by the Agent;

(b)     on or before Wednesday of each week, the Borrower shall deliver to the Agent an Approved Budget Variance Report; and

(c)     On each Approved Budget and each Approved Budget Variance Report shall each be prepared in good faith on the basis of the assumptions stated therein, which assumptions were fair in light of the conditions existing at the time of delivery of such forecasts, and represented, at the time of such delivery, the Borrower's good faith estimate of its future financial performance.

**6.02** **Certificates; Other Information**. Deliver to the Agent, in form and detail satisfactory to the Agent:

(a)     reserved;

(b)     reserved;

(c)     on the Wednesday of each week (or, if such day is not a Business Day, on the next succeeding Business Day), a Borrowing Base Certificate showing the Borrowing Base as of the close of business as of the last day of the immediately preceding week, each Borrowing Base Certificate to be certified as complete and correct by a Responsible Officer of the Borrower and accompanied by all applicable system generated documentation supporting the information contained within the Borrowing Base Certificate, including but not limited to inventory reporting inclusive of inventory mix by category and/or department and, where applicable, accounts receivable detail documentation, screen shots of the Loan Parties' bank accounts requested by the Agent as of the date of such Borrowing Base Certificate, accounts payable agings, flash sales report (including sales comparison by store), inventory receipts by vendor, and any additional documentation reasonably requested by the Agent.

(d)     promptly upon receipt, copies of any detailed audit reports, management letters or recommendations submitted to the board of directors (or the audit committee of the board of directors)

of any Loan Party by its Registered Public Accounting Firm in connection with the accounts or books of the Loan Parties or any Subsidiary, or any audit of any of them, including, without limitation, specifying any Internal Control Event;

(e)     promptly after the same are available, copies of each annual report, proxy or financial statement or other report or communication sent to the stockholders of the Loan Parties, and copies of all annual, regular, periodic and special reports and registration statements which any Loan Party may file or be required to file with the SEC under Section 13 or 15(d) of the Securities Exchange Act of 1934 or with any national securities exchange, and in any case not otherwise required to be delivered to the Agent pursuant hereto;

(f)     the financial and collateral reports described on Schedule 6.02 hereto, at the times set forth in such Schedule;

(g)     promptly after the furnishing thereof, copies of any statement or report furnished to any holder of debt securities of any Loan Party or any Subsidiary thereof pursuant to the terms of any indenture, loan or credit or similar agreement and not otherwise required to be furnished to the Lenders pursuant to Section 6.01 or any other clause of this Section 6.02;

(h)     as soon as available, but in any event within thirty (30) days after the end of each Fiscal Year of the Loan Parties, a report summarizing the insurance coverage (specifying type, amount and carrier) in effect for each Loan Party and its Subsidiaries and containing such additional information as the Agent, or any Lender through the Agent, may reasonably specify;

(i)     promptly after the Agent's request therefor, copies of all Material Contracts and documents evidencing Material Indebtedness;

(j)     promptly, and in any event within five (5) Business Days after receipt thereof by any Loan Party or any Subsidiary thereof, copies of each notice or other correspondence received from any Governmental Authority (including, without limitation, the SEC (or comparable agency in any applicable non-U.S. jurisdiction)) concerning any proceeding with, or investigation or possible investigation or other inquiry by such Governmental Authority regarding financial or other operational results of any Loan Party or any Subsidiary thereof or any other matter which, if adversely determined, could reasonably expected to have a Material Adverse Effect; and

(k)     promptly, such additional information regarding the business affairs, financial condition or operations of any Loan Party or any Subsidiary, or compliance with the terms of the Loan Documents, as the Agent or any Lender may from time to time reasonably request.

**6.03     Notices**.  Promptly notify the Agent:

(a)     of the occurrence of any Default or Event of Default;

(b)     of any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect, other than breaches or defaults arising as a result of the filing of the Chapter 11 Case, the exercise of remedies as a result of which are stayed under the Bankruptcy Code;

(c)     of any breach or non-performance of, or any default under, or any termination of, a Material Contract or with respect to Material Indebtedness;

(d)     of any dispute, litigation, investigation, proceeding or suspension between any Loan Party or any Subsidiary thereof and any Governmental Authority or the commencement of, or any material development in, any litigation or proceeding affecting any Loan Party or any Subsidiary thereof, including pursuant to any applicable Environmental Laws;

(e)     of the occurrence of any ERISA Event;

(f)     of any material change in accounting policies or financial reporting practices by any Loan Party or any Subsidiary thereof;

(g)     of any change in any Loan Party's senior executive officers (including, for the avoidance of doubt, any Key Person);

(h)     of the discharge by any Loan Party of its present Registered Public Accounting Firm or any withdrawal or resignation by such Registered Public Accounting Firm;

(i)     of any collective bargaining agreement or other labor contract to which a Loan Party becomes a party, or the application for the certification of a collective bargaining agent;

(j)     of the filing of any Lien for unpaid Taxes against any Loan Party;

(k)     of any casualty or other insured damage to any material portion of the Collateral or the commencement of any action or proceeding for the taking of any interest in a material portion of the Collateral under power of eminent domain or by condemnation or similar proceeding or if any material portion of the Collateral is damaged or destroyed;

(l)     of any failure by any Loan Party to pay rent or any other amounts due at (A) any distribution centers or warehouses; or (B) any of such Loan Party's locations, in each case, when such rent or such other amounts first came due following the Petition Date, unless such non-payment was permitted under the Bankruptcy Code or pursuant to an order of the Bankruptcy Court;

(m)     the termination, discharge, or resignation of the Consultant;

(n)     of any transaction of the nature contained in Article VII hereof; and

(o)     the receipt or delivery of any material notice (including, without limitation, any notice of any breach or alleged breach) under the Consulting Agreement or any other consulting or agency agreement, asset purchase agreement or other contract relating to any Permitted Sale by any party thereto.

Each notice pursuant to this Section shall be accompanied by a statement of a Responsible Officer of the Borrower setting forth details of the occurrence referred to therein and stating what action the Borrower has taken and proposes to take with respect thereto.  Each notice pursuant to Section 6.03(a) shall describe with particularity any and all provisions of this Agreement and any other Loan Document that have been breached.

**6.04     Payment of Obligations**.

(a)     Subject to the Bankruptcy Code, pay and discharge as the same shall become due and payable, all of its obligations and liabilities, including (a) all tax liabilities, assessments and governmental charges or levies upon it or its properties or assets, (b) all lawful claims (including, without

limitation, claims of landlords, warehousemen, customs brokers, freight forwarders, consolidators and carriers) which, if unpaid, would by Law become a Lien upon its property; and (c) all Indebtedness, as and when due and payable, but subject to any subordination provisions contained in any instrument or agreement evidencing such Indebtedness, except, in each case, where (i) the validity or amount thereof is being contested in good faith by appropriate proceedings, (ii) such Loan Party has set aside on its books adequate reserves with respect thereto in accordance with GAAP, (iii) such contest effectively suspends collection of the contested obligation and enforcement of any Lien securing such obligation, (iv) no Lien has been filed with respect thereto and (v) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect. Nothing contained herein shall be deemed to limit the rights of the Agent with respect to determining Reserves pursuant to this Agreement.

(b)     Within one (1) Business Day after the Final Entry Date, pay in full all of the Pre-Petition Obligations in accordance with Section 2.05

**6.05     Preservation of Existence, Etc**.  Preserve, renew and maintain in full force and effect its legal existence and good standing under the Laws of the jurisdiction of its organization or formation except in a transaction permitted by Section 7.04 or 7.05; (b) take all reasonable action to maintain all rights, privileges, permits, licenses and franchises necessary or desirable in the normal conduct of its business, except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect; and (c) preserve or renew all of its Intellectual Property, except to the extent such Intellectual Property is no longer used or useful in the conduct of the business of the Loan Parties.

**6.06     Maintenance of Properties**.  (a) Maintain, preserve and protect all of its material properties and equipment necessary in the operation of its business in good working order and condition, ordinary wear and tear excepted; and (b) make all necessary repairs thereto and renewals and replacements thereof except where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

**6.07     Maintenance of Insurance**.

(a)     Maintain with financially sound and reputable insurance companies reasonably acceptable to the Agent in its Permitted Discretion, and not Affiliates of the Loan Parties, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business and operating in the same or similar locations or as is required by applicable Law, of such types and in such amounts as are customarily carried under similar circumstances by such other Persons and as are acceptable to the Agent in its Permitted Discretion.

(b)     Cause fire and extended coverage policies maintained with respect to any Collateral to be endorsed or otherwise amended to include (i) a non-contributing mortgage clause (regarding improvements to Real Estate) and lenders' loss payable clause (regarding personal property), in form and substance satisfactory to the Agent, which endorsements or amendments shall provide that the insurer shall pay all proceeds otherwise payable to the Loan Parties under the policies directly to the Agent, (ii) a provision to the effect that none of the Loan Parties, Credit Parties or any other Person shall be a co-insurer and (iii) such other provisions as the Agent may reasonably require from time to time to protect the interests of the Credit Parties.

(c)     Cause commercial general liability policies to be endorsed to name the Agent as an additional insured.

(d)     Cause business interruption policies to name the Agent as a lender's loss payee and to be endorsed or amended to include (i) a provision that, from and after the Closing Date, the insurer

shall pay all proceeds otherwise payable to the Loan Parties under the policies directly to the Agent, (ii) a provision to the effect that none of the Loan Parties, Credit Parties or any other Person shall be a co-insurer, and (iii) such other provisions as the Agent may reasonably require from time to time to protect the interests of the Credit Parties.

(e) Cause each such policy referred to in this Section 6.07 to also provide that it shall not be canceled, modified or not renewed (i) by reason of nonpayment of premium except upon not less than ten (10) days' prior written notice thereof by the insurer to the Agent (giving the Agent the right to cure defaults in the payment of premiums) or (ii) for any other reason except upon not less than thirty (30) days' prior written notice thereof by the insurer to the Agent.

(f) Deliver to the Agent, prior to the cancellation, modification or non-renewal of any such policy of insurance, a copy of a renewal or replacement policy (or other evidence of renewal of a policy previously delivered to the Agent, including an insurance binder) together with evidence satisfactory to the Agent of payment of the premium therefor.

(g) If at any time the area in which any Real Estate is located is designated (i) a "flood hazard area" in any Flood Insurance Rate Map published by the Federal Emergency Management Agency (or any successor agency), obtain flood insurance in such total amount as is reasonable and customary for companies engaged in the same or similar business of the Loan Parties, and otherwise comply with the National Flood Insurance Program as set forth in the Flood Disaster Protection Act of 1973, as amended from time to time, or (ii) a "Zone 1" area, obtain earthquake insurance in such total amount as is reasonable and customary for companies engaged in the Business.

(h) Maintain for themselves and their Subsidiaries, a Directors and Officers insurance policy, and a "Blanket Crime" policy including employee dishonesty, forgery or alteration, theft, disappearance and destruction, robbery and safe burglary, property, and computer fraud coverage with responsible companies in such amounts as are customarily carried by business entities engaged in similar businesses similarly situated, and will upon request by the Agent furnish the Agent certificates evidencing renewal of each such policy.

(i) Permit any representatives that are designated by the Agent to inspect the insurance policies maintained by or on behalf of the Loan Parties and to inspect books and records related thereto and any properties covered thereby.

(j) None of the Credit Parties, or their agents or employees shall be liable for any loss or damage insured by the insurance policies required to be maintained under this Section 6.07. Each Loan Party shall look solely to its insurance companies or any other parties other than the Credit Parties for the recovery of such loss or damage and such insurance companies shall have no rights of subrogation against any Credit Party or its agents or employees. If, however, the insurance policies do not provide waiver of subrogation rights against such parties, as required above, then the Loan Parties hereby agree, to the extent permitted by Law, to waive their right of recovery, if any, against the Credit Parties and their agents and employees. The designation of any form, type or amount of insurance coverage by any Credit Party under this Section 6.07 shall in no event be deemed a representation, warranty or advice by such Credit Party that such insurance is adequate for the purposes of the business of the Loan Parties or the protection of their properties.

**6.08    Compliance with Laws**. Except to the extent non-compliance is permitted under the Bankruptcy Code, comply with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its business or property, except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings

diligently conducted and with respect to which adequate reserves have been set aside and maintained by the Loan Parties in accordance with GAAP; (b) such contest effectively suspends enforcement of the contested Laws, and (c) the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect.

**6.09    Books and Records; Accountants**.

(a)    (i)  Maintain proper books of record and account, in which full, true and correct entries in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of the Loan Parties and their Subsidiaries; and (ii) maintain such books of record and account in material conformity with all applicable requirements of any Governmental Authority having regulatory jurisdiction over the Loan Parties and their Subsidiaries.

(b)    At all times retain a Registered Public Accounting Firm which is satisfactory to the Agent and shall instruct such Registered Public Accounting Firm to cooperate with, and be available to, the Agent or its representatives to discuss the Loan Parties' financial performance, financial condition, operating results, controls, and such other matters, within the scope of the retention of such Registered Public Accounting Firm, as may be raised by the Agent.

**6.10    Inspection Rights**.

(a)    Permit representatives and independent contractors of and advisors to the Agent to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and, upon prior written notice and opportunity to be present during such discussions, with its Registered Public Accounting Firm, and permit the Agent or professionals (including investment bankers, consultants, accountants, and lawyers) retained by the Agent to conduct evaluations of the Approved Budget, forecasts and cash flows, and the Borrower's inventory and key performance indicators affecting the net orderly liquidation value of such inventory all at the expense of the Loan Parties and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Borrower; provided, however, that when a Default or Event of Default exists, the Agent (or any of its representatives or independent contractors) may do any of the foregoing at the expense of the Loan Parties at any time during normal business hours and without advance notice.

(b)    Upon the request of the Agent after reasonable prior notice, permit the Agent or professionals (including investment bankers, consultants, accountants, and lawyers) retained by the Agent to conduct commercial finance examinations, quality of earnings, and other evaluations, including, without limitation, of (i) the Borrower's practices in the computation of the Borrowing Base, (ii) the assets included in the Borrowing Base and related financial information such as, but not limited to, sales, gross margins, payables, accruals and reserves, and (iii) the Approved Budget.  The Loan Parties shall pay the fees and expenses of the Agent and such professionals with respect to such examinations and evaluations.  Without limiting the foregoing, the Loan Parties acknowledge that the Agent may, in its Permitted Discretion, undertake up to two (2) commercial finance examinations each Fiscal Year at the Loan Parties' expense.  Notwithstanding the foregoing, the Agent may cause additional commercial finance examinations to be undertaken (i) as it deems necessary or appropriate, at its own expense or, (ii) if required by Agent in its Permitted Discretion or if a Default or Event of Default shall have occurred and be continuing, at the expense of the Loan Parties.

(c)    Upon the request of the Agent after reasonable prior notice, permit the Agent or professionals (including appraisers) retained by the Agent to conduct appraisals of the Collateral,

including, without limitation, the assets included in the Borrowing Base. The Loan Parties shall pay the fees and expenses of the Agent and such professionals with respect to such appraisals. Without limiting the foregoing, the Loan Parties acknowledge that the Agent may, in its Permitted Discretion, undertake up to one (1) inventory appraisal in each Fiscal Year at the Loan Parties' expense. Notwithstanding the foregoing, the Agent may cause additional appraisals to be undertaken (i) as it deems necessary or appropriate, at its own expense or, (ii) if required by applicable Law or the Agent in its Permitted Discretion or if a Default or Event of Default shall have occurred and be continuing, at the expense of the Loan Parties.

