IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| A'GACI, L.L.C., | Case No. 19-51919 |
| | Honorable Ronald B. King |
| Debtor. | |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DEBTORS' MOTION SEEKING ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364 AND 507 (I) APPROVING POST-PETITION FINANCING, (II) AUTHORIZING USE OF CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING AUTOMATIC STAY, (VI) GRANTING RELATED RELIEF, AND (VII) SCHEDULING A FINAL HEARING**

The Official Committee of Unsecured Creditors (the "Committee") of A'Gaci, L.L.C. (the "Debtor"), by and through its undersigned proposed counsel, submits this objection (the "Objection") to the Debtors' motion (the "Motion") (ECF No. 5) seeking entry of interim and final orders authorizing the Debtors to use cash collateral and obtain secured post-petition financing and seeking other relief. In support of this Objection, the Committee states as follows:

**PRELIMINARY STATEMENT**

Second Avenue Capital Partners, LLC (the "Lender") is asserting a great deal of control over the Debtor in this chapter 11 case. This control is evidenced by the combination of (i) the onerous terms and fees associated with the proposed debtor-in-possession financing (the "DIP Loan"); and (ii) the requirement that the Debtor hire the Lender's affiliate, SB360 Capital Partners, LLC ("SB360"), and Hilco Merchant Resources, LLC ("Hilco" and, together with SB360, the "Consultant") to liquidate the Debtor's assets. Since this case is a straight liquidation, the Lender has effectively seized control of the administration of this case.

The Lender has received all of the net sale proceeds before the Committee has had an opportunity to review its liens or object to the burdeonsome fees, interest and expenses the Lender is charging the estate, both through the proposed DIP Loan and through the Consultant. The sale is expected to be concluded by the end of this week, and the Lender should not receive full payment until the Committee has had the opportunity to conclude its investigation of the Lender.

The Debtor has also indicated that the Lender's pre-petition claim is nearly paid off from sale proceeds received thus far. The Lender should not be the *only* creditor to benefit from this case. The Committee is concerned that, even if the Lender's pre-petition liens and claims are valid, any amounts above the Lender's pre-petition claim will be funneled to the Lender under the guise of post-petition fees and interest, instead of being used to provide a distribution to unsecured creditors. Likewise, the Lender should not collect such interest and fees with one hand while the Consultant also collects fees related to the expenses with the other.

Further, under no circumstances is giving the Lender a security interest in unencumbered assets, such as chapter 5 causes of action, justified. If a lien on such claims were allowed, the Lender will be the only party to benefit from this case on the backs of the unsecured creditors, affirmatively putting them in a worse position than they were on the Petition Date.[1] This is especially true because the Debtor's budget shows a positive cash flow for the entire sale period, without tapping into the DIP Loan from the Lender. Indeed, it appears the only purpose of the DIP Loan was to roll-up the Lender's pre-petition debt and pay additional and unnecessary fees and interest to the Lender. If the Debtor did not *need* a DIP loan, it should not subject the estate to risks and fees associated with the proposed loan.

---

[1] The "Petition Date" is the date the Debtor commenced this case, August 7, 2019.

Finally, the Taxing Authorities[2] have alleged that the Lender failed to fulfill its obligations to provide exit financing from the first bankruptcy case[3] to pay the Debtor's tax obligations, leaving the Debtor with a large priority tax debt in this case. If the Lender materially breached its funding obligations, the estate may have claims against the Lender. The Committee should be allowed the opportunity to investigate those claims before the Lender receives anything.

At a minimum, the following relief sought by the Debtor in the Motion is objectionable:

- The Motion would allow the Debtor to use the proposed DIP Loan from the Lender of up to $10 million at an interest rate of approximately 12.5% to pay the expenses of the liquidation. Instead of charging the collateral for such expenses, as is required by section 506(c) of the Bankruptcy Code, the Lender would receive the opposite – interest and fees for the costs of liquidation, plus liens on assets in which the Lender would not otherwise have an interest.