6.11    **Use of Proceeds**.  Use the proceeds of the Revolving Credit Borrowings, to the extent permitted under applicable Law, the Approved Budget (subject to the Permitted Variance), and the Loan Documents, (a) on the Closing Date, for the payment of transaction expenses in connection with this Agreement, and (b) after the Closing Date, (i) to finance the payoff of the Pre-Petition Obligations in accordance with Section 2.05, (ii) to finance general corporate purposes of the Loan Parties and the acquisition of working capital assets of the Borrower, including capital expenditures and the purchase of inventory and equipment, in each case in accordance with the Approved Budget or as otherwise approved by the Lenders, and (iii) to fund the Professional Fee Escrow Account and to pay other fees, expenses, and costs incurred in connection with the Chapter 11 Case, as well as the payment of any adequate protection payments approved in the Financing Orders as approved by the Bankruptcy Court and the Agent.

6.12    **Additional Loan Parties**.  Notify the Agent at the time that any Person becomes a Subsidiary, and promptly thereafter (and in any event within fifteen (15) days), cause any such Person (a) to (i) become a Loan Party by executing and delivering to the Agent a Joinder to this Agreement or a Joinder to the Facility Guaranty or such other documents as the Agent shall deem appropriate for such purpose, (ii) grant to the Agent a Lien on such Person's assets of the same type that constitute Collateral to secure the Obligations, and (iii) deliver to the Agent documents of the types referred to in clauses (iii) and (iv) of Section 4.01(a) and favorable opinions of counsel to such Person (which shall cover, among other things, the legality, validity, binding effect and enforceability of the documentation referred to in clause (a)), and (b) if any Equity Interests or Indebtedness of such Person are owned by or on behalf of any Loan Party, to pledge such Equity Interests and promissory notes evidencing such Indebtedness, in each case in form, content and scope reasonably satisfactory to the Agent.  In no event shall compliance with this Section 6.12 waive or be deemed a waiver or Consent to any transaction giving rise to the need to comply with this Section 6.12 if such transaction was not otherwise expressly permitted by this Agreement or constitute or be deemed to constitute, with respect to any Subsidiary, an approval of such Person as a Loan Party or permit the inclusion of any acquired assets in the computation of the Borrowing Base.

6.13    **Cash Management**.

(a)    On or prior to the Closing Date:

(i)    deliver to the Agent copies of notifications (each, a "Credit Card Notification") substantially in the form attached hereto as Exhibit G which have been executed on behalf of the applicable Loan Party and delivered to such Loan Party's Credit Card Issuers and Credit Card Processors listed on Schedule 5.21(b);

(ii)    enter into a Blocked Account Agreement satisfactory in form and substance satisfactory to the Agent with each Blocked Account Bank (the accounts subject to such Blocked Account Agreements, collectively, together with the Concentration Account, the

"Blocked Accounts"; for the avoidance of doubt, the JPM Cash Collateral Account shall not be required to become a Blocked Account); and

(iii)     at the request of the Agent, deliver to the Agent copies of notifications (each, a "DDA Notification") substantially in the form attached hereto as Exhibit H which have been executed on behalf of the applicable Loan Party and delivered to such Loan Party's depository institutions listed on Schedule 5.21(a).

(b)     From and after the Closing Date, the Loan Parties shall cause to be sent via ACH or wire transfer no less frequently than daily (and whether or not there are then any outstanding Obligations) to a Blocked Account all of the following:

(i)     all amounts on deposit in each DDA (net of any minimum balance, not to exceed $2,500.00, as may be required to be kept in the subject DDA by the depository institution at which such DDA is maintained);

(ii)     all payments due from Credit Card Processors and Credit Card Issuers and proceeds of all credit card charges;

(iii)     all cash receipts from the Disposition of Inventory and other assets (whether or not constituting Collateral);

(iv)     all proceeds of Accounts;

(v)     all Net Proceeds, and all other cash payments received by a Loan Party from any Person or from any source or on account of any Disposition or other transaction or event, including, without limitation, any Prepayment Event; and

(vi)     all amounts paid or payable to any Loan Party in connection with, or pursuant to, the Consulting Agreement or any similar consulting or agency agreement (including, without limitation, all amounts paid or payable to the Loan Parties in connection with any Permitted Sale.

(c)     Each Blocked Account Agreement shall require the ACH or wire transfer no less frequently than daily (and whether or not there are then any outstanding Obligations) to the concentration account controlled by the Agent (the "Concentration Account"), of all cash receipts and collections received by each Loan Party from all sources (the "Receipts and Collections"), including, without limitation, the following:

(i)     the then entire ledger balance of each Blocked Account (net of any minimum balance, not to exceed $2,500.00, as may be required to be kept in the subject Blocked Account by the applicable Blocked Account Bank);

(ii)     all amounts required to be deposited into the Blocked Accounts pursuant to clause (b) above; and

(iii)     any other cash amounts received by any Loan Party from any other source, on account of any type of transaction or event.

(d)     The Concentration Account shall at all times be under the sole dominion and control of the Agent and all funds therein shall be wired to an account specified by Agent no less

frequently than daily. The Agent shall cause all funds on deposit in the Concentration Account to be applied to the Obligations on the third Business Day following the Business Day on which such funds in the Concentration Account are received the Agent, which amounts shall be applied to the Obligations in the order proscribed in either Section 2.05(g) or Section 8.03 of this Agreement, as applicable. The Loan Parties hereby acknowledge and agree that (i) the Loan Parties have no right of withdrawal from the Concentration Account, and (ii) the funds on deposit in the Concentration Account shall at all times be collateral security for all of the Obligations. In the event that, notwithstanding the provisions of this Section 6.13, any Loan Party receives or otherwise has dominion and control of any such cash receipts or collections, such receipts and collections shall be held in trust by such Loan Party for the Agent, shall not be commingled with any of such Loan Party's other funds or deposited in any account of such Loan Party and shall, not later than the Business Day after receipt thereof, be deposited into the Concentration Account or dealt with in such other fashion as such Loan Party may be instructed by the Agent.

(e) Upon the request of the Agent, the Loan Parties shall cause bank statements and/or other reports to be delivered to the Agent not less often than monthly, accurately setting forth all amounts deposited in each Blocked Account to ensure the proper transfer of funds as set forth above and provide the Agent with "view-only" access to each of the Loan Parties' bank accounts identified by the Agent.

(f) If the Agent does not require DDA Notifications to be delivered on the Closing Date in accordance with Section 6.13(a) above, then the Loan Parties shall, upon the request of the Agent at any time after the Closing Date and in any event no later than thirty (30) days after the Closing Date, deliver to the Agent copies of DDA Notifications, which have been executed on behalf of the applicable Loan Party and delivered to the applicable depository institutions listed on Schedule 5.21(a).

(g) Borrower shall not permit the balance in the JPM Cash Collateral Account to exceed $200,000 at any time.

(h) Notwithstanding anything to the contrary contained herein, during the period between the Closing Date and payment in full of the Total Revolver Outstandings (as such term is defined in the Pre-Petition Credit Agreement), all funds on deposit in the Concentration Account shall be applied to the Pre-Petition Obligations.

**6.14     Information Regarding the Collateral**.

(a) Furnish to the Agent at least thirty (30) days prior written notice of any change in: (i) any Loan Party's name or in any trade name used to identify it in the conduct of its business or in the ownership of its properties; (ii) the location of any Loan Party's chief executive office, its principal place of business, any office in which it maintains books or records relating to Collateral owned by it or any office, store or facility at which Collateral owned by it is located (including the establishment of any such new office or facility); (iii) any Loan Party's organizational structure or jurisdiction of incorporation or formation; or (iv) any Loan Party's federal taxpayer identification number or organizational identification number assigned to it by its state of organization. The Loan Parties agree not to effect or permit any change referred to in the preceding sentence to be effected unless all filings have been made under the UCC or otherwise that are required in order for the Agent to continue at all times following such change to have a valid, legal and perfected first priority security interest in all of the Collateral (subject to Permitted Prior Liens and the Carve-Out) for its own benefit and the benefit of the other Credit Parties.

(b) Should any of the information on any of the Schedules hereto or to the other Loan Documents become inaccurate or misleading in any material respect as a result of changes after the

Closing Date, the Borrower shall advise the Agent in writing of such revisions or updates as may be necessary or appropriate to update or correct the same. From time to time as may be reasonably requested by the Agent, the Borrower shall supplement each Schedule hereto and to the other Loan Documents, or any representation herein or in any other Loan Document, with respect to any matter arising after the Closing Date that, if existing or occurring on the Closing Date, would have been required to be set forth or described in such Schedule or as an exception to such representation or that is necessary to correct any information in such Schedule or representation which has been rendered inaccurate thereby (and, in the case of any supplements to any Schedule, such Schedule shall be appropriately marked to show the changes made therein). Notwithstanding the foregoing, no supplement or revision to any Schedule or representation shall be deemed the Credit Parties' consent to the matters reflected in such updated Schedules or revised representations nor permit the Loan Parties to undertake any actions otherwise prohibited hereunder or under any other Loan Document or fail to undertake any action required hereunder or under any other Loan Document or otherwise depart from the restrictions and requirements in existence prior to the delivery of such updated Schedules or such revision of a representation; nor shall any such supplement or revision to any Schedule or representation be deemed the Credit Parties' waiver of any Default or Event of Default resulting from the matters disclosed therein.

**6.15   Commercial Finance Examinations**.  Upon the request of the Agent after reasonable prior notice, permit the Agent or professionals (including investment bankers, consultants, accountants, and lawyers and other Lender Service Parties) retained by the Agent to conduct commercial finance examinations, quality of earnings, and other evaluations, including, without limitation, of (i) the Borrower's practices in the computation of the Borrowing Base, (ii) the assets included in the Borrowing Base and related financial information such as, but not limited to, sales, gross margins, payables, accruals and reserves, and (iii) the Approved Budget.  The Loan Parties shall pay the fees and expenses of the Agent and such professionals with respect to such examinations and evaluations and acknowledges that such professionals may be Affiliates of the Agent.  Without limiting the foregoing, the Loan Parties acknowledge that the Agent may, in its Permitted Discretion, undertake up to two (2) commercial finance examinations each Fiscal Year at the Loan Parties' expense.  Notwithstanding the foregoing, the Agent may cause additional commercial finance examinations to be undertaken (i) as it deems necessary or appropriate, at its own expense or, (ii) if required by Agent in its Permitted Discretion or if a Default or Event of Default shall have occurred and be continuing, at the expense of the Loan Parties.

**6.16   Environmental Laws**. (a) Conduct its operations and keep and maintain its Real Estate in material compliance with all Environmental Laws; (b) obtain and renew all environmental permits necessary for its operations and properties; and (c) implement any and all investigation, remediation, removal and response actions that are reasonably appropriate or necessary to maintain the value and marketability of the Real Estate or to otherwise comply with Environmental Laws pertaining to the presence, generation, treatment, storage, use, disposal, transportation or release of any Hazardous Materials on, at, in, under, above, to, from or about any of its Real Estate, provided, however, that neither a Loan Party nor any of its Subsidiaries shall be required to undertake any such cleanup, removal, remedial or other action to the extent that its obligation to do so is being contested in good faith and by proper proceedings and adequate reserves have been set aside and are being maintained by the Loan Parties with respect to such circumstances in accordance with GAAP.

**6.17   Further Assurances**.

(a)      Execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements and other documents), that may be required under any applicable Law, or which the Agent may request, to effectuate the transactions contemplated by the Loan Documents or to grant, preserve, protect or perfect the Liens created or intended to be created by the Security Documents or the validity or priority of

any such Lien, all at the expense of the Loan Parties. The Loan Parties also agree to provide to the Agent, from time to time upon request, evidence satisfactory to the Agent as to the perfection and priority of the Liens created or intended to be created by the Security Documents.

(b)     If any material assets are acquired by any Loan Party after the Closing Date (other than assets constituting Collateral under the Security Documents that become subject to the perfected first-priority Lien under the Security Documents upon acquisition thereof), notify the Agent thereof, and the Loan Parties will cause such assets to be subjected to a Lien securing the Obligations and will take such actions as shall be necessary or shall be requested by the Agent to grant and perfect such Liens, including actions described in paragraph (a) of this Section 6.17, all at the expense of the Loan Parties. In no event shall compliance with this Section 6.17 waive or be deemed a waiver or Consent to any transaction giving rise to the need to comply with this Section 6.17 if such transaction was not otherwise expressly permitted by this Agreement or constitute or be deemed to constitute Consent to the inclusion of any acquired assets in the computation of the Borrowing Base.

(c)     Use, and cause each of the Subsidiaries to use, their commercially reasonable efforts to obtain lease terms in any Lease entered into by any Loan Party after the Closing Date not expressly prohibiting the recording in the relevant real estate filing office of an appropriate memorandum of lease and the encumbrancing of the leasehold interest of such Loan Party in the property that is the subject of such Lease.

(d)     Upon the request of the Agent, use commercially reasonable efforts to cause each of its customs brokers, freight forwarders, consolidators and/or carriers to deliver an agreement (including, without limitation, a Customs Broker/Carrier Agreement) to the Agent covering such matters and in such form as the Agent may reasonably require.

(e)     Upon the request of the Agent, use commercially reasonable efforts to cause any of its landlords or bailees to deliver a Collateral Access Agreement to the Agent in such form as the Agent may reasonably require.

**6.18     Compliance with Terms of Leaseholds**.  Except as otherwise expressly permitted hereunder or to the extent that non-performance thereof is permitted by the Bankruptcy Code and other than the filing of other Chapter 11 Case and the effect thereof, (a) make all payments and otherwise perform all Post-Petition Obligations in respect of all Leases to which any Loan Party or any of its Subsidiaries is a party, keep such Leases in full force and effect, (b) not allow such Leases to lapse or be terminated or any rights to renew such Leases to be forfeited or cancelled, (c) notify the Agent of any default by any party with respect to such Leases and cooperate with the Agent in all respects to cure any such default, and (d) cause each of its Subsidiaries to do the foregoing.

**6.19     Material Contracts**.  (a) Perform and observe all the terms and provisions of each Material Contract to be performed or observed by it, (b) maintain each such Material Contract in full force and effect, (c) enforce each such Material Contract in accordance with its terms, (d) take all such action to such end as may be from time to time requested by the Agent, (e) upon request of the Agent, make, to each other party to each such Material Contract, such demands and requests for information and reports or for action as any Loan Party or any of its Subsidiaries is entitled to make under such Material Contract, and (f) cause each of its Subsidiaries to do the foregoing.

**6.20     Reserved**.

**6.21     Reserved**.

**6.22** **Employee Benefit Plans**.

(a)     Maintain, and cause each ERISA Affiliate to maintain, each Pension Plan in substantial compliance with all applicable Laws.

(b)     Make, and cause each ERISA Affiliate to make, on a timely basis, all required contributions to any Multiemployer Plan.

(c)     Not, and not permit any ERISA Affiliate to (i) seek a waiver of the minimum funding standards of ERISA, (ii) terminate or withdraw from any Pension Plan or Multiemployer Plan, or (iii) take any other action with respect to any Pension Plan that would, or could reasonably be expected to, entitle the PBGC to terminate, impose liability in respect of, or cause a trustee to be appointed to administer, any Pension Plan, unless the actions or events described in clauses (i), (ii) and (iii) above individually or in the aggregate would not have or could not reasonably be expected to have a Material Adverse Effect.