- The Motion seeks to pay the entire pre-petition loan off by drawing on the DIP Loan, under the guise of an "adequate protection payment" to the Lender in an unspecified and unbudgeted amount. The so-called adequate protection payment is clearly a roll-up of the pre-petition debt into the DIP Loan. The roll-up should not be allowed; the Committee should be allowed to complete its investigation of the Lender's liens claims before the pre-petition debt is paid off.

- Paragraph 20 of the proposed order indicates that the proceeds of the DIP Collateral[4] will first be used to pay the pre-petition obligations prior to payment of the DIP Loan and associated expenses.

- The Debtor should not pay any closing fees, administrative fees, or unused line fees associated with the DIP Loan because the only purpose of the DIP Loan is to help the Lender liquidate its own collateral and, since the DIP Loan does not appear to be necessary in the first place, the Debtor should not pay any fees for not fully drawing down on it.

- The Motion seeks to encumber causes of action existing as of the Petition Date. Such causes of action should be preserved for the benefit of unsecured creditors.

---

[2] The Taxing Authorities consist of Crowley ISD, Arlington ISD, City of Grapevine, Grapevine-Colleyville ISD, Brazoria County Tax Office, City of Katy, Katy Management District #1, Humble ISD, Alief ISD, City of Houston, Spring Branch ISD, City of Mercedes, Maverick County, Tyler ISD, Lubbock CAD, and Midland County.

[3] Case No. 18-50049-rbk (Bankr. W.D. Tex.)

[4] Capitalized terms not defined in this Objection shall have the meaning ascribed to them in the Motion.

- The Motion seeks to grant to the Lender a superpriority claim pursuant to sections 503 and 507(b) of the Bankruptcy Code, with recourse from Avoidance Actions. Again, the Lender should not charge unsecured creditors, by taking away potential Avoidance Action recovery, for the liquidation of the Lender's collateral.

- The post-petition events of default (the "<u>Events of Default</u>") are overbroad and the following should be stricken:

    - improperly bootstrapping the terms of the Consulting Agreement between the Consultant and the Debtor, in disregard of the rights or input of unsecured creditors [Credit Agreement 6.27];

    - cross-default provision with obligations Subsidiaries and non-debtor guarantors outside of the control of this Court [Credit Agreement 8.01(e)];

    - judgments entered against non-debtor Subsidiary [Credit Agreement 8.01(h)];

    - allowance of section 506(c) claims against the Lender [Credit Agreement 8.01 (p)(viii)];

    - commencement of a suit or action against the Lender [Credit Agreement 8.01 (p)(xii)];

    - requiring the retention of SierraConstellationPartners, LLC ("<u>Sierra</u>") [Credit Agreement 6.25];

    - pre-payment of pre-petition debt to Lender [Credit Agreement 7.07].

- The Motion seeks to waive the estates' rights to surcharge the Lender's collateral pursuant to section 506(c) of the Bankruptcy Code.

- The Committee's deadline to investigate and challenge the Lender's claims and security interests is too short in light of the Debtors' extended deadline to file their schedules of assets and liabilities ("<u>Schedules</u>") and statements of financial affairs ("<u>SOFAs</u>"), and the Proposed Final Order should grant the Committee standing to pursue claims against the Pre-Petition Lenders.

- The Motion seeks indemnification of the Lender.

- The proposed order contains a finding of good faith on behalf of the DIP Agent, DIP Lenders, and Prepetition Secured Creditors, which is inappropriate

4

considering that the Lender has been fully controlling the Debtor and the bankruptcy process.[5]

The Proposed Final Order should not be entered until the foregoing issues are adequately addressed.

## OBJECTIONS

I. **The DIP Loan Should Not be Allowed or, in the Alternative, Use of the DIP Loan Should Have Reasonable Terms and Be Limited to Prevent a "Creeping" Roll-Up**

While the Committee has no objection in principle to the Debtor borrowing money if necessary, the Debtor's budget shows sufficient cash flow to cover the budgeted expenses of the liquidation. Even if the Debtor did need some bridge financing to cover expenses until the cash flow was sufficient, there is no discernible reason for the Debtor to borrow from the DIP Loan under the current terms, which allow the Lender to improve its position to the detriment of unsecured creditors.