**6.23** **Inventory Tracking and Security**.

(a)     Upon the request of the Agent, permit the Agent or professionals (including loss prevention professionals, consultants, accountants, lawyers and other Lender Service Professionals) retained by the Agent to conduct loss prevention examinations and other evaluations related to loss prevention, including investigative interviews with employees of the Borrower, the other Loan Parties and/or their Subsidiaries. Such examinations shall be undertaken from time to time as the Agent deems necessary or appropriate, shall be conducted at the Borrower's expense and may be conducted by Affiliates of the Agent. The Borrower, its Subsidiaries and their employees shall cooperate fully with such investigations by Agent and shall make timely responses to all requests for information made by the Agent pursuant to any investigations conducted under this Section 6.23(d). The Agent agrees to share the results of such investigations with the Borrower within a reasonable time after (i) receipt by the Agent of the Borrower's written request therefor, and (ii) the completion of such investigations.

(b)     Upon the request of the Agent, permit the Agent or professionals (including compliance professionals, consultants, accountants, lawyers and other Lender Service Professionals) retained by the Agent to conduct compliance audit examinations at any and all locations of the Borrower, the other Loan Parties, their Subsidiaries, and all other locations at which Eligible Inventory is held or sold. Such audit examinations shall be conducted at the Borrower's expense, shall be undertaken from time to time as the Agent deems necessary or appropriate and may be conducted by Affiliates of the Agent. Such compliance audit examinations may, in the Agent's Permitted Discretion, include announced and unannounced visits to and reviews of activity in any or all of the locations described above. The Borrower, the other Loan Parties, their Subsidiaries, and their employees shall cooperate fully with such audit examinations and shall make timely responses to all requests for information made by the Agent during any compliance audits conducted under this Section 6.23(e). The Agent agrees to share the results of such compliance audits with the Borrower within a reasonable time after (i) receipt by the Agent of the Borrower's written request therefor, and (ii) the completion of such compliance audits.

(c)     Upon the request of the Agent, permit the Agent or professionals (including compliance professionals, consultants, accountants, lawyers and other Lender Service Professionals) retained by the Agent to monitor the portfolio of customer Accounts receivable of the Loan Parties and any policies of the Loan Parties maintained in connection therewith. Such monitoring shall be conducted at the Borrower's expense, shall be undertaken from time to time or on an ongoing basis as the Agent deems necessary or appropriate and may be conducted by Affiliates of the Agent. The Borrower, the other Loan Parties, their Subsidiaries, and their employees shall cooperate fully with such monitoring and

shall make timely responses to all requests for information made by the Agent in connection with the monitoring program conducted under this Section 6.23(f).

**6.24    Personally Identifiable Information**.  Maintain and comply with a policy for the treatment, handling, and storage of consumer information and personally identifiable information in accordance with applicable Laws.  The Loan Parties shall promptly deliver to the Agent a true, accurate, and complete copy of the current version of such policy as such policy is amended, modified, restated, or otherwise updated from time to time.

**6.25    Financial Advisor**.  At all times following the Closing Date, the Borrower shall retain a financial advisor acceptable to Agent in its Permitted Discretion (the "Financial Advisor"), at the sole cost and expense of Borrower; provided that Agent agrees that SierraConstellation Partners, LLC would be considered acceptable to Agent in its Permitted Discretion.  The scope and terms of Financial Advisor's employment will be acceptable to Agent in its Permitted Discretion.  Borrower covenants and agrees that Agent (including any of its representatives, agents or independent contractors) is hereby authorized to communicate directly with Financial Advisor (without interference from Borrower) regarding any and all matters related to Borrower or its Affiliates.

**6.26    OFAC; Sanctions; Anti-Corruption Laws; Anti-Coney Laundering Laws**.  Each Loan Party will, and will cause each of its Subsidiaries to comply with all applicable Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws.  Each of the Loan Parties and its Subsidiaries shall implement and maintain in effect policies and procedures designed to ensure compliance by the Loan Parties and their Subsidiaries and their respective directors, officers, employees, agents and Affiliates with all Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws.  Each of the Loan Parties shall and shall cause their respective Subsidiaries to comply with all Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws.

**6.27    Retention of Consultant; Communication with Accountants and Other Financial Advisors**.

(a)    The Agent shall have received evidence by no later than the Petition Date, that the Borrower has filed a motion seeking to retain the Consultant.  The terms and scope of the engagement of and responsibilities of the Consultant shall be reasonably acceptable to the Agent, and, without limiting the foregoing, the Agent shall have the right to communicate directly with the Consultant and authorize and direct the Consultant to communicate directly with the Agent and to furnish the Agent with such information as the Agent may reasonably request.  Subject to Bankruptcy Court approval, to be obtained by no later than thirty (30) days after the Petition Date, the Borrower shall continue to retain the Consultant, the scope and terms of each such engagement to be reasonably satisfactory to the Agent.  There shall be no material modifications to the terms (excluding any decreases in compensation but including any other modification in compensation) of the engagement of the Consultant without the written consent of each Agent.  Until such time as all Pre-Petition Obligations and all Obligations have been repaid in full and all Revolving Commitments have been terminated, the Borrower shall continue to retain the Consultant to assist the Borrower with the preparation of the Approved Budget and the other financial and Collateral reporting required to be delivered to the Agent pursuant to this Agreement, and approval of all requests for Revolving Credit Borrowings and all disbursements by the Borrower.

(b)    The Borrower authorizes the Agent to communicate directly with the Loan Parties' independent appraisers, financial advisors, investment bankers and consultants, if any, (including the Consultant), which have been engaged from time to time by the Loan Parties, and authorizes and shall instruct those appraisers, financial advisors, investment bankers and consultants to communicate to the Agent information relating to each Loan Party with respect to the business, results of operations,

prospects and financial condition of such Loan Party. The Borrower acknowledges and agrees that (i) the Loan Parties and their representatives will cooperate with the Consultant and any Lender Group Consultant (as defined below), if any, (ii) the Consultant and any Lender Group Consultant shall be granted reasonable access to the Loan Parties' books and records during normal business hours, (iii) the Agent and the Lenders are authorized to communicate directly with the Consultant and the Consultant is authorized to communicate directly with the Agent and the Lenders, regarding the bankruptcy milestones, all financial reports, the Approved Budget and any variances from same, other financial information, operational issues, matters related to the Collateral, and such other matters as the Agent may reasonably request, and (v) the Consultant is authorized to provide the Agent and the Lenders with all reports and other information (including, without limitation, all marketing materials and indications of interest) prepared or reviewed by the Consultant; provided that the Consultant shall not be required to provide copies of any reports (financial or otherwise) that are in "draft" or "work product" form, but, if so requested by the Agent, such Consultant may elect to do so. The Consultant shall, together with senior management of the Loan Parties, participate in weekly telephonic calls with the Agent and Lenders (and/or their advisors and counsel) to discuss the matters described above.

(c)     Each Loan Party acknowledges that the Agent shall be permitted to engage such outside consultants and advisors (each, a "Lender Group Consultant"), for the sole benefit of the Agent and the Lenders, as the Agent may determine to be necessary or appropriate, in its sole discretion. Each Loan Party covenants and agrees that (i) such Loan Party shall provide its complete cooperation during normal business hours with any Lender Group Consultant (including, without limitation, providing reasonable access to such Loan Party's business, books and records and senior management); (ii) all reasonable costs and expenses of any such Lender Group Consultant shall be expenses required to be paid by the Loan Parties under Section 10.04 hereof; and (iii) all reports, determinations and other written and verbal information provided by any Lender Group Consultant shall be confidential and no Loan Party shall be entitled to have access to same.

**6.28     Performance within Budget**. At all times following the entry of the Interim Financing Order, perform in accordance with the Approved Budget, including having made all scheduled payments to Lenders, as applicable, as and when required, subject to the following (the "Permitted Variance"): (a) each of the Borrower's actual credit card collections, inventory receipts, furniture, fixtures and equipment proceeds and insurance claim proceeds shall not be less than 90% of the projected respective amounts set forth in the Approved Budget for such line items, (b) the Borrower's actual expenses and cash expenditures shall not be greater than 110% of the projected amounts set forth in the Approved Budget on line item basis (other than with respect to fees and expenses of Case Professionals, which shall not be greater than 110% of the projected amounts set forth in the Approved Budget on a line item basis by Case Professional), and (c) the Borrower's Availability shall not be less than 90% of the projected amounts set forth in the Approved Budget. Each of the foregoing covenants shall be tested on Saturday of each week (commencing with the first (1st) week after the entry of the Interim Financing Order) on a cumulative basis from the entry of the Interim Financing Order and on a weekly basis, pursuant to the Approved Budget Variance Report delivered by the Borrower to the Agent in accordance with Section 6.01(b).

**6.29     Bankruptcy Related Affirmative Covenants**. The Borrower shall complete, or shall cause to be completed, the following actions as and when required below, which motions and orders shall, in all cases, be upon terms and conditions acceptable to the Agent in its Permitted Discretion, provided that such deadlines below are subject to the Bankruptcy Court's availability, and if the Bankruptcy Court cannot accommodate the deadlines set forth below, the Borrower and Agent shall work together in good faith to amend the deadlines accordingly:

(a)     no later than three (3) days after the Petition Date, the Bankruptcy Court shall have entered an interim order approving the Consulting Motion;

(b)      no later than three (3) days after the Petition Date, the Bankruptcy Court shall have entered an order approving the Interim Financing Order;

(c)      no later than three (3) days after the Petition Date, the Bankruptcy Court shall have entered an interim order approving the Advisor Motion;

(d)      no later than twenty-thirty (25) days after the Petition Date, the Bankruptcy Court shall have entered a final order approving the Consulting Motion;

(e)      no later than twenty-thirty (25) days after the Petition Date, the Bankruptcy Court shall have entered a final order approving the Advisor Motion; and

(f)      no later than twenty-five (25) days after the Petition Date, the Bankruptcy Court shall have entered the Final Financing Order.

**6.30    Lease Extension**.  No later than thirty (30) days after the Petition Date, the Loan Parties shall have filed a motion seeking an order ("Lease Extension Order") of the Bankruptcy Court extending the time period of the Loan Parties to assume or reject leases to not less than 210 days from the Petition Date, and on or before forty-five (45) days after the Petition Date, the Bankruptcy Court shall have entered the Lease Extension Order.

**6.31    Financing Orders**.  The Loan Parties shall comply with the terms and conditions of the Financing Orders, as then in effect, in all respects, and shall not seek any reversal, vacatur, stay, amendment or modification thereto without the prior written consent of the Agent; and (ii) all terms and conditions of all other orders entered by the Bankruptcy Court, unless otherwise agreed to by the Agent.

<u>ARTICLE VII</u>
<u>NEGATIVE COVENANTS</u>

So long as any Lender shall have any Revolving Commitment hereunder or any Committed Revolving Loan or other Obligation hereunder shall remain unpaid or unsatisfied (other than contingent indemnification obligations for which a claim has not been asserted), no Loan Party shall, nor shall it permit any Subsidiary to, directly or indirectly:

**7.01    Liens**.  Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired or sign or file or suffer to exist under the UCC or any similar Law or statute of any jurisdiction a financing statement that names any Loan Party or any Subsidiary thereof as debtor; sign or suffer to exist any security agreement authorizing any Person thereunder to file any such financing statement; sell any of its property or assets subject to an understanding or agreement (contingent or otherwise) to repurchase such property or assets with recourse to it or any of its Subsidiaries; or assign or otherwise transfer any accounts or other rights to receive income, other than, as to all of the above, Permitted Encumbrances.

**7.02    Investments**.  Make any Investments, except for Permitted Investments.

**7.03    Indebtedness; Disqualified Stock**.  (a) Create, incur, assume, guarantee, suffer to exist or otherwise become or remain liable with respect to, any Indebtedness, except Permitted Indebtedness; (b) issue Disqualified Stock, or (c) issue and sell any other Equity Interests unless (i) such Equity Interests shall be issued solely by the Borrower and not by a Subsidiary of a Loan Party, (ii) such Equity Interests provide that all dividends and other Restricted Payments in respect thereof shall be made solely in additional shares of such Equity Interests, in lieu of cash, except as otherwise permitted under Section

7.06(c), (iii) such Equity Interests shall not be subject to redemption other than redemption at the option of the Borrower and in accordance with the limitations contained in this Agreement, and (iv) all Restricted Payments in respect of such Equity Interests are expressly subordinated to the Obligations pursuant to a Subordination Agreement acceptable to the Agent in its Permitted Discretion.

7.04    **Fundamental Changes**.  Merge, dissolve, divide, liquidate, consolidate with or into another Person, (or agree to do any of the foregoing), except that, so long as no Default or Event of Default shall have occurred and be continuing prior to or immediately after giving effect to any action described below or would result therefrom:

(a)    any Subsidiary which is not a Loan Party may merge with (i) a Loan Party, provided that the Loan Party shall be the continuing or surviving Person, or (ii) any one or more other Subsidiaries which are not Loan Parties, provided that when any wholly-owned Subsidiary is merging with another Subsidiary, the wholly-owned Subsidiary shall be the continuing or surviving Person; and

(b)    any Subsidiary which is a Loan Party may merge into any Subsidiary which is a Loan Party or into the Borrower, provided that in any merger involving the Borrower, the Borrower shall be the continuing or surviving Person.

7.05    **Dispositions**.   Make any Disposition or enter into any agreement to make any Disposition, except for Permitted Dispositions.

7.06    **Restricted Payments**.  Declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, or issue or sell any Equity Interests or accept any capital contribution, except that, so long as no Default or Event of Default shall have occurred and be continuing prior to or immediately after giving effect  to any action described below or would result therefrom:

(a)    each Subsidiary of a Loan Party may make Restricted Payments to any Loan Party;

(b)    reserved; and

(c)    the Borrower may make dividend payments to its shareholders on a quarterly basis in an amount not to exceed the aggregate amount of federal, state and local taxes payable by such shareholders attributable to the income of the Borrower and its Subsidiaries with respect to such Fiscal Quarter.

7.07    **Prepayments of Indebtedness**.  Prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner any Indebtedness (other than (i) Indebtedness incurred hereunder, (ii) Indebtedness under the Pre-Petition Credit Agreement in accordance with the terms and conditions herein, (iii) any adequate protection payments expressly provided for in the Financing Orders, and (iv) as set forth in the Approved Budget or expressly permitted under this Agreement) or make any payment in violation of any subordination terms of any Subordinated Indebtedness.

7.08    **Change in Nature of Business**.  In the case of each of the Loan Parties, engage in any line of business substantially different from the Business conducted by the Loan Parties and their Subsidiaries on the Closing Date or any business substantially related or incidental thereto.

**7.09    Transactions with Affiliates**.  Enter into, renew, extend or be a party to any transaction of any kind with any Affiliate of any Loan Party, whether or not in the ordinary course of business, other than on fair and reasonable terms substantially as favorable to the Loan Parties or such Subsidiary as would be obtainable by the Loan Parties or such Subsidiary at the time in a comparable arm's length transaction with a Person other than an Affiliate, provided that the foregoing restriction shall not apply to (a) a transaction between or among the Loan Parties, (b) transactions described on Schedule 7.09 hereto, (c) subject to the approved Budget, advances for commissions, travel and other similar purposes in the ordinary course of business to directors, officers and employees, (d) the issuance of Equity Interests in the Borrower to any officer, director, employee or consultant of the Borrower or any of its Subsidiaries, (e) subject to the approved Budget, the payment of reasonable fees and out-of-pocket costs to directors, and compensation and employee benefit arrangements paid to, and indemnities provided for the benefit of, directors, officers or employees of the  Borrower or any of its Subsidiaries, and (f) any issuances of securities of the Borrower (other than Disqualified Stock and other Equity Interests not permitted hereunder).