The notable terms of the DIP Loan are as follows:

- Up to $10 million in post-petition revolving loans;
- Interest of 10.5% plus the greater of 3 month LIBOR (approx. 2.13%) or 1.5%;
- 0.75% per annum fee on the *unused* available undrawn commitment;
- $200,000 closing fee;
- Administration fee of $6,500 per month; and
- Use of the DIP Loan to pay the Lender's pre-petition loans.

The Debtor seeks approval to borrow up to $10 million from the Lender under the DIP Loan, ostensibly to "ensure that [the Debtor] is able to continue operating during this chapter 11 case and preserve the value of its estate for the benefit of all parties in interest." (Motion ¶ 15.)

---

[5] The Committee does not have sufficient information at this time to determine whether the Lender has acted in good faith. It is too early for the Court to make such a finding.

5

However, the Debtor's Budget demonstrates that any need for liquidity is actually driven by the Lender's requirement that "the Debtor must remit substantially all cash receipts on a daily basis to a non-Debtor account" maintained by the Lender in its capacity as the "Prepetition Agent." (Motion ¶ 14.)

Indeed, the Budget projects a cumulative net cash flow from operations of $16.5 million through the end of the sale. Even the first week of the bankruptcy case was projected to have a $1 million positive net cash flow from operations. Even when taking into account professional fees, claims agent's fees, and liquidator's fees, the projected net cash flow is more than $7.5 million. With such a steady cash flow, it appears there is no need for a DIP Loan. The beginning DIP Loan balance indicated in the Budget for the week of August 9, 2019 is $6.019 million, but the total operating and non-operating expenses are only $1,008,000[6] and projected cash receipts are $1,851,000. As the below chart demonstrates, the sole purpose of the DIP Loan is to pay off the pre-petition debt in full, and it also allows the Lender to charge the Debtor more onerous terms than the pre-petition loan.

| WEEK 1 PROJECTIONS WITH DIP LOAN | |
|---|---|
| *Week 1 DIP Loan Proceeds* | $ 6,019,000.00 |
| Cash Receipts | $ 1,851,000.00 |
| Operating Expenses | $ (795,000.00) |
| Non-Operating Expenses | $ (213,000.00) |
| | $ 6,862,000.00 |
| *Prepetition Loan Payment* | $ (6,099,123.62) |
| DIP Fees and Interest | $ (219,000.00) |
| Week 1 Ending Balance | $ 543,876.38 |

In essence, the Debtor is proposing a "creeping" rollup by seeking to **borrow** post-petition funds from the Lender in order **pay** those same funds to the Lender on account of pre-petition interest and principal.

---

[6] Budgeted operating expenses are $795,000 and non-operating expenses are $213,000 for the week of August 9, 2019.

With the proposed DIP Loan, the Lender's pre-petition debt would be paid in full week one and then the Lender's interest rate would increase from 8.5% plus LIBOR (pre-petition non-default debt rate) to 10.5% plus LIBOR (DIP Loan rate) – which is approximately $5,700 in additional interest over the four-week budget. The Lender would also collect $200,000 in closing fees, $6,500 in monthly administrative fees, and approximately $30,000 in an unused line fee.[7] In sum, the DIP Loan allows the Lender to pay its pre-petition debt in full and collect an additional windfall well in excess of $200,000.[8]

Contrast that with a projected budget with no DIP Loan:

| WEEK 1 PROJECTIONS WITH NO DIP LOAN | |
|---|---|
| Cash Receipts | $ 1,851,000.00 |
| Operating Expenses | $ (795,000.00) |
| Non-Operating Expenses | $ (213,000.00) |
|  | $ 843,000.00 |
| Pre-Petition Interest | $ (12,468.02) |
| Week 1 Ending Balance | $ 830,531.98 |

The ending net cash balance without a DIP Loan is higher than with the DIP Loan, even when accounting for post-petition interest payments on the pre-petition debt. The cash flow alone is sufficient to pay budgeted expenses.