**7.10    Burdensome Agreements**.  Enter into or permit to exist any Contractual Obligation (other than this Agreement, any other Loan Document or the Pre-Petition Credit Agreement) that (a) limits the ability (i) of any Subsidiary to make Restricted Payments or other distributions to any Loan Party or to otherwise transfer property to or invest in a Loan Party, (ii) of any Subsidiary to Guarantee the Obligations, (iii) of any Subsidiary to make or repay loans to a Loan Party, or (iv) of the Loan Parties or any Subsidiary to create, incur, assume or suffer to exist Liens on property of such Person in favor of the Agent; provided, however, that this clause (iv) shall not prohibit any negative pledge incurred or provided in favor of any holder of Indebtedness permitted under clauses (c) of the definition of Permitted Indebtedness solely to the extent any such negative pledge relates to the property financed by or the subject of such Indebtedness; or (b) requires the grant of a Lien to secure an obligation of such Person if a Lien is granted to secure another obligation of such Person.

**7.11    Use of Proceeds**.  Use the proceeds of any Revolving Credit Borrowing, whether directly or indirectly, and whether immediately, incidentally or ultimately, (a) to purchase or carry margin stock (within the meaning of Regulation U of the FRB) or to extend credit to others for the purpose of purchasing or carrying margin stock or to refund Indebtedness originally incurred for such purpose; (b) to make any payments to a Sanctioned Entity or a Sanctioned Person, to finance any investments in a Sanctioned Entity or a Sanctioned Person, to fund any investments, loans or contributions in, or otherwise make such proceeds available to, a Sanctioned Entity or a Sanctioned Person, to fund any operations, activities or business of a Sanctioned Entity or a Sanctioned Person, or in any other manner that would result in a violation of Sanctions by any Person; (c) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Sanctions, Anti-Corruption Laws or Anti-Money Laundering Laws or (d) for purposes other than those permitted under this Agreement.

**7.12    Amendment of Material Documents**.  Amend, modify or waive any of a Loan Party's rights under, or otherwise terminate or cancel, (a) its Organization Documents in a manner adverse to the Credit Parties, or (b) any Material Contract or Material Indebtedness (other than on account of any refinancing thereof otherwise permitted hereunder), in each case to the extent that such amendment, modification, waiver, termination or cancellation would result in a Default or Event of Default under any of the Loan Documents, would be materially adverse to the Credit Parties or otherwise would be reasonably likely to have a Material Adverse Effect.

**7.13    Fiscal Year**.  Change the Fiscal Year of any Loan Party, or the accounting policies or reporting practices of the Loan Parties, except as required  by GAAP.

**7.14   Deposit Accounts; Credit Card Processors**.   Open new DDAs or Blocked Accounts unless the Loan Parties shall have delivered to the Agent appropriate DDA Notifications (to the extent requested by Agent pursuant to the provisions of Section 6.13(a)(iii) hereof) or Blocked Account Agreements consistent with the provisions of Section 6.13 and otherwise satisfactory to the Agent.   No Loan Party shall maintain any bank accounts or enter into any agreements with Credit Card Issuers or Credit Card Processors other than the ones expressly contemplated herein or in Section 6.13 hereof.

**7.15   Reclamation Claims**.   Enter into any agreement to return any of its Inventory to any of its creditors for application against any Pre-Petition Indebtedness, Pre-Petition trade payables or other Pre-Petition claims under Section 546(c) of the Bankruptcy Code or agree to allow any creditor to take any setoff or recoupment against any of its Pre-Petition Indebtedness, Pre-Petition trade payables or other Pre-Petition claims based upon any such return pursuant to Section 553(b)(l) of the Bankruptcy Code or otherwise if, after giving effect to any such agreement, setoff or recoupment, the aggregate amount applied to Pre-Petition Indebtedness, Pre-Petition trade payables and other Pre-Petition claims subject to all such agreements, setoffs and recoupments since the Petition Date would exceed $50,000.

**7.16   Designation of Senior Debt**.   Designate any Indebtedness (other than the Indebtedness under the Loan Documents) of any Loan Party or any of its Subsidiaries as "Designated Senior Debt" (or any similar term).

**7.17   New Store Locations**.   Open any new Store location after the Closing Date.

**7.18   Bankruptcy Related Negative Covenants**.   No Loan Party shall seek, consent to, or permit to exist any of the following:

(a)   Any modification, stay, vacation or amendment to the Financing Orders to which the Agent has not consented in writing;

(b)   A priority claim or administrative expense or unsecured claim against the Borrower (now existing or hereafter arising or any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in Sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (after entry of the Final Financing Order), 507(a), 507(b), 546(c), 546(d), 726, 1114 of the Bankruptcy Code) equal or superior to the priority claim of the Agent and the Lenders in respect of the Obligations and the Pre-Petition Obligations, subject to the Carve-Out and Permitted Prior Liens, and except as otherwise set forth in the Financing Orders;

(c)   Any Lien on any Collateral having a priority equal or superior to the Lien securing the Obligations or Pre-Petition Liens including any adequate protection Liens, subject to the Carve-Out and Permitted Prior Liens and except as otherwise set forth in the Financing Orders;

(d)   Any order which authorizes the return of any of the Borrower's property pursuant to Section 546(h) of the Bankruptcy Code;

(e)   Any order which authorizes the payment of any Indebtedness (other than the Pre-Petition Obligations and Pre-Petition Indebtedness reflected in the Approved Budget (subject to the Permitted Variance)) incurred prior to the Petition Date, except as set forth in the orders entered into in connection with the first day motions and the Financing Orders and the grant of "adequate protection" (whether payment in cash or transfer of property) with respect to any such Indebtedness which is secured by a Lien; or

(f)     Any order seeking authority to take any action that is prohibited by the terms of this Agreement or the other Loan Documents or refrain from taking any action that is required to be taken by the terms of this Agreement or any of the other Loan Documents.

**7.19     Subsidiaries**.  Form or otherwise create any Subsidiary without the prior written consent of the Agent.

**ARTICLE VIII**
**EVENTS OF DEFAULT AND REMEDIES**

**8.01     Events of Default**.  Any of the following shall constitute an Event of Default:

(a)     Non-Payment.  The Borrower or any other Loan Party or any Limited Recourse Guarantor fails to pay when and as required to be paid herein, (i) any amount of principal of any Committed Revolving Loan, or (ii) any interest on any Committed Revolving Loan, or any fee due hereunder, or (iii) any other amount payable hereunder or under any other Loan Document or the Financing Orders; or

(b)     Specific Covenants.  (i) Any Loan Party fails to perform or observe any term, covenant or agreement contained in any of Section 6.01, 6.02, 6.03, 6.05, 6.07, 6.10, 6.11, 6.12, 6.13, 6.14, 6.19, 6.20, 6.21, 6.22, 6.23, 6.24, 6.25, 6.26, 6.27, 6.28, 6.29, 6.30, 6.31 or Article VII; or (ii) any Guarantor or Limited Recourse Guarantor fails to perform or observe any payment or other material term, covenant or agreement contained in the Facility Guaranty; or (iii) any of the Loan Parties fails to perform or observe any term, covenant or agreement contained in the Security Documents to which it is a party; or

(c)     Other Defaults.  Any Loan Party or Limited Recourse Guarantor fails to perform or observe any other covenant or agreement (not specified in subsection (a) or (b) above) contained in any Loan Document on its part to be performed or observed and such failure continues for fifteen (15) days; or

(d)     Representations and Warranties.  Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of the Borrower or any other Loan Party or any Limited Recourse Guarantor herein, in any other Loan Document, or in any document delivered in connection herewith or therewith (including, without limitation, any Borrowing Base Certificate) shall be incorrect or misleading in any material respect when made or deemed made; or

(e)     Cross-Default.  Any Loan Party or any Subsidiary thereof (A) fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Post-Petition or unstayed Material Indebtedness (including undrawn committed or available amounts and including amounts owing to all creditors under any combined or syndicated credit arrangement), or (B) fails to observe or perform any other agreement or condition relating to any such Post-Petition or unstayed Material Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which default or other event is to cause, or to permit the holder or holders of such Post-Petition or unstayed Material Indebtedness or the beneficiary or beneficiaries of any Guarantee thereof (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, and the passage of any applicable cure period, such Indebtedness to be demanded or to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity, or such Guarantee to become payable or cash collateral in respect thereof to be demanded; or (C) there exists a default or an event of default under any material contract or

(f)        Maturity Date.  The Maturity Date occurs; or

(g)        Reserved; or

(h)        Judgments.  There is entered against any Loan Party or any Subsidiary thereof (i) one or more judgments or orders for the payment of money in an aggregate amount (as to all such judgments and orders) exceeding $200,000 (to the extent not covered by independent third-party insurance as to which the insurer is rated at least "A" by A.M. Best Company, has been notified of the potential claim and does not dispute coverage), or (ii) any one or more non-monetary judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and, in either case, (A) enforcement proceedings are commenced by any creditor upon such judgment or order, or (B) there is a period of ten (10) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, is not in effect; or

(i)        ERISA.  (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or could reasonably be expected to result in liability of any Loan Party or any ERISA Affiliate under Title IV of ERISA to the Pension Plan, Multiemployer Plan or the PBGC in an aggregate amount in excess of $100,000 or which would reasonably likely result in a Material Adverse Effect, or (ii) a Loan Party or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount in excess of $100,000 or which would reasonably likely result in a Material Adverse Effect; or

(j)        Invalidity of Loan Documents.  (i)  Any provision of any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or satisfaction in full of all of the Obligations and the Pre-Petition Obligations, ceases to be in full force and effect; or any Loan Party, Limited Recourse Guarantor or any other Person contests in any manner the validity or enforceability of any provision of any Loan Document; or any Loan Party or Limited Recourse Guarantor denies that it has any or further liability or obligation under any provision of any Loan Document, or purports to revoke, terminate or rescind any provision of any Loan Document or seeks to avoid, limit or otherwise adversely affect any Lien purported to be created under any Security Document; or (ii) any Lien purported to be created under any Security Document shall cease to be, or shall be asserted by any Loan Party or any other Person not to be, a valid and perfected Lien on any Collateral, with the priority required by the applicable Security Document; or

(k)        Change of Control.  There occurs any Change of Control; or

(l)        Reserved; or

(m)        Loss of Collateral.  There occurs any uninsured loss to any material portion of the Collateral; or

(n)        Breach of Consulting Agreement.  The Loan Parties breach any of the material terms or conditions of the Consulting Agreement or cease conducting the Permitted Sale contemplated thereunder in accordance therewith or file a motion with the Bankruptcy Court to reject, or otherwise seek authority not to perform under the Consulting Agreement, in all cases, without the prior written consent of the Agent; or

(o)        Indictment.  The indictment or institution of any legal process or proceeding against any Key Person, any Loan Party or any Subsidiary thereof, under any federal, state, municipal,

and other criminal statute, rule, regulation, order, or other requirement having the force of law for a felony involving fraud, tax evasion, or another financial crime; or

(p)        Chapter 11 Case.  The occurrence of any of the following in the Chapter 11 Case:

(i)        the Borrower, without the Agent's prior written consent, files a motion with the Bankruptcy Court seeking the authority to liquidate all or substantially all of the Borrower's assets or capital stock unless the transactions that are the subject of the motion will result in payment in full in cash of the Pre-Petition Obligations and the Obligations on the closing of such sale;

(ii)        other than in connection with the payment in full or refinancing of the Pre-Petition Obligations and the Obligations, the bringing or supporting of a motion, taking of any action or the filing of any plan or disclosure statement attendant thereto by or on behalf of any Loan Party in the Chapter 11 Case: (A) to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement; (B) to grant any Lien other than Permitted Encumbrances upon or affecting any Collateral; (C) except as provided in the Interim Financing Order or Final Financing Order, as the case may be, to use cash collateral under Section 363(c) of the Bankruptcy Code without the prior written consent of the Agent; (D) that seeks to prohibit Agent or Lenders from credit bidding on any or all of the Loan Parties' assets during the pendency of the Chapter 11 Case; or (E) any other action or actions adverse to the interest of the Agent or the Lenders in their capacities as such or their rights and remedies hereunder or its interest in the Collateral;

(iii)        (A) other than in connection with the payment in full or refinancing of the Pre-Petition Obligations and the Obligations on the effective date of such plan, the filing of any plan of reorganization or disclosure statement attendant thereto, or any direct or indirect amendment to such plan or disclosure statement, by any Loan Party or any other Person to which the Agent does not consent or otherwise agree to treatment of the respective claims of the Agent and the Lenders, (B) the entry of any order terminating the Loan Parties' exclusive right to file a plan of reorganization without the consent of the Agent, or (C) the expiration of the Loan Parties' exclusive right to file a plan of reorganization without the consent of the Agent;

(iv)        the entry of an order in the Chapter 11 Case confirming a plan that (A) is not acceptable to the Agent in its Permitted Discretion (it being agreed that a plan that satisfies the Obligations and the Pre-Petition Obligations (if any) in full in cash on the effective date thereof is acceptable to the Agent) or (B) does not contain a provision for termination of the Revolving Commitments and repayment in full in cash of all of the Pre-Petition Obligations and the Obligations under this Agreement on or before the effective date of such plan or plans;

(v)        the entry of an order reversing, amending, supplementing, staying, vacating or otherwise modifying the Loan Documents, the Pre-Petition Credit Agreement or the Interim Financing Order, the Final Financing Order, the order approving the Consulting Motion or the Cash Management Order without the written consent of the Agent or the filing of a motion for reconsideration with respect to the Interim Financing Order or the Final Financing Order or the Interim Financing Order, the Final Financing Order, order approving the Consulting Motion or the Cash Management Order are otherwise not in full force and effect, in each case, without the consent of the Agent;

(vi)        the Final Financing Order is not entered prior to the expiration of the Interim Financing Order, and in any event within twenty-five (25) days after the Petition Date;

(vii)     except as set forth in any motions which have been delivered to and are acceptable to the Agent and as contemplated by the Approved Budget (subject to the Permitted Variance), the payment of, or application for authority to pay, any Pre-Petition Indebtedness or Pre-Petition claim without the Agent's prior written consent;

(viii)     the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code or otherwise against the Agent, any other Credit Party or any of the Collateral;

(ix)     the filing of a motion by a Loan Party or any of their respective Affiliates for, or the entry of an order directing, the appointment of an interim or permanent trustee in the Chapter 11 Case or the appointment of a receiver or an examiner in the Chapter 11 Case with expanded powers to operate or manage the financial affairs, the business, or reorganization of the Loan Parties; or, the sale without the Agent's consent, of all or substantially all of the Loan Parties' assets either through a sale under Section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Chapter 11 Case, or otherwise that does not provide for payment in full in cash of the Pre-Petition Obligations and the Obligations and termination of the Commitments on the effective date of such plan or the closing of such sale;

(x)     the dismissal of the Chapter 11 Case, or the conversion of the Chapter 11 Case from Chapter 11 to Chapter 7 of the Bankruptcy Code, or any Loan Party files a motion or other pleading seeking the dismissal of the Chapter 11 Case under Section 1112 of the Bankruptcy Code or otherwise;