Even if the Debtor had minor liquidity issues the first week, the DIP Loan requirement would be nowhere near $10 million. The week 1 expenses are only about $1 million at most.[9] Thereafter, the projected sale proceeds are sufficient to cover any liquidation expenses going

---

[7] The unused line fee of .75% is particularly unjustifiable because the total line is purportedly $10,000,000, but the budgeted draws are only about $6,000,000 at their peak and the projected borrowing base net of reserves never exceeds $5.532 million. Inevitably, there will be "unused" funds.

[8] This number is even higher when you include the amounts the Consultant (which is an affiliate of the Lender) receives for liquidating the Lender's collateral.

[9] Notably, the only reason the Debtor would have needed *any* post-petition loan to fund its operations is because the Lender swept all operating cash pre-petition. Thus, the Lender itself created the necessity, if any, for the DIP Loan.

forward. Further, the Motion proposes to provide liens on all assets, including all Avoidance Action. The Lender should be limited to liens on its pre-petition collateral.

If the Court approves the DIP Loan, it should (a) restrict the Debtor from using the proceeds of the DIP Loan to pay the Lender's pre-petition debt until after the Committee has completed its investigation of the Lender, (b) require that the Debtor first repay the outstanding balance on the DIP Loan before paying the Lender's pre-petition debt, (c) limit the amount of the DIP Loan to the Debtor's actual cash needs, (d) strike the $200,000 closing fee, $6,500 monthly administrative fee, and the 0.75% per annum fee on the unused available commitment, and (e) strike the requirement for liens on additional collateral, including the superpriority liens.[10] Otherwise, the Court would effectively be approving more than $242,500 in fees and costs for a $1 million DIP Loan.

## II. The Proposed Adequate Protection and Payment of Default Interest to Lender is Improper

The Motion seeks an order requiring the Debtor to provide adequate protection in the form of adequate protection payments to Lender, adequate protection liens, and adequate protection superpriority claims.

Upon request, a court shall condition the use of cash collateral as is necessary to provide to a party who has an interest in the cash collateral "adequate protection" as is necessary to protect that interest. 11 U.S.C. § 363(e). ). "Adequate protection is a device intended to provide additional protection against loss to a secured creditor arising from continuation of the automatic stay of 11 U.S.C. § 362 as called for by the circumstances of the case." *Matter of Braniff Airways, Inc.*, 782 F.2d 1283, 1286 (5th Cir. 1986) (internal quotation omitted). *See also In re*

---

[10] As stated below, the Lender should not be granted liens on Avoidance Actions. Also, superpriority liens should not be used as way for the Lender to evade claims the estate may have against the Lender for actions the Lender has taken with respect to the Debtor prior to or during the bankruptcy case.

8

*Spacek*, 112 B.R. 162, 165 (Bankr. W.D. Tex. 1990). A creditor is only entitled to adequate protection to the extent of the anticipated or actual decrease in value of the collateral during the bankruptcy case. *See In re First South Savings Assoc.*, 820 F.2d 700, 710 (5th Cir. 1987). The adequate protection, therefore, "must not substantially exceed that to which the secured creditor is entitled." *In re Blehm Land & Castle Co.*, 859 F.2d 137 (10th Cir. 1988). Indeed, "[t]he purpose of adequate protection is to adequately protect creditors from the diminution of value in a creditor's collateral." *In re Geijsel*, 480 B.R. 238, 265 n.19 (Bankr. N.D. Tex. 2012).

The Lender should not be granted any adequate protection by the Court because it is already adequately protected by the pre-petition collateral and the Debtor has not shown that the Lender's collateral has diminished in this case. The budget projects that the sale of inventory will result in $7,551,000 net of all costs of the bankruptcy, which is more than sufficient to pay the Lender's pre-petition debt in full. The Lender, through the Consultant, is in possession of and in charge of liquidating the inventory, so the Lender cannot also argue that the value of the non-perishable inventory is diminishing in its own hands. The Lender's position is adequately protected by the equity in its collateral.

The adequate protection offered to the Lender in the Motion is unnecessary.