(xi)     the entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (1) to allow any creditor to execute upon or enforce a Lien on any Collateral having a value of $50,000 (or $100,000 in the aggregate) or more, or (2) with respect to any Lien or the granting of any Lien on any Collateral to any state or local environmental or regulatory agency or authority;

(xii)     the commencement of a suit or action against the Agent, any Lender or any other Credit Party (both under this Agreement and as such terms are defined in the Pre-Petition Credit Agreement) by or on behalf of any Loan Party, its bankruptcy estates, any of their Affiliates, or any statutory committee;

(xiii)     the entry of an order in the Chapter 11 Case avoiding or permitting recovery of any portion of the payments made on account of the Indebtedness owing under this Agreement or the other Loan Documents or the Pre-Petition Credit Agreement;

(xiv)     the failure of any Loan Party to perform any of its obligations under the Interim Financing Order, the Final Financing Order or the Cash Management Order or any of its material obligations under the any other order of the Bankruptcy Court;

(xv)     the failure of the Bankruptcy Court to, within sixty (60) days after the Petition Date (or such later date to which the Agent may otherwise agree), grant an order extending the time period of the Loan Parties to assume or reject unexpired leases of real property to a date that is 210 days from the Petition Date; or

(xvi)     the entry of an order in the Chapter 11 Case granting any other super-priority administrative claim or Lien equal or superior to that granted to the Agent, the Lenders and Pre-Petition Agent except as set forth in the Financing Orders; or

(q)     Guaranty.  The termination or attempted termination of any Facility Guaranty except as expressly permitted hereunder or under any other Loan Document; or

(r)     Subordination.  (i)  The subordination provisions of any Subordination Agreement or other documents evidencing or governing any Subordinated Indebtedness (the "Subordination Provisions") shall, in whole or in part, terminate, cease to be effective or cease to be legally valid, binding and enforceable against any holder of the applicable Subordinated Indebtedness; or (ii) the Borrower or any other Loan Party shall, directly or indirectly, disavow or contest in any manner (A) the effectiveness, validity or enforceability of any of the Subordination Provisions, (B) that the Subordination Provisions exist for the benefit of the Credit Parties, or (C) that all payments of principal of or premium and interest on the applicable Subordinated Indebtedness, or realized from the liquidation of any property of any Loan Party, shall be subject to any of the Subordination Provisions; or

(s)     Material Adverse Effect.  A Material Adverse Effect shall occur, other than with respect to the Events and Circumstances.

**8.02    Remedies Upon Event of Default**.  Subject to the applicable Financing Order, if any Event of Default occurs and is continuing, the Agent may, or, at the request of the Required Lenders shall, take any or all of the following actions:

(a)     declare the Revolving Commitments of each Lender to make Committed Revolving Loans to be terminated, whereupon such Revolving Commitments shall be terminated;

(b)     declare the unpaid principal amount of all outstanding Committed Revolving Loans, all interest accrued and unpaid thereon, and all other Obligations to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Loan Parties;

(c)     reserved;

(d)     capitalize any accrued and unpaid interest by adding such amount to the outstanding principal balance of the Committed Revolving Loans, at which time such capitalized amount shall bear interest at the Default Rate;

(e)     whether or not the maturity of the Obligations shall have been accelerated pursuant hereto, proceed to protect, enforce and exercise all rights and remedies of the Credit Parties under this Agreement, any of the other Loan Documents or applicable Law, including, but not limited to, by suit in equity, action at law or other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in this Agreement and the other Loan Documents or any instrument pursuant to which the Obligations are evidenced, and, if such amount shall have become due, by declaration or otherwise, proceed to enforce the payment thereof or any other legal or equitable right of the Credit Parties; and/or

(f)     the Agent may purchase, in any public or private sale conducted under the provisions of the UCC (including pursuant section 9-610 and 9-620 of the UCC), the provisions of the Bankruptcy Code (including pursuant to section 363 of the Bankruptcy Code) or at any sale or foreclosure conducted by the Agent (whether by judicial action or otherwise) in accordance with applicable Law, all or any portion of the Collateral.  The Lenders hereby irrevocably authorize the Agent, upon written consent of the Required Lenders, to credit bid (in an amount and on such terms as may be directed by the Required Lenders) and purchase at any such sale (either directly or through one or more acquisition vehicles) all or any portion of the Collateral on behalf of and for the benefit of the Lenders;

provided, however, that upon the occurrence of any Event of Default with respect to any Loan Party or any Subsidiary thereof under Section 8.01(f), the obligation of each Lender to make Committed Revolving Loans shall automatically terminate, and the unpaid principal amount of all outstanding Committed Revolving Loans and all interest and other amounts as aforesaid shall automatically become due and payable, in each case without further act of the Agent or any Lender.

No remedy herein is intended to be exclusive of any other remedy and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or any other provision of Law.

**8.03    Application of Funds**.  After the exercise of remedies provided for in Section 8.02 (or after the  Committed Revolving Loans have automatically become immediately due and payable as set forth in the proviso to Section 8.02), any amounts received on account of the Obligations shall be applied by the Agent in the following order, in each case whether or not such Obligations are allowed or allowable in any bankruptcy or insolvency proceeding or under any Debtor Relief Law:

First, to payment in full of the Pre-Petition Obligations in accordance with the Financing Orders;

Second, to payment of that portion of the Obligations constituting fees, indemnities, Credit Party Expenses and other amounts (including fees, charges and disbursements of counsel to the Agent and amounts payable under Article III) payable to the Agent;

Third, to payment of that portion of the Obligations constituting indemnities, Credit Party Expenses, and other amounts (other than principal, interest and fees) payable to the Lenders (including fees, charges and disbursements of counsel to the respective Lenders and amounts payable under Article III), ratably among them in proportion to the amounts described in this clause Third payable to them;

Fourth, to the extent not previously reimbursed by the Lenders, to payment to the Agent of that portion of the Obligations constituting principal and accrued and unpaid interest on any Permitted Overadvances;

Fifth, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Committed Revolving Loans and other Obligations, and fees, ratably among the Lenders in proportion to the respective amounts described in this clause Fifth payable to them;

Sixth, to payment of that portion of the Obligations constituting unpaid principal of the Committed Revolving Loans, ratably among the Lenders in proportion to the respective amounts described in this clause Sixth held by them;

Seventh, to payment of all other Obligations (including without limitation the cash collateralization of unliquidated indemnification obligations), ratably among the Credit Parties in proportion to the respective amounts described in this clause Seventh held by them; and

Last, the balance, if any, after all of the Obligations have been indefeasibly paid in full, to the Loan Parties or as otherwise required by Law.

# ARTICLE IX
## THE AGENT

**9.01    Appointment and Authority**.  Each of the Lenders hereby irrevocably appoints Second Avenue to act on its behalf as the Agent hereunder and under the other Loan Documents and authorizes the Agent to take such actions on its behalf and to exercise such powers as are delegated to the Agent by the terms hereof or thereof (including, without limitation, acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations and appearing in the Chapter 11 Case on behalf of the Lenders), together with such actions and powers as are reasonably incidental thereto.  The provisions of this Article are solely for the benefit of the Agent and the Lenders, and no Loan Party or any Subsidiary thereof shall have rights as a third party beneficiary of any of such provisions.  It is understood and agreed that the use of the terms "agent" herein or in any other Loan Documents (or any other similar term) with reference to the Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Law. Instead, such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

**9.02    Rights as a Lender**.  The Person serving as the Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though they were not the Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Agent hereunder in its individual capacity.  Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Loan Parties or any Subsidiary or other Affiliate thereof as if such Person were not the hereunder and without any duty to account therefor to the Lenders.

**9.03    Exculpatory Provisions**.  The Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents.  Without limiting the generality of the foregoing, the Agent:

(a)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing;

(b)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except for discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), provided that the Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Agent to liability or that is contrary to any Loan Document or applicable Law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law or that may affect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law; and

(c)    shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Loan Parties or any of their Affiliates that is communicated to or obtained by the Person serving as the Agent or any of its Affiliates in any capacity.

(d)    The Agent shall not be liable for any action taken or not taken by it (i) with the Consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Agent shall believe in good faith shall be necessary, under the circumstances

as provided in Sections 8.02 and 10.01) or (ii) in the absence of its own gross negligence or willful misconduct as determined by a final and non-appealable judgment of a court of competent jurisdiction.

(e)     The Agent shall not be deemed to have knowledge of any Default or Event of Default unless and until notice describing such Default or Event of Default is given to the Agent by the Loan Parties or a Lender. Upon the occurrence of a Default or Event of Default, the Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Applicable Lenders. Unless and until the Agent shall have received such direction, the Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to any such Default or Event of Default as it shall deem advisable in the best interest of the Credit Parties. In no event shall the Agent be required to comply with any such directions to the extent that the Agent believes that its compliance with such directions would be unlawful.

(f)     The Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document or the creation, perfection or priority of any Lien purported to be created by the Security Documents, (v) the value or the sufficiency of any Collateral, or (vi) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Agent.

9.04     **Reliance by Agent**.  The Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including, but not limited to, any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of a Committed Revolving Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Agent may presume that such condition is satisfactory to such Lender unless the Agent shall have received written notice to the contrary from such Lender prior to the making of such Committed Revolving Loan.  The Agent may consult with legal counsel (who may be counsel for any Loan Party), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

9.05     **Delegation of Duties**.  The Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub agents appointed by the Agent.  The Agent and any such sub agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.  The exculpatory provisions of this Article shall apply to any such sub agent and to the Related Parties of the Agent and any such sub agent, and shall apply to their respective activities in connection with the syndication of the credit facility provided for herein as well as activities as the Agent.  The Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that the Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

9.06     **Resignation of Agent**.  The Agent may at any time give written notice of its resignation to the Lenders and the Borrower.  Upon receipt of any such notice of resignation, the Required Lenders

shall have the right to appoint a successor. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within thirty (30) days after the retiring Agent gives notice of its resignation, then the retiring Agent may, on behalf of the Lenders, appoint a successor Agent meeting the qualifications set forth above; provided that if the Agent shall notify the Borrower and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (1) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any Collateral held by the Agent on behalf of the Lenders under any of the Loan Documents, the retiring Agent shall continue to hold such collateral security until such time as a successor Agent is appointed) and (2) all payments, communications and determinations provided to be made by, to or through the Agent shall instead be made by or to each Lender directly, until such time as the Required Lenders appoint a successor Agent as provided for above in this Section. Upon the acceptance of a successor's appointment as Agent hereunder or under Section 10.06(i), such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section). The fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the retiring Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article and Section 10.04 shall continue in effect for the benefit of such retiring Agent, its sub agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting as Agent hereunder. This Section 9.06 shall be subject in all respects to the provisions of Section 10.06(i).

9.07    **Non-Reliance on Agent and Other Lenders**. Each Lender acknowledges that it has, independently and without reliance upon the Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder. Except as provided in Section 9.12, the Agent shall not have any duty or responsibility to provide any Credit Party with any other credit or other information concerning the affairs, financial condition or business of any Loan Party that may come into the possession of the Agent.

9.08    **No Other Duties, Etc**. Anything herein to the contrary notwithstanding, no person who is or becomes a bookrunner, arranger, syndication agent or documentation agent hereunder shall have any powers, rights, liabilities, duties or responsibilities under this Agreement or any of the other Loan Documents, except in its capacity as the Agent or a Lender hereunder.

9.09    **Agent May File Proofs of Claim**. In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Agent (irrespective of whether the principal of any Committed Revolving Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Agent shall have made any demand on the Loan Parties) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Committed Revolving Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of

the Lenders, the Agent and the other Credit Parties (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, the Agent, the other Credit Parties and their respective agents and counsel and all other amounts due to the Lenders, the Agent and the other Credit Parties hereunder, including, without limitation under Sections 2.09 and 10.04) allowed in such judicial proceeding; and

        (b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Agent and, if the Agent shall consent to the making of such payments directly to the Lenders, to pay to the Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Agent and its agents and counsel, and any other amounts due the Agent under Sections 2.09 and 10.04.

Nothing contained herein shall be deemed to authorize the Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the Agent to vote in respect of the claim of any Lender in any such proceeding.

       **9.10**    **Collateral and Guaranty Matters**.  The Credit Parties irrevocably authorize the Agent, at its option and in its Permitted Discretion,

        (a)    to release any Lien on any property granted to or held by the Agent under any Loan Document (i) upon termination of the Revolving Commitments and payment in full of all Obligations (other than contingent indemnification obligations for which no claim has been asserted), (ii) that is sold or to be sold as part of or in connection with any sale permitted hereunder or under any other Loan Document, or (iii) if approved, authorized or ratified in writing by the Applicable Lenders in accordance with Section 10.01;

        (b)    to subordinate any Lien on any property granted to or held by the Agent under any Loan Document to the holder of any Lien on such property that is permitted by clause (h) of the definition of Permitted Encumbrances; and

        (c)    to release any Guarantor from its obligations under the Facility Guaranty if such Person ceases to be a Subsidiary as a result of a transaction permitted hereunder.

Upon request by the Agent at any time, the Applicable Lenders will confirm in writing the Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Facility Guaranty pursuant to this Section 9.10.  In each case as specified in this Section 9.10, the Agent will, at the Loan Parties' expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Security Documents or to subordinate its interest in such item, or to release such Guarantor from its obligations under the Facility Guaranty, in each case in accordance with the terms of the Loan Documents and this Section 9.10.

       **9.11**    **Notice of Transfer**.  The Agent may deem and treat a Lender party to this Agreement as the owner of such Lender's portion of the Obligations for all purposes, unless and until, and except to the extent, an Assignment and Assumption shall have become effective as set forth in Section 10.06.

**9.12** **Reports and Financial Statements**. By signing this Agreement, each Lender:

(a)      reserved;

(b)      is deemed to have requested that the Agent furnish such Lender, promptly after they become available, copies of all Borrowing Base Certificates, financial statements and other Borrower Materials required to be delivered by the Borrower hereunder and all commercial finance examinations and appraisals of the Collateral received by the Agent (collectively, the "Reports");

(c)      expressly agrees and acknowledges that the Agent makes no representation or warranty as to the accuracy or completeness of any Borrower Materials, and shall not be liable for any information contained in any Borrower Materials (including any Report);

(d)      expressly agrees and acknowledges that the Reports are not comprehensive audits or examinations, that the Agent or any other party performing any audit or examination will inspect only specific information regarding the Loan Parties and will rely significantly upon the Loan Parties' books and records, as well as on representations of the Loan Parties' personnel;

(e)      agrees to keep all Reports and other Borrower Materials confidential in accordance with the provisions of Section 10.07 hereof; and

(f)      without limiting the generality of any other indemnification provision contained in this Agreement, agrees: (i) to hold the Agent and any such other Lender preparing a Report harmless from any action the indemnifying Lender may take or conclusion the indemnifying Lender may reach or draw from any Report and any other Borrower Materials in connection with any Revolving Credit Borrowing that the indemnifying Lender has made or may make to the Borrower, or the indemnifying Lender's participation in, or the indemnifying Lender's purchase of, a Committed Revolving Loan or Committed Revolving Loans; and (ii) to pay and protect, and indemnify, defend, and hold the Agent and any such other Lender preparing a Report harmless from and against, the claims, actions, proceedings, damages, costs, expenses, and other amounts (including attorney costs) incurred by the Agent and any such other Lender preparing a Report as the direct or indirect result of any third parties who might obtain all or part of any Report through the indemnifying Lender.