### A. Lender Should Not Receive Adequate Protection Payments

The "adequate protection payments" the Motion requests are payment of "the amounts required under the Payoff Letter" upon entry of the final order approving the DIP Loan. (Motion p. 12.) In other words, a full payment of the pre-petition loan on day 1. The Motion is silent as to the amounts of the payoff, or the amounts of the pre-petition interest, fees, costs, expenses, indemnities and other amounts related to the pre-petition debt or whether post-petition interest on

the pre-petition debt would be at the Lender's default rate. The request is overreaching, as it goes well beyond the purpose and intent of adequate protection.

The result of this scheme is that unsecured creditors end up paying the price of the Lender's liquidation of its collateral. All of the risk is on unsecured creditors and none of the benefits. Unsecured creditors will be in a substantially worse position in chapter 11 than they would be in chapter 7, but the Lender would be in a much better position.

The Lender is not entitled to any "adequate protection" payments to payoff its pre-petition debt, much less a full immediate payoff.

### B. Lender Should Not Receive Liens on Causes of Action

The Motion seeks to grant the Lender liens on causes of action under chapter 5 and section 724(a) of the Bankruptcy Code ("Avoidance Actions"). There is no need to grant the Lender liens on any post-petition causes of action. If unencumbered, the Avoidance Actions and other claims the Debtors own could be a significant source of recovery for unsecured creditors.

Allowing the Lender to take a lien on Avoidance Actions is not only unjustified, as further adequate protection is not necessary under the circumstances, but it is also unfair to the unsecured creditors, as it would encumber an asset that was previously available to satisfy the claims of all creditors. *See e.g.* Local Rule 1020-1, Comments to Cash Collateral and DIP Financing Checklist ¶ 3(b) ("Avoidance actions are frequently one of the few sources of recovery for creditors other than secured lenders."); Local Rule 1020-1, Exhibit J ¶ 3(g) (indicating that liens on chapter 5 actions are generally not favored by the Court).

### C. Lender is Not Entitled to Automatic Superpriority Administrative Claims

The Debtor's sole business during the post-petition period is the liquidation of the Lender's collateral for the Lender's benefit. The Motion seeks a grant of automatic superpriority

administrative claims pursuant to section 507(b) of the Bankruptcy Code, payable from and with recourse to the Avoidance Actions.

"[T]o the extent adequate protection of the interest of a holder of a claim proves to be inadequate, then the creditor's claim is given priority over every other allowable claim entitled to distribution under section 507(a)." *In re James B. Downing & Co.*, 94 B.R. 515, 520 (Bankr. N.D. Ill. 1988)(quoting 124 Cong.Rec. H11095 (daily ed. Sept. 28, 1978); S17411 (daily ed. Oct. 6, 1978); remarks of Rep. Edwards and Sen. DeConcini). A claim can arise under section 507(b), two conditions must be met: (1) the creditor must have been provided adequate protection of its lien interest and (2) the adequate protection approved by the Court must be later proven to be inadequate. *In re DeSardi*, 340 B.R. 790, 801 (Bankr. S.D. Tex. 2006). *See also In re Scopac*, 624 F.3d 274, 282 (5th Cir. 2010).

It is premature for the Lender to be provided any claim or priority under section 507(b). The amount and priority of the Lender's claims have not been determined, as the Committee's challenge period has not expired. The Lender should be required to file a request for a superpriority claim, and all parties should have the right to object.

The Debtor's own budget, moreover, shows that the Lender is adequately protected by the equity cushion in inventory. In any event, the disappearance of an equity cushion (which the Lender would have if it is over secured) does not mean a creditor has been denied adequate protection. *In re Ralar Distributors, Inc.*, 166 B.R. 3, 7 (Bankr. D. Mass. 1994) (stating a creditor is not entitled to adequate protection of a right to accrue interest and for that reason, cannot be entitled to a section 507(b) claim with respect to any post-petition interest charges).

Further, as stated above, under no circumstances should the Lender be given recourse to the Avoidance Action, putting the expenses of this case on the backs of the unsecured creditors.

### D. Lender Should Not Receive Post-Petition Payments on Pre-Petition Debt Until After the Committee's Investigation Period Expires

The Motion seeks to make payments to Lender in undisclosed and unbudgeted amounts and at unknown times in order to reduce the pre-petition debt. While the Committee objects to the Lender receiving any adequate protection payments, it certainly should not be paid on its pre-petition debt until the Committee has had the opportunity to complete its investigation. Otherwise, if there are defects in the Lender's liens or other potential claims against the Lender, the estate could be in the position of having to use estate resources to recover money that the Lender was never entitled to receive in the first place. Since the Lender is not a bank, collectability should be a consideration.