**9.13** **Agency for Perfection**. Each Lender hereby appoints each other Lender as agent for the purpose of perfecting Liens for the benefit of the Agent and the Lenders in assets which, in accordance with Article 9 of the UCC or any other applicable Law of the United States, can be perfected only by possession.  Should any Lender (other than the Agent) obtain possession of any such Collateral, such Lender shall notify the Agent thereof, and, promptly upon the Agent's request therefor shall deliver such Collateral to the Agent or otherwise deal with such Collateral in accordance with the Agent's instructions.

**9.14** **Indemnification of Agent**.  Without limiting the obligations of the Loan Parties hereunder, the Lenders hereby agree to indemnify the Agent and any of its Related Parties, as the case may be, ratably according to their Applicable Percentages, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever that may be imposed on, incurred by, or asserted against the Agent and its Related Parties in any way relating to or arising out of this Agreement or any other Loan Document or any action taken or omitted to be taken by the Agent and any of its Related Parties in connection therewith; provided, that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Agent's or its Related Parties' gross negligence or willful misconduct as determined by a final and nonappealable judgment of a court of competent jurisdiction.

**9.15     Relation among Lenders**.  The Lenders are not partners or co-venturers, and no Lender shall be liable for the acts or omissions of, or (except as otherwise set forth herein in the case of the Agent) authorized to act for, any other Lender.

**ARTICLE X**
**MISCELLANEOUS**

**10.01     Amendments, Etc**.  No amendment or waiver of any provision of this Agreement or any other Loan Document, and no Consent to any departure by any Loan Party or Limited Recourse Guarantor therefrom, shall be effective unless in writing signed by the Agent, with the Consent of the Required Lenders, and the Borrower or the applicable Loan Party or Limited Recourse Guarantor, as the case may be, and acknowledged by the Agent, and each such waiver or Consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that no such amendment, waiver or consent shall:

(a)     increase the Revolving Commitment of any Lender (or reinstate any Revolving Commitment terminated pursuant to Section 8.02) without the written Consent of such Lender;

(b)     as to any Lender, postpone any date fixed by this Agreement or any other Loan Document for (i) any scheduled payment (including the Maturity Date) or mandatory prepayment of principal, interest, fees or other amounts due hereunder or under any of the other Loan Documents without the written Consent of such Lender entitled to such payment, or (ii) any scheduled or mandatory reduction or termination of the Revolving Commitments hereunder or under any other Loan Document without the written Consent of such Lender;

(c)     as to any Lender, reduce the principal of, or the rate of interest specified herein on, any Committed Revolving Loan held by such Lender, or (subject to clause (ii) of the second proviso to this Section 10.01) any fees or other amounts payable hereunder or under any other Loan Document to or for the account of such Lender, without the written Consent of each Lender entitled to such amount; provided, however, that only the Consent of the Required Lenders shall be necessary (i) to amend the definition of "Default Rate" or to waive any obligation of the Borrower to pay interest at the Default Rate;

(d)     as to any Lender, change Section 2.05, Section 2.13 or Section 8.03 in a manner that would alter the pro rata sharing of payments required thereby without the written Consent of such Lender;

(e)     change any provision of this Section or the definition of "Applicable Lenders" or "Required Lenders" or any other provision hereof specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or make any determination or grant any consent hereunder, without the written Consent of each Lender;

(f)     except as expressly permitted hereunder or under any other Loan Document, release, or limit the liability of, any Loan Party or Limited Recourse Guarantor without the written Consent of each Lender;

(g)     except for Permitted Dispositions, release all or substantially all of the Collateral from the Liens of the Security Documents without the written Consent of each Lender;

(h)     increase the Aggregate Revolving Commitments without the written Consent of each Lender;

(i)     modify the definition of Permitted Overadvance so as to increase the amount thereof or, except as provided in such definition, the time period for which a Permitted Overadvance may remain outstanding without the written Consent of each Lender; and

(j)     except as expressly permitted herein or in any other Loan Document, subordinate the Obligations hereunder or the Liens granted hereunder or under the other Loan Documents, to any other Indebtedness or Lien, as the case may be without the written Consent of each Lender;

and, provided further, that no amendment, waiver or Consent shall, unless in writing and signed by the Agent in addition to the Lenders required above, affect the rights or duties of the Agent under this Agreement or any other Loan Document. Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders), except that (x) the Revolving Commitment of any Defaulting Lender may not be increased or extended without the consent of such Lender, and (y) any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender that by its terms affects any Defaulting Lender disproportionately adversely relative to other affected Lenders shall require the consent of such Defaulting Lender.

Notwithstanding anything to the contrary in this Agreement or any other Loan Document, any Loan Document may be amended and waived with the written consent of the Agent at the request of the Borrower without the need to obtain the consent of any Lender if such amendment or waiver is delivered in order (i) to comply with local law or advice of local counsel, (ii) to cure ambiguities or defects, or (iii) to cause any Loan Document to be consistent with this Agreement and the other Loan Documents.

**10.02   Notices; Effectiveness; Electronic Communications**.

(a)     Notices Generally.  Except as provided in subsection (b) below, all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier or electronic mail as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)     if to the Loan Parties or the Agent, to the address, telecopier number, electronic mail address or telephone number specified for such Person on Schedule 10.02; and

(ii)     if to any Lender, to the address, telecopier number, electronic mail address or telephone number specified in its Administrative Questionnaire.

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient).  Notices delivered through electronic communications to the extent provided in subsection (b) below, shall be effective as provided in such subsection (b).

(b)     Electronic Communications.  Notices and other communications to the Loan Parties and the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Agent, provided that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender has notified the Agent that it is incapable of receiving notices under such Article by electronic communication.  The

Agent may, in its Permitted Discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, provided that approval of such procedures may be limited to particular notices or communications.

Unless the Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(c)     The Internet.  In no event shall the Agent or any of its Related Parties have any liability to any Loan Party, any Lender or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Loan Parties' or the Agent's transmission of Borrower Materials through the Internet.

(d)     Change of Address, Etc.  Each of the Loan Parties and the Agent may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the other parties hereto.  Each Lender may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the Borrower and the Agent.  In addition, each Lender agrees to notify the Agent from time to time to ensure that the Agent has on record (i) an effective address, contact name, telephone number, telecopier number and electronic mail address to which notices and other communications may be sent, and (ii) accurate wire instructions for such Lender.

(e)     Reliance by Agent and Lenders.  The Agent and the Lenders shall be entitled to rely and act upon any notices purportedly given by or on behalf of the Loan Parties even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  The Loan Parties shall indemnify the Agent, each Lender and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Loan Parties.  All telephonic communications with the Agent may be recorded by the Agent, and each of the parties hereto hereby consents to such recording.

**10.03   No Waiver; Cumulative Remedies**.  No failure by any Credit Party to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder or under any other Loan Document preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges provided herein and in the other Loan Documents are cumulative and not exclusive of any rights, remedies, powers and privileges provided by Law.  Without limiting the generality of the foregoing, the making of a Committed Revolving Loan shall not be construed as a waiver of any Default or Event of Default, regardless of whether any Credit Party may have had notice or knowledge of such Default or Event of Default at the time.

**10.04    Expenses; Indemnity; Damage Waiver**.

(a)    Costs and Expenses.  The Borrower shall pay all Credit Party Expenses; provided that, so long as no Default or Event of Default has occurred and is continuing, the Borrower shall be responsible for reimbursement to Agent of such Credit Party Expenses of Tower Hill in an aggregate amount not to exceed $4,000 plus reasonable and documented out-of-pocket expenses per month. The Borrower acknowledges that Tower Hill is an Affiliate of the Agent.

(b)    Indemnification by the Loan Parties.  The Loan Parties shall indemnify the Agent (and any sub-agent thereof), each other Credit Party, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless (on an after tax basis) from, any and all losses, claims, causes of action, damages, liabilities, settlement payments, costs, and related expenses (including the fees, charges and disbursements of any counsel for any Indemnitee), incurred by any Indemnitee or asserted against any Indemnitee by any third party or by the Borrower or any other Loan Party arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, or, in the case of the Agent (and any sub-agents thereof) and their Related Parties only, the administration of this Agreement and the other Loan Documents, (ii) any Committed Revolving Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by any Loan Party or any of its Subsidiaries, or any Environmental Liability related in any way to any Loan Party or any of its Subsidiaries, (iv) any claims of, or amounts paid by any Credit Party to, a Blocked Account Bank or other Person which has entered into a control agreement with any Credit Party hereunder, or (v) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Borrower or any other Loan Party or any of the Loan Parties' directors, shareholders or creditors, and regardless of whether any Indemnitee is a party thereto, in all cases, whether or not caused by or arising, in whole or in part, out of the comparative, contributory or sole negligence of the Indemnitee; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee, or (y) result from a claim brought by the Borrower or any other Loan Party against an Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under any other Loan Document, if the Borrower or such Loan Party has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction.

(c)    Reimbursement by Lenders.    Without limiting their obligations under Section 9.14 hereof, to the extent that the Loan Parties for any reason fail to indefeasibly pay any amount required under subsection (a) or (b) of this Section to be paid by them, each Lender severally agrees to pay to the Agent (or any such sub-agent) or such Related Party, as the case may be, such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount, provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Agent (or any such sub-agent) in its capacity as such, or against any Related Party of any of the foregoing acting for the Agent (or any such sub-agent) in connection with such capacity.  The obligations of the Lenders under this subsection (c) are subject to the provisions of Section 2.12(d).

(d)    Waiver of Consequential Damages, Etc.  To the fullest extent permitted by applicable Law, the Loan Parties shall not assert, and hereby waive, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or

actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Committed Revolving Loan or the use of the proceeds thereof. No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby other than for direct or actual damages resulting from the gross negligence or willful misconduct of such Indemnitee as determined by a final and nonappealable judgment of a court of competent jurisdiction.

(e) **Payments.** All amounts due under this Section shall be payable on demand therefor.

(f) **Survival.** The agreements in this Section shall survive the resignation of any Agent, the assignment of any Revolving Commitment or Committed Revolving Loan by any Lender, the replacement of any Lender, the termination of the Revolving Commitments and the repayment, satisfaction or discharge of all of the other Obligations.

**10.05 Payments Set Aside**. To the extent that any payment by or on behalf of the Loan Parties is made to any Credit Party, or any Credit Party exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Credit Party in its Permitted Discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Agent upon demand its Applicable Percentage (without duplication) of any amount so recovered from or repaid by the Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate from time to time in effect. The obligations of the Lenders under clause (b) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

**10.06 Successors and Assigns**.

(a) **Successors and Assigns Generally.** The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no Loan Party or Limited Recourse Guarantor may assign or otherwise transfer any of its rights or obligations hereunder or under any other Loan Document without the prior written Consent of the Agent and each Lender, and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Eligible Assignee in accordance with the provisions of Section (b), (ii) by way of participation in accordance with the provisions of subsection Section 10.06(d), or (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 10.06(f) (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in subsection (d) of this Section and, to the extent expressly contemplated hereby, the Related Parties of each of the Credit Parties) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b) **Assignments by Lenders.** Any Lender may at any time assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a

portion of its Revolving Commitment and the Committed Revolving Loans at the time owing to it); provided that any such assignment shall be subject to the following conditions:

(i) <u>Minimum Amounts</u>.

(A) in the case of an assignment of the entire remaining amount of the assigning Lender's Revolving Commitment and the Committed Revolving Loans at the time owing to it or in the case of an assignment to a Lender or an Affiliate of a Lender or an Approved Fund with respect to a Lender, no minimum amount need be assigned; and

(B) in any case not described in subsection (b)(i)(A) of this Section, the aggregate amount of the Revolving Commitment (which for this purpose includes Committed Revolving Loans outstanding thereunder) or, if the Revolving Commitment is not then in effect, the principal outstanding balance of the Committed Revolving Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than $1,000,000 unless the Agent otherwise consents (each such consent not to be unreasonably withheld or delayed); provided, however, that concurrent assignments to members of an Assignee Group and concurrent assignments from members of an Assignee Group to a single Eligible Assignee (or to an Eligible Assignee and members of its Assignee Group) will be treated as a single assignment for purposes of determining whether such minimum amount has been met;

(ii) Proportionate Amounts. Each partial assignment shall be made as an assignment of a proportionate part of all of the assigning Lender's rights and obligations under this Agreement with respect to the Committed Revolving Loans or the Revolving Commitment assigned;

(iii) Required Consents. No consent shall be required for any assignment except (A) to the extent required by subsection (b)(i)(B) of this Section and (B) the consent of the Agent (such consent not to be unreasonably withheld or delayed) shall be required for assignments in respect of any Revolving Commitment if such assignment is to a Person that is not a Lender, an Affiliate of such Lender or an Approved Fund with respect to such Lender.

(iv) Assignment and Assumption. The parties to each assignment shall execute and deliver to the Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500, provided, however, that the Agent may, in its Permitted Discretion, elect to waive such processing and recordation fee in the case of any assignment. The assignee, if it shall not be a Lender, shall deliver to the Agent an Administrative Questionnaire.

(v) Certain Additional Payments. In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Borrower and the Agent, the applicable pro rata share of Committed Revolving Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Agent or any Lender hereunder (and interest accrued thereon), and (y) acquire (and fund as appropriate) its full pro rata share of

all Committed Revolving Loans in accordance with its Applicable Percentage.  Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable Law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

Subject to acceptance and recording thereof by the Agent pursuant to subsection (c) of this Section, from and after the effective date specified in each Assignment and Assumption, the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 3.01, 3.04 and 10.04 with respect to facts and circumstances occurring prior to the effective date of such assignment; provided, that except to the extent otherwise expressly agreed by the affected parties, no assignment by a Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from the Lender's having been a Defaulting Lender.  Upon request, the Borrower (at its expense) shall execute and deliver a Note to the assignee Lender.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 10.06(d).

(c)     Register.  The Agent, acting solely for this purpose as an agent of the Borrower (and such agency being solely for tax purposes), shall maintain at the Agent's Office a copy of each Assignment and Assumption delivered to it (or the equivalent thereof in electronic form) and a register for the recordation of the names and addresses of the Lenders, and the Revolving Commitments of, and principal amounts of the Committed Revolving Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive, absent manifest error, and the Loan Parties, the Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower and any Lender at any reasonable time and from time to time upon reasonable prior notice.

(d)     Participations.  Any Lender may at any time, without the consent of, or notice to, the Loan Parties or the Agent, sell participations to any Person (other than a natural person or the Loan Parties or any of the Loan Parties' Affiliates or Subsidiaries) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Revolving Commitment and/or the Committed Revolving Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Loan Parties, the Agent and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any Participant shall agree in writing to comply with all confidentiality obligations set forth in Section 10.07 as if such Participant was a Lender hereunder.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any  provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in the first proviso to Section 10.01 that affects such Participant.  Subject to subsection (e) of this Section, the Loan Parties agree that each Participant shall be entitled to the benefits of Sections 3.01 and 3.04 to the same extent as if it were a Lender and had

acquired its interest by assignment pursuant to Section 10.06(b). To the extent permitted by Law, each Participant also shall be entitled to the benefits of Section 10.08 as though it were a Lender, provided such Participant agrees to be subject to Section 2.13 as though it were a Lender. Each Lender, acting for this purpose as an agent of the Loan Parties, shall maintain at its offices a record of each agreement or instrument effecting any participation and a register for the recordation of the names and addresses of its Participants and their rights with respect to principal amounts and other Obligations from time to time (each a "Participation Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participation Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in each Participation Register shall be conclusive absent manifest error and the Loan Parties, the Administrative Agent and the Lenders may treat each Person whose name is recorded in a Participant Register as a Participant for all purposes of this Agreement (including, for the avoidance of doubt, for purposes of entitlement to benefits under Section 3.01, Section 3.04 and Section 10.08). The Participation Register shall be available for inspection by the Borrower and any Lender at any reasonable time and from time to time upon reasonable prior notice.