### E. Lender Should Not Receive Post-Petition Interest at the Default Rate

The Lender is charging post-petition interest at a level that equaled the default rate under the pre-petition loan documents. The Motion is silent as to the purported defaults of the Debtor. In other words, the Debtor has not shown that the Lender has suffered any financial loss related to the pre-petition loan. Any non-financial "injury" suffered by the Lender is already more than fully compensated by the regular interest rate and payment of the Lender's attorneys' fees. Thus, the additional default rate is not a reasonable charge under section 506(b). *See In re AE Hotel Venture*, 321 B.R. 209, 215-16 (Bankr. N.D. Ill. 2005) (explaining that default interest is "designed to reimburse creditors for 'extra costs incurred after default'" and not to perform the usual function of interest); *In re Haldes*, 503 B.R. 441, 447 (Bankr. N.D. Ill. 2013) (default interest rate not reasonable where it compensated for an injury that had already been substantially compensated through late charges and attorneys' fees).

This is particularly true since it is apparent that the Debtor filed this case for the sole benefit of the Lender. Indeed, the Debtor did not even choose its own liquidator or financial

advisor. The Lender required the Debtor to hire its affiliate, the Consultant, as liquidator and Sierra as financial advisor. Therefore, the Lender should not be allowed to charge default interest on pre-petition debt.

### III. The Post-Petition Default Provisions are Unreasonably Restrictive

The Proposed Final Order provides a cumulative list of eighty-three items upon which the DIP Loan is conditioned.[11] The more troubling Events of Default include:

- Improperly bootstrapping the terms of the Consulting Agreement between the Consultant and the Debtor, in disregard of the rights or input of unsecured creditors [Credit Agreement 6.27 and 8.01(n)]. If the Debtor breaches or defaults on any of the numerous terms of the Consulting Agreement, even if inadvertant, it will also be defaulting under the DIP Loan.

- Cross-default provision with obligations Subsidiaries and non-debtor guarantors outside of the control of this Court [Credit Agreement 8.01(e)].

- Judgments entered against non-debtor Subsidiary [Credit Agreement 8.01(h)].

- Allowance of section 506(c) claims against the Lender [Credit Agreement 8.01 (p)(viii)]. The Lender should be charged with the costs of preserving and liquidating its collateral.

- Commencement of a suit or action against the Lender [Credit Agreement 8.01 (p)(xii)]. In light of the allegations that the Lender failed to perform under the terms of the exit loan related to the Debtor's first bankruptcy, the Lender may not use the DIP Loan as a shield (especially because the DIP Loan is not necessary).

- Requiring the retention of Sierra or another financial advisor acceptable to the Lender [Credit Agreement 6.25]. While the Committee has no reason to believe that Sierra is not a competent financial advisor, the Debtor's choice of professionals should not be left to the Lender's discretion.

- Pre-payment of pre-petition debt to Lender [Credit Agreement 7.07]. This provision appears to include pre-payment of debt owed to the Lender by non-debtors.

- The expiration or termination of the Debtor's exclusive right to file a plan of reorganization [Credit Agreement 8.01 (p)(iii)].

---

[11] The Motion is confusing as to whether these would also be conditions for use of cash collateral, but presumably they would.

- Failure of the Bankruptcy Court within sixty (60) days after the Petition Date to grant an order extending the time period of the Debtor to assume or reject unexpired leases of real property to a date that is 210 days from the Petition Date [Credit Agreement 8.01 (p)(xv)].

- Violation of subordination provisions [Credit Agreement 8.01 (r)]. The Credit Agreement does not clearly describe what subordination agreements or provisions exist, who is subordinating debt and what debt is subordinated. Such vague references should not be an Event of Default.

- The entry of any order in the Chapter 11 Case avoiding or permitting recovery of any portion of the payments made on account of the Indebtedness owing under the Credit Agreement or the other Loan Documents or the Pre-Petition Credit Agreement [Credit Agreement 8.01 (p)(xiii)].