(e)     Limitations upon Participant Rights. A Participant shall not be entitled to receive any greater payment under Section 3.01 or 3.04 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent. A Participant that would be a Foreign Lender if it were a Lender shall not be entitled to the benefits of Section 3.01 unless the Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Loan Parties, to comply with Section 3.01(e) as though it were a Lender.

(f)     Certain Pledges. Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(g)     Electronic Execution of Assignments. The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

(h)     Reserved.

(i)     Transactions with Second Avenue Entity. Notwithstanding anything in this Agreement or any other Loan Document to the contrary, (A) neither the Agent nor any Affiliate (each, a "Second Avenue Entity") shall be required to comply with this Section 10.06 in connection with any transaction involving any other Second Avenue Entity or any of its or their lenders or funding or financing sources, and no Second Avenue Entity shall have any obligation to disclose any such transaction to any Person, and (B) there shall be no limitation or restriction on (i) the ability of any Second Avenue Entity to assign or otherwise transfer its rights and/or obligations under this Agreement or any other Loan Document, any Revolving Commitment, any Committed Revolving Loan, or any other

Obligation to any other Second Avenue Entity or any lender or financing or funding source of a Second Avenue Entity, or (ii) any such lender's or funding or financing source's ability to assign or otherwise transfer its rights and/or obligations under this Agreement or any other Loan Document, any Revolving Commitment, any Committed Revolving Loan, or any other Obligation. Notwithstanding Section 9.06 or any other term or condition of this Agreement, the Agent may at any time appoint a Second Avenue Entity as a replacement or successor agent hereunder, and such Second Avenue Entity shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided in Section 9.06).

**10.07   Treatment of Certain Information; Confidentiality**.  Each of the Credit Parties agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, agents, funding sources, attorneys, advisors and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable Laws or regulations or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement, or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to any Loan Party and its obligations, (g) with the consent of the Borrower, or (h) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section, or (y) becomes available to any Credit Party or any of their respective Affiliates on a non-confidential basis from a source other than the Loan Parties or Limited Recourse Guarantors.

For purposes of this Section, "Information" means all information received from the Loan Parties, any Subsidiary or any Limited Recourse Guarantor thereof relating to the Loan Parties, any Subsidiary thereof, the Limited Recourse Guarantors or their respective businesses, other than any such information that is available to any Credit Party on a non-confidential basis prior to disclosure by the Loan Parties, any Subsidiary thereof or the Limited Recourse Guarantors, provided that, in the case of information received from any Loan Party, any Subsidiary thereof or any Limited Recourse Guarantor after the Closing Date, such information is clearly identified at the time of delivery as confidential.  Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Each of the Credit Parties acknowledges that (a) the Information may include material non-public information concerning the Loan Parties, any Subsidiary thereof or a Limited Recourse Guarantor, as the case may be, (b) it has developed compliance procedures regarding the use of material non-public information, and (c) it will handle such material non-public information in accordance with applicable Law, including federal and state securities Laws.

**10.08   Right of Setoff**.  If an Event of Default shall have occurred and be continuing or if any Lender shall have been served with a trustee process or similar attachment relating to property of a Loan Party, each Lender and each of their respective Affiliates is hereby authorized at any time and from time

to time, after obtaining the prior written consent of the Agent or the Required Lenders, to the fullest extent permitted by applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of the Borrower or any other Loan Party against any and all of the Obligations now or hereafter existing under this Agreement or any other Loan Document to such Lender, regardless of the adequacy of the Collateral, and irrespective of whether or not such Lender shall have made any demand under this Agreement or any other Loan Document and although such obligations of the Borrower or such Loan Party may be contingent or unmatured or are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such indebtedness; provided, that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Agent for further application in accordance with the provisions of Section 2.16 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Agent and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff. The rights of each Lender and their respective Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender or its respective Affiliates may have. Each Lender agrees to notify the Borrower and the Agent promptly after any such setoff and application, provided that the failure to give such notice shall not affect the validity of such setoff and application.

**10.09    Interest Rate Limitation**.  Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "Maximum Rate"). If the Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Committed Revolving Loans or, if it exceeds such unpaid principal, refunded to the Borrower. In determining whether the interest contracted for, charged, or received by the Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

**10.10    Counterparts; Integration; Effectiveness**.  This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Agent and when the Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto. Delivery of an executed counterpart of a signature page of this Agreement by telecopy, pdf., or other electronic transmission shall be as effective as delivery of a manually executed counterpart of this Agreement.

**10.11    Survival**.  All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof. Such representations and warranties have been or will be relied upon by the Credit Parties, regardless of any investigation made by any Credit Party or on their behalf and notwithstanding that any Credit Party may have had notice or knowledge of any Default or Event of Default at the time of any Revolving Credit Borrowing, and shall continue in full force and effect as long as any Committed Revolving Loan or any other Obligation hereunder shall

remain unpaid or unsatisfied. Further, the provisions of Sections 3.01, 3.04 and 10.04 and Article IX shall survive and remain in full force and effect regardless of the repayment of the Obligations, the expiration or termination of the Revolving Commitments or the termination of this Agreement or any provision hereof. In connection with the termination of this Agreement and the release and termination of the security interests in the Collateral, the Agent may require such indemnities and collateral security as it shall reasonably deem necessary or appropriate to protect the Credit Parties against (x) loss on account of credits previously applied to the Obligations that may subsequently be reversed or revoked, and (y) any Obligations that may thereafter arise under Section 10.04.

      **10.12    Severability**. If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby, and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. Without limiting the foregoing provisions of this Section 10.12, if and to the extent that the enforceability of any provisions in this Agreement relating to Defaulting Lenders shall be limited by Debtor Relief Laws, as determined in good faith by the Agent, then such provisions shall be deemed to be in effect only to the extent not so limited.

      **10.13    Replacement of Lenders**. If any Lender requests compensation under Section 3.04, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, or if any Lender is a Defaulting Lender, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 10.06), all of its interests, rights and obligations under this Agreement and the related Loan Documents to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment), provided that:

            (a)    the Borrower shall have paid to the Agent the assignment fee specified in Section 10.06(b);

            (b)    such Lender shall have received payment of an amount equal to the outstanding principal of its Committed Revolving Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts);

            (c)    in the case of any such assignment resulting from a claim for compensation under Section 3.04 or payments required to be made pursuant to Section 3.01, such assignment will result in a reduction in such compensation or payments thereafter; and

            (d)    such assignment does not conflict with applicable Laws.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

**10.14    Governing Law; Jurisdiction; Etc**.

(a)    GOVERNING LAW.  THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO THE CONFLICTS OF LAWS PRINCIPLES THEREOF, BUT INCLUDING SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW AND TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

(b)    SUBMISSION TO JURISDICTION.  EACH LOAN PARTY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE NONEXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE LOAN PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT.  EACH OF THE LOAN PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT ANY CREDIT PARTY MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST ANY LOAN PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(c)    WAIVER OF VENUE.  EACH LOAN PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (B) OF THIS SECTION.  EACH OF THE LOAN PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d)    SERVICE OF PROCESS.  EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 10.02. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

(e)    ACTIONS COMMENCED BY LOAN PARTIES. EACH LOAN PARTY AGREES THAT ANY ACTION COMMENCED BY ANY LOAN PARTY ASSERTING ANY CLAIM OR COUNTERCLAIM ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT SHALL BE BROUGHT SOLELY IN THE BANKRUPTCY COURT OR THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AS THE AGENT MAY ELECT IN ITS SOLE DISCRETION AND CONSENTS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS WITH RESPECT TO ANY SUCH ACTION.

**10.15 Waiver of Jury Trial.** EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**10.16 No Advisory or Fiduciary Responsibility; Disclosure Regarding Affiliates.**

(a) In connection with all aspects of each transaction contemplated hereby, the Loan Parties each acknowledge and agree that: (i) the credit facility provided for hereunder and any related arranging or other services in connection therewith (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document) are an arm's-length commercial transaction between the Loan Parties, on the one hand, and the Credit Parties, on the other hand, and each of the Loan Parties is capable of evaluating and understanding and understands and accepts the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents (including any amendment, waiver or other modification hereof or thereof); (ii) in connection with the process leading to such transaction, each Credit Party is and has been acting solely as a principal and is not the financial advisor, agent or fiduciary, for the Loan Parties or any of their respective Affiliates, stockholders, creditors or employees or any other Person; (iii) none of the Credit Parties has assumed or will assume an advisory, agency or fiduciary responsibility in favor of the Loan Parties with respect to any of the transactions contemplated hereby or the process leading thereto, including with respect to any amendment, waiver or other modification hereof or of any other Loan Document (irrespective of whether any of the Credit Parties has advised or is currently advising any Loan Party or any of its Affiliates on other matters) and none of the Credit Parties has any obligation to any Loan Party or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; (iv) the Credit Parties and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Loan Parties and their respective Affiliates, and none of the Credit Parties has any obligation to disclose any of such interests by virtue of any advisory, agency or fiduciary relationship; and (v) the Credit Parties have not provided and will not provide any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby (including any amendment, waiver or other modification hereof or of any other Loan Document) and each of the Loan Parties has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate. Each of the Loan Parties hereby waives and releases, to the fullest extent permitted by law, any claims that it may have against each of the Credit Parties with respect to any breach or alleged breach of agency or fiduciary duty.

(b) Each of the Loan Parties hereby acknowledges that certain Affiliates of and/or direct and indirect equity holders in or advisors to the Agent or one or more of the Lenders (including, without limitation, Agent's parent entity, SB360 Holdings, LLC) (collectively, "Lender Service Parties") may from time to time be retained to provide services to the Agent and Lenders concerning the Loan Parties or other business entities (including, without limitation, consulting or analytic services, appraisals, purchases, sales and other dispositions of inventory, real property, financial instruments and other assets of public and private companies), and such Lender Service Parties may provide such services to the Credit Parties or their borrowers on ordinary and customary market terms. Nothing herein shall preclude

the Lender Service Parties from engaging in the above-referenced ordinary course business transactions conducted without use of or reference to the confidential information provided to the Credit Parties hereunder. The fees and expenses of the Lender Service Parties shall be Credit Party Expenses. Nothing contained herein shall limit or preclude the Lender Service Parties or any of their respective affiliates from providing services to or doing business with the Loan Parties or any other party, including, without limitation, any competitor, supplier or customer of the Loan Parties. None of the Lender Service Parties has assumed or will assume an advisory, agency or fiduciary responsibility in favor of the Loan Parties with respect to any of the transactions contemplated hereby or the process leading thereto, including with respect to any amendment, waiver or other modification hereof or of any other Loan Document and none of the Lender Service Parties has any obligation or duty to any Loan Party or any of its Affiliates with respect to the transactions contemplated hereby. Each of the Loan Parties hereby waives and releases, to the fullest extent permitted by law, any claims that it may have against each of the Lender Service Parties with respect to any breach or alleged breach of agency or fiduciary duty.

**10.17  USA PATRIOT Act Notice**. Each Lender that is subject to the Act (as hereinafter defined) and the Agent (for itself and not on behalf of any Lender) hereby notifies the Loan Parties that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act"), it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender or the Agent, as applicable, to identify each Loan Party in accordance with the Act. Each Loan Party is in compliance, in all material respects, with the Act. No part of the proceeds of the Committed Revolving Loans will be used by the Loan Parties, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended. The Loan Parties shall, promptly following a request by the Agent or any Lender, provide all documentation and other information that the Agent or such Lender requests in order to comply with its ongoing obligations under applicable "know you customer" and anti-money laundering rules and regulations, including the Act.

**10.18  Foreign Asset Control Regulations**. Neither of the advance of the Committed Revolving Loans nor the use of the proceeds of any thereof will violate the Trading With the Enemy Act (50 U.S.C. § 1 et seq., as amended) (the "Trading With the Enemy Act") or any of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) (the "Foreign Assets Control Regulations") or any enabling legislation or executive order relating thereto (which for the avoidance of doubt shall include, but shall not be limited to (a) Executive Order 13224 of September 21, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)) (the "Executive Order"), and (b) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56)). Furthermore, none of the Borrower or its Affiliates (a) is or will become a "blocked person" as described in the Executive Order, the Trading With the Enemy Act or the Foreign Assets Control Regulations, or (b) engages or will engage in any dealings or transactions, or be otherwise associated, with any such "blocked person" or in any manner violative of any such order.

**10.19  Time of the Essence**. Time is of the essence of the Loan Documents.

**10.20  Reserved**.

**10.21    Press Releases; Non-Disclosure**.

(a)    Each Credit Party executing this Agreement agrees that neither it nor its Affiliates will in the future issue any press releases or other public disclosure using the name of the Agent or its Affiliates or referring to this Agreement or the other Loan Documents without at least two (2) Business Days' prior notice to the Agent and without the prior written consent of the Agent unless (and only to the extent that) such Credit Party or Affiliate is required to do so under applicable Law and then, in any event, such Credit Party or Affiliate will consult with the Agent before issuing such press release or other public disclosure.

(b)    Each Loan Party consents to the publication by the Agent or any Lender of advertising material, including any "tombstone" or comparable advertising, on its website or in other marketing materials of Agent, relating to the financing transactions contemplated by this Agreement using any Loan Party's name, product photographs, logo, trademark or other insignia.  The Agent or such Lender shall provide a draft reasonably in advance of any advertising material to the Borrower for review and comment prior to the publication thereof.  The Agent reserves the right to provide to industry trade organizations and loan syndication and pricing reporting services information necessary and customary for inclusion in league table measurements.

(c)    Each Loan Party agrees to maintain the confidentiality of this Agreement and the other Loan Documents and the terms hereof and thereof, and agrees that it will not disclose (pursuant to any press release or otherwise) the name of the Agent or its Affiliates or this Agreement or the other Loan Documents or the terms hereof or thereof, in each case without the prior written consent of the Agent, except that such information may be disclosed (a) to such Loan Party's directors, officers, employees, attorneys and advisors (it being understood that the persons to whom such disclosure is made will be informed of the confidential nature of such information and instructed to keep such information confidential), (b) to the extent required by applicable Laws or regulations or by an subpoena or similar legal process or (c) to the extent such information becomes publicly available other than as a result of a breach of this section.

**10.22    Additional Waivers**.

(a)    The Obligations are the joint and several obligation of each Loan Party. To the fullest extent permitted by applicable Law, the obligations of each Loan Party shall not be affected by (i) the failure of any Credit Party to assert any claim or demand or to enforce or exercise any right or remedy against any other Loan Party under the provisions of this Agreement, any other Loan Document or otherwise, (ii) any rescission, waiver, amendment or modification of, or any release from any of the terms or provisions of, this Agreement or any other Loan Document, or (iii) the failure to perfect any security interest in, or the release of, any of the Collateral or other security held by or on behalf of the Agent or any other Credit Party.