- The entry of an order in the Chapter 11 Case confirming a plan that is not acceptable to the Lender [Credit Agreement 8.01 (p)(iv)].

- The entry of an order granting any other super-priority administrative claim or lien equal or superior to the Lender's liens [Credit Agreement 8.01 (p)(xvi)].

- The entry of an order allowing another creditor relief from the automatic stay [Credit Agreement 8.01 (p)(ix)].

These Events of Default should be stricken. If the terms are allowed, the Debtor and creditors of the estate would be effectively be denied remedies available under the Bankruptcy Code, would be beholden to non-debtor's performance, and the Lender would be allowed improper leverage over the bankruptcy process.

## IV. The 506(c) Surcharge Waiver Must Be Removed

The Motion also seeks to waive the estate's right to assert a 506(c) surcharge claim. (Motion p. 21-22; Proposed Interim Order ¶ 39). Waiving these rights requires the estates to pay for any and all expenses associated with the preservation and disposition of the Lender's pre-petition collateral. At this point, the Debtor's entire business consists of liquidating its remaining inventory. The 506(c) surcharge is not appropriate and should be stricken. *See In re Domistyle, Inc.*, 811 F.3d 691, 696 (5th Cir. 2015) (noting that the purpose of section 506(c) is to prevent unjust enrichment by a secured creditor reaping the benefits of actions taken to preserve its

collateral without shouldering the cost); Local Rule 1020-1, Comments to Cash Collateral and DIP Financing Checklist ¶ 3(c) ("[L]imitations on the surcharge of the lender's collateral under § 506(c) are disfavored. The secured lender may be the principal beneficiary of the proceedings in Chapter 11.")

**V.      The Committee's Challenge Period Should Be Extended and It Should Be Granted Standing.**

The Motion seeks to set a deadline for the Committee to investigate and challenge the Lender's claims of sixty (60) days from the appointment of the Committee, which is October 19, 2019. (Motion p. 22-23; Proposed Interim Order ¶ 36). This is only approximately s0069 weeks after the Debtor's September 5, 2019 deadline to file its Schedules and SOFA. *See* ECF No. 53. The Committee requires at least sixty (60) days after the Debtor files its Schedules and SOFA to bring any challenges to the Lender's claim or other action against the Lender.

Moreover, the Committee should be granted automatic standing to bring such an action in any final order because the Debtor is effectively precluded from bringing such a challenge as a result of its stipulations to the Lender's claims. (Motion p. 22).

**VII.    Indemnification Provisions are Improper**

The Credit Agreement requires the Debtor and other loan parties to indemnify the Lender, as agent, for claims asserted by third parties or borrowers in connection with the DIP Loan. Such a broad indemnity should not be granted under the circumstances, since the Lender is effectively controlling the Debtor, the liquidation process, and this bankruptcy case.

CONCLUSION

Based upon the foregoing, the Committee submits that the Court should deny the Motion unless and until the Committee's concerns are addressed.

Dated: August 26, 2019   **FREEBORN & PETERS LLP**

By: /s/ Shelly A. DeRousse
   One of Its Attorneys

Shelly A. DeRousse
Devon J. Eggert
Elizabeth L. Janczak
311 South Wacker Drive, Suite 3000
Chicago, IL 60606
Tel:   312.360.6000
Fax:   312.360.6520
Email:  sderousse@freeborn.com
   deggert@freeborn.com
   ejanczak@freeborn.com
*Proposed Counsel for Official Committee of Unsecured Creditors of Total Finance Investment Inc. et. al.*

# CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served electronically upon the parties on the attached list either electronically through the Court's CM/ECF system or by first class mail on the 26th day of August, 2019.

By First Class Mail:

A'gaci, L.L.C.
4958 Stout Dr. Suite 113
San Antonio, TX 78219 4400

Jonathan D. Marshall
Choate, Hall & Stewart, LLP
Two International Place
Boston, MA 02110

John F. Ventola
Choate, Hall & Stewart, LLP
Two International Place
Boston, MA 02110

By Electronic Means as listed on the Court's ECF Noticing System:

Carlos M Arce
8626 Tesoro Dr., Suite 816
San Antonio, TX 78712
carce@pbfcm.com

Tab Beall
P.O. Box 2007
Tyler, TX 75710
tbeall@pbfcm.com, tylbkc@pbfcm.com;tbeall@ecf.inforuptcy.com

Eboney Delane Cobb
500 E. Border St., suite 640
Arlington, TX 76010
ecobb@pbfcm.com, rgleason@pbfcm.com

Andrew S Conway
200 East Long Lake Rd., Suite 30
Bloomfield Hills, MI 48304
aconway@taubman.com, mrumpl@taubman.com

John P. Dillman
P.O. Box 3064
Houston, TX 77253
houston_bankruptcy@publicans.com

Ronald Eric Gold
201 East Fifth Street
Cincinnati, OH 45202-4182
rgold@fbtlaw.com, eseverini@fbtlaw.com;awebb@fbtlaw.com

Patrick L. Huffstickler
711 Navarro, Suite 300
San Antonio, TX 78205
phuffstickler@dykema.com, mlongoria@dykema.com;docketsat@dykema.com

Harlan Mitchell Lazarus
240 Madison Avenue, 8th Floor
New York, NY 10016
Hlazarus@lazarusandlazarus.com, harlan.lazarus@gmail.com

Tara LeDay
P.O. Box 1269
Round Rock, TX 78680-1269
tleday@ecf.courtdrive.com;kmorriss@mvbalaw.com;
ccain@mvbalaw.com;vcovington@mvbalaw.com;bankruptcy@mvbalaw.com;j
williams@mvbalaw.com;alocklin@mvbalaw.com

Robert L. LeHane
101 Park Avenue
New York, NY 10178
kdwbankruptcydepartment@kelleydrye.com;
MVicinanza@ecf.inforuptcy.com

Laura J. Monroe
P.O. Box 817
Lubbock, TX 79408-0817
lmbkr@pbfcm.com, krobertson@ecf.inforuptcy.com

Kevin M Newman
125 East Jefferson Street
Syracuse, NY 13202
knewman@barclaydamon.com, kmnbk@barclaydamon.com

Jack O'Boyle
P.O. Box 815369
Dallas, TX 75381
txwb@jackoboyle.com, travis@jackoboyle.com

Diane W. Sanders
P.O. Box 17428
Austin, TX 78760
austin.bankruptcy@publicans.com

Kimberly Marie Johnson Sims
8115 Preston Rd., Suite 600
Dallas, TX 75225
ksims@palterlaw.com, kburkhart@palterlaw.com

Owen M Sonik
1235 North Loop West, Suite 600
Houston, TX 77008
osonik@pbfcm.com, tpope@pbfcm.com;osonik@ecf.inforuptcy.com

Donald P. Stecker
711 Navarro, Suite 300
San Antonio, TX 78205
don.stecker@lgbs.com

Benjamin Joseph Steele
60 East 42nd St., Suite 1440
New York, NY 10165
ecf@primeclerk.com

Eric Terry
3511 Broadway
San Antonio, TX 78209
eric@ericterrylaw.com

Ronald M. Tucker
225 West Washington St.
Indianapolis, IN 46204
rtucker@simon.com,
cmartin@simon.com,bankruptcy@simon.com,antimm@simon.com,jvalentin@simon.com

United States Trustee - SA12
P.O. Box 1539
San Antonio, TX 78295-1539
USTPRegion07.SN.ECF@usdoj.gov

Melissa Emily Valdez
1235 North Loop West, Suite 600
Houston, TX 77008
mvaldez@pbfcm.com,
tpope@pbfcm.com;osonik@pbfcm.com;mvaldez@ecf.courtdrive.com

H. Elizabeth Weller
2777 N. Stemmons Frwy., Suite 1000
Dallas, TX 75207
bethw@publicans.com

Jennifer Francine Wertz
100 Congress Ave., Suite 1100
Austin, TX 78701
jwertz@jw.com, kgradney@jw.com

            /s/ Shelly A. DeRousse
            Shelly A. DeRousse