(b)    The obligations of each Loan Party  shall not be subject to any reduction, limitation, impairment or termination for any reason (other than the indefeasible payment in full in cash of the Obligations after the termination of the Revolving Commitments), including any claim of waiver, release, surrender, alteration or compromise of any of the Obligations, and shall not be subject to any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of any of the Obligations or otherwise. Without limiting the generality of the foregoing, the obligations of each Loan Party hereunder shall not be discharged or impaired or otherwise affected by the failure of the Agent or any other Credit Party to assert any claim or demand or to enforce any remedy under this Agreement, any other Loan Document or any other agreement, by any waiver or modification of any provision of any thereof, any default, failure or delay, willful or otherwise, in the

performance of any of the Obligations, or by any other act or omission that may or might in any manner or to any extent vary the risk of any Loan Party or that would otherwise operate as a discharge of any Loan Party as a matter of law or equity (other than the indefeasible payment in full in cash of all the Obligations after the termination of the Revolving Commitments).

(c)     To the fullest extent permitted by applicable Law, each Loan Party waives any defense based on or arising out of any defense of any other Loan Party or the unenforceability of the Obligations or any part thereof from any cause, or the cessation from any cause of the liability of any other Loan Party, other than the indefeasible payment in full in cash of all the Obligations and the termination of the Revolving Commitments. The Agent and the other Credit Parties may, at their election, foreclose on any security held by one or more of them by one or more judicial or non-judicial sales, accept an assignment of any such security in lieu of foreclosure, compromise or adjust any part of the Obligations, make any other accommodation with any other Loan Party, or exercise any other right or remedy available to them against any other Loan Party, without affecting or impairing in any way the liability of any Loan Party hereunder except to the extent that all the Obligations have been indefeasibly paid in full in cash and the Revolving Commitments have been terminated. Each Loan Party waives any defense arising out of any such election even though such election operates, pursuant to applicable Law, to impair or to extinguish any right of reimbursement or subrogation or other right or remedy of such Loan Party against any other Loan Party, as the case may be, or any security.

(d)     Each Loan Party is obligated to repay the Obligations as joint and several obligors under this Agreement.  Upon payment by any Loan Party of any Obligations, all rights of such Loan Party against any other Loan Party arising as a result thereof by way of right of subrogation, contribution, reimbursement, indemnity or otherwise shall in all respects be subordinate and junior in right of payment to the prior indefeasible payment in full in cash of all the Obligations and the termination of the Revolving Commitments. In addition, any indebtedness of any Loan Party now or hereafter held by any other Loan Party is hereby subordinated in right of payment to the prior indefeasible payment in full of the Obligations and no Loan Party will demand, sue for or otherwise attempt to collect any such indebtedness.  If any amount shall erroneously be paid to any Loan Party on account of (i) such subrogation, contribution, reimbursement, indemnity or similar right or (ii) any such indebtedness of any Loan Party, such amount shall be held in trust for the benefit of the Credit Parties and shall forthwith be paid to the Agent to be credited against the payment of the Obligations, whether matured or unmatured, in accordance with the terms of this Agreement and the other Loan Documents.  Subject to the foregoing, to the extent that any Loan Party shall, under this Agreement as a joint and several obligor, repay any of the Obligations constituting Committed Revolving Loans made to another Loan Party hereunder or other Obligations incurred directly and primarily by any other Loan Party (an "Accommodation Payment"), then the Loan Party making such Accommodation Payment shall be entitled to contribution and indemnification from, and be reimbursed by, each of the other Loan Parties in an amount, for each of such other Loan Parties, equal to a fraction of such Accommodation Payment, the numerator of which fraction is such other Loan Party's Allocable Amount and the denominator of which is the sum of the Allocable Amounts of all of the Loan Parties.  As of any date of determination, the "Allocable Amount" of each Loan Party shall be equal to the maximum amount of liability for Accommodation Payments which could be asserted against such Loan Party hereunder without (a) rendering such Loan Party "insolvent" within the meaning of Section 101 (31) of the Bankruptcy Code, Section 2 of the Uniform Fraudulent Transfer Act ("UFTA") or Section 2 of the Uniform Fraudulent Conveyance Act ("UFCA"), (b) leaving such Loan Party with unreasonably small capital or assets, within the meaning of Section 548 of the Bankruptcy Code, Section 4 of the UFTA, or Section 5 of the UFCA, or (c) leaving such Loan Party unable to pay its debts as they become due within the meaning of Section 548 of the Bankruptcy Code or Section 4 of the UFTA, or Section 5 of the UFCA.

(e)     Without limiting the generality of the foregoing, or of any other waiver or other provision set forth in this Agreement, each Loan Party hereby absolutely, knowingly, unconditionally, and expressly waives any and all claim, defense or benefit arising directly or indirectly under any one or more of Sections 2787 to 2855 inclusive of the California Civil Code or any similar law of California.

**10.23   No Strict Construction**.  The parties hereto have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

**10.24   Attachments**.  The exhibits, schedules and annexes attached to this Agreement are incorporated herein and shall be considered a part of this Agreement for the purposes stated herein, except that in the event of any conflict between any of the provisions of such exhibits and the provisions of this Agreement, the provisions of this Agreement shall prevail.

[Signature Pages Follow]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the date first above written.

**A'GACI, L.L.C.,**
as the Borrower


By:_____
Name:
Title:



**SECOND AVENUE CAPITAL PARTNERS, LLC,**
as the Agent and a Lender


By:_____
Name:
Title:

# EXHIBIT B

**Approved Budget**

# A'GACI

## A'GACI, LLC
## Debtor-in-Possession Budget

August 8, 2019

---

A'GACI
DIP Budget
Cash Flow Summary

| Forecast Week | 1 | 2 | 3 | 4 | | |
|---|---|---|---|---|---|---|
| Retail Week | 27 | 28 | 29 | 30 | Total | Post |
| Week Ending | 8/9/2019 | 8/16/2019 | 8/23/2019 | 8/30/2019 | Through | Sale |
| ($ in 000s) | Forecast | Forecast | Forecast | Forecast | Sale | |
| **Cash Flow** | | | | | | |
| **Cash Receipts** | | | | | | |
| Cash Register Collections | - | - | - | 150 | 150 | - |
| Credit Card Collections | 517 | 517 | 129 | 129 | 1,293 | - |
| Inventory Proceeds | 1,382 | 3,098 | 3,723 | 3,527 | 11,731 | - |
| Furniture Fixtures & Equipment | - | - | 78 | 78 | 156 | - |
| Insurance Claim Proceeds | - | 205 | - | - | 205 | 1,620 |
| Visa / Mastercard Litigation | - | - | - | 191 | 191 | - |
| Gift Card Redemption | (48) | (48) | (48) | (48) | (193) | - |
| **Total Cash Receipts** | **1,851** | **3,772** | **3,882** | **4,027** | **13,533** | **1,620** |
| **Operating Disbursements** | | | | | | |
| Store Occupancy | - | - | - | 1,046 | 1,046 | - |
| Store Payroll | - | 717 | - | 586 | 1,303 | - |
| Corporate and DC Payroll | 362 | 226 | 92 | 92 | 772 | 200 |
| Accrued Vacation | 61 | - | - | 210 | 271 | - |
| Corporate and DC Rent | - | - | - | 43 | 43 | - |
| AP - Merchandise | - | - | - | - | - | - |
| AP - Other | 150 | 125 | 25 | 25 | 325 | - |
| Freight | 50 | 50 | - | - | 100 | - |
| Sales Tax | - | - | - | - | - | 1,693 |
| Sales Tax Penalties, Interest and Audit | - | - | - | - | - | 600 |
| Property Tax | - | - | 318 | - | 318 | - |
| Credit Card Fees | 26 | 59 | 70 | 67 | 222 | - |
| Insurance | 20 | 20 | 20 | 70 | 130 | (89) |
| Advertising and Supervision | 77 | 65 | 65 | 75 | 282 | - |
| Other | 50 | 50 | 50 | 50 | 200 | - |
| **Total Operating Disbursements** | **795** | **1,312** | **640** | **2,265** | **5,012** | **2,403** |
| **Net Cash Flow from Operations** | **1,056** | **2,460** | **3,242** | **1,763** | **8,521** | **(783)** |
| **Cumulative Net Cash Flow from Operations** | **550** | **3,010** | **6,252** | **8,015** | **16,536** | **15,753** |
| **Non-Operating Disbursements** | | | | | | |
| Professional Fees | 135 | 160 | 60 | 160 | 515 | 255 |
| Lender Professionals | 10 | - | 140 | - | 150 | - |
| Claims Agent | 40 | 10 | 10 | 10 | 70 | - |
| Liquidator Fees | 28 | 62 | 74 | 71 | 235 | - |
| **Total Non-Operating Disbursements** | **213** | **232** | **284** | **241** | **970** | **255** |
| **Net Cash Flow** | **843** | **2,228** | **2,958** | **1,522** | **7,551** | **(1,038)** |
| **Cumulative Net Cash Flow** | **843** | **3,071** | **6,029** | **7,551** | | **6,513** |
| **Borrowing Base** | | | | | | |
| Inventory (Cost) | 7,085 | 5,128 | 3,115 | 1,546 | | |
| Less: Shrink Reserve | (239) | (313) | (392) | (440) | | |
| Total Eligible Inventory | 6,845 | 4,815 | 2,723 | 1,106 | | |
| Advance Rate | 81.9% | 73.9% | 54.2% | 25.2% | | |
| NOLV | 94.9% | 94.9% | 94.9% | 94.9% | | |
| **Net BB from Inventory** | **5,320** | **3,377** | **1,400** | **265** | | |
| Credit Card A/R | 1,153 | 636 | 507 | 378 | | |
| Less: Fees/Chargebacks | - | - | - | - | | |
| Less: Holdback Reserve | (328) | (328) | (328) | (328) | | |
| Total Eligible Credit Card A/R | 825 | 308 | 178 | 49 | | |
| Advance Rate | 95.0% | 95.0% | 95.0% | 95.0% | | |
| **Net BB from Credit Card A/R** | **784** | **292** | **170** | **47** | | |
| Total Borrowing Base, before Reserves | 6,104 | 3,669 | 1,570 | 311 | | |
| Less: Reserves | (572) | (572) | (572) | (572) | | |
| **Total Borrowing Base, net of Reserves** | **5,532** | **3,097** | **998** | **-** | | |

**A'GACI**
**DIP Budget**
**Cash Flow Summary**

| Forecast Week | 1 | 2 | 3 | 4 | | |
|---|---|---|---|---|---|---|
| Retail Week | 27 | 28 | 29 | 30 | Total | Post |
| Week Ending | 8/9/2019 | 8/16/2019 | 8/23/2019 | 8/30/2019 | Through | Sale |
| *($ in 000s)* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | Sale | |
| **Debt Schedules** | | | | | | |
| **DIP Loan** | | | | | | |
| Beginning DIP Loan Balance | 6,019 | 5,395 | 3,176 | 223 | 6,019 | (1,298) |
| Less: Collections | (1,851) | (3,772) | (3,882) | (4,027) | (13,533) | (1,620) |
| Plus: Interest and Fees | 219 | 9 | 5 | 2 | 234 | |
| Plus: Net Funding Request | 1,008 | 1,544 | 925 | 2,505 | 5,982 | 2,658 |
| **Ending DIP Loan Balance** | **5,395** | **3,176** | **223** | **(1,298)** | **(1,298)** | **(260)** |
| **DIP Availability** | **137** | **-** | **775** | **-** | | |
| **Projected Asset Coverage** | **1.03x** | **0.98x** | **4.48x** | **N/A** | | |
| **Supplemental Information** | | | | | | |
| **Inventory Proceeds Calculation:** | | | | | | |
| Projected Net Sales | 2,845,907 | 3,855,272 | 3,327,065 | 1,031,712 | | |
| Projected COGS | 1,876,945 | 2,036,272 | 1,990,242 | 1,146,516 | | |
| Average Discount | 18.1% | 26.1% | 45.8% | 74.8% | | |
| Projected Collections | 1,382,127 | 3,098,249 | 3,723,221 | 3,527,011 | | |
| | | | | | | |
| **DIP Interest and Fees Calculation:** | | | | | | |
| Interest | 11 | 9 | 3 | - | | |
| Unused Line Fee | 1 | 1 | 1 | 2 | | |
| DIP Closing Fee | 200 | - | - | - | | |
| Collateral Monitoring Fee | 7 | - | - | - | | |
| **Total Interest and Fees** | 219 | 9 | 5 | 2 | | |

| Category | Sale Total | Post Sale Total | Assumptions |
|---|---|---|---|
| **Cash Receipts** | | | |
| Cash Register Collections | 150 | - | Estimated store register cash based on average daily cash collections over the last two months |
| Credit Card Collections | 1,293 | - | Assumed to collect 90% of estimated Credit Card A/R as of 8/2/2019 over the next four weeks |
| Inventory Proceeds | 11,731 | - | Recovery and timing based on projected sales analysis from Joint Venture dated August 6, 2019; proceeds are net of sales taxes incurred |
| Furniture Fixtures & Equipment | 156 | - | Assumes $3,500 / per store less 17.5% Joint Venture fee; Does not include FF&E from DC or Corporate office |
| Insurance Claim Proceeds | 205 | 1,620 | $205k represents the release of an approved claim; the $1.6m is an estimate on the remaining claim and is subject to change |
| Visa / Mastercard Litigation | 191 | - | Estimated proceeds for Visa / Mastercard class action litigation based on credit sales from 2004 through 2019 |
| Gift Card Redemption | (193) | - | Assumes 25% of gift card balance (approximately $770k) is redeemed over the next four weeks |
| **Operating Disbursements** | | | |
| Store Occupancy | 1,046 | - | Pro-rated for anticipated August 7, 2019 filing date and paid on September 1, 2019 |
| Store Payroll | 1,303 | - | Assumed to be consistent with Joint Venture store payroll forecast dated August 2, 2019 |
| Corporate and DC Payroll | 772 | 200 | Based on employee-level build up of corporate and DC winddown teams and includes weekly payments of wages and retention |
| Accrued Vacation | 271 | - | Based on actual accrued vacation balance as of July 31, 2019 less approximately $64k paid on August 2, 2019 for terminated employees |
| Corporate and DC Rent | 43 | - | Pro-rated for anticipated August 8, 2019 filing date and paid on September 1, 2019 |
| AP - Merchandise | - | - | None; All shipments were pre-petition |
| AP - Other | 325 | - | Includes provision for utility deposits and other critical operating expenses |
| Freight | 100 | - | Assumes $50k per week for freight providers until all goods are transferred from distribution center to stores |
| Sales Tax | - | 1,693 | Outstanding sales and use taxes |
| Sales Tax Penalties, Interest and Audit | - | 600 | Represents penalties and interest for late payments; additional $300k of TX taxes currently under audit from 2015 - 2017 (Result: TBD) |
| Property Tax | 318 | - | Represents outstanding ad valorem taxes; balance currently under review |
| Credit Card Fees | 222 | - | Assumes 2.7% of estimated credit card sales, which are assumed to be 70% of total sales |
| Insurance | 130 | (89) | Includes payment for all corporate insurance, $50k estimate for D&O tail and $20k per week for self-insurance medical claims |
| Advertising and Supervision | 282 | - | Assumed to be consistent with Joint Venture proposal dated July 25, 2019 |
| Other | 200 | - | Assumed to be $50k per week |
| **Non-Operating Disbursements** | | | |
| Professional Fees | 515 | 255 | Includes Debtor (Counsel, Financial Advisor, Disposition Financial Advisor) and Creditor (Committee Fee, UST) professional fees |
| Lender Professionals | 150 | - | Includes lender professional fees |
| Claims Agent | 70 | - | Estimate based on engagement letter and proposed scope of work |
| Liquidator Fees | 235 | - | Assumed to be consistent with Joint Venture proposal dated July 25, 2019 